Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial<br><br>In re:<br><br>Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas | 2012 TSPR 32<br><br>184 DPR ____ |

Número del Caso: ER-2012-01
                 EN-2012-01


Fecha: 21 de febrero de 2012


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re: | ER-2012-1 |
|---|---|
| Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial | |
| In re: | EN-2012-1 |
| Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas | |

Voto de conformidad emitido por el Juez Asociado señor MARTÍNEZ TORRES, la Jueza Asociada señora PABÓN CHARNECO, el Juez Asociado señor KOLTHOFF CARABALLO, el Juez Asociado señor RIVERA GARCÍA, el Juez Asociado señor FELIBERTI CINTRÓN y el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 21 de febrero de 2012.

Una lectura de los votos disidentes emitidos hoy, nos remontan a un famoso diálogo de Platón en el cual Sócrates cuestiona al reconocido sofista Gorgias en cuanto al significado de la *Retórica*. En el intercambio entre ambos, Sócrates argumenta que "[l]a Retórica, al parecer, **es la autora de la persuasión, <u>que hace creer, y no de la que hace saber</u>**, respecto de lo justo y de lo injusto. . . no se propone **instruir** a los tribunales y a las demás asambleas acerca de lo justo y de lo injusto, **sino únicamente atraerlos a la creencia**". Platón,

*Diálogos: Gorgias*, México, Ed. Porrúa, 2007, pág. 206. (Énfasis suplido).

Así, acuñando palabras punzantes y haciendo uso de la hipérbole retórica a la cual nos tiene acostumbrados, la disidencia intenta *inculcar* una creencia en el Pueblo en cuanto al reciente proceder de una mayoría de miembros de este Tribunal. Así, no debe sorprendernos que la disidencia hace un llamado a utilizar el "ideario colectivo"[1] de nuestra sociedad, "el comportamiento durante sesenta años de los actores constitucionales que han vivido su historia"[2] e inclusive *otra* "verdadera Constitución, voluntad viva del Pueblo"[3] para analizar el significado de una disposición constitucional. En el fondo, se nos hace un llamado a abandonar el texto claro de nuestro documento constitucional, así como la intención de los que lo redactaron.

De esta manera, **por primera vez en nuestra historia constitucional** se anuncia en los votos disidentes que la Constitución de Puerto Rico creó dos (2) entes en el seno de este Tribunal Supremo: un Pleno que opera de forma colegiada y un Juez Presidente, independiente, autónomo, con aparentes poderes plenarios y con la capacidad de

---

[1] Voto particular disidente de la Juez Asociada señora Rodríguez Rodríguez, pág. 19.
[2] *Íd.* pág. 8.
[3] Voto particular disidente de la Jueza Asociada señora Fiol Matta, pág. 2.

someter con su discreción a toda la Rama Judicial. Se trata así de la celebración de una **dictadura imperial** sin aparentes límites en su facultad administrativa.

Pero detrás de toda la tinta derramada en la disidencia, escondido entre las líneas y asfixiado por sofismas, subyace un concepto que permea todo asunto en nuestro ordenamiento constitucional: el Poder. Hoy, como en muchas otras ocasiones, debemos analizar de manera sosegada "¿quién tiene poder para qué?" R. Serrano Geyls, *Derecho Constitucional de Puerto Rico y Estados Unidos*, Vol. I, pág. 571. Así, resulta de cardinal importancia indagar a quién le otorgó la Constitución el poder para administrar los tribunales en Puerto Rico.

Frecuentemente, en las situaciones en las cuales un ente argumenta que ostenta un poder constitucional para ejecutar determinada acción *a expensas de otro*, la acción controversial se intenta disfrazar inocentemente con piel de oveja. Sin embargo, los hechos que dieron génesis a las Resoluciones de epígrafe no fueron inocentes: en esta situación histórica, el lobo no vino disfrazado de oveja.[4]

En resumen, procederemos a realizar un análisis sosegado y profundo en cuanto a la Sec. 7 del Art. V de la Constitución de Puerto Rico. Utilizaremos como

---

[4] Véase *Morrison v. Olson*, 487 U.S. 654 (1988) (Op. Disidente de Scalia, J.)

herramientas interpretativas el texto mismo de la disposición constitucional y el historial de la Convención Constituyente. Así, y a manera de resumen, abundaremos en los siguientes aspectos:

- La contratación de un investigador por parte de la Oficina de Administración de los Tribunales (en adelante O.A.T.) a espaldas de los miembros del Tribunal Supremo, lo que obligó a una mayoría de este Tribunal a promulgar las Resoluciones de epígrafe para evitar el carpeteo y la persecución, a la vez que protegimos la independencia de la Rama Judicial.

- Un análisis textual del Art. V, Sec. 7, el cual revela que el documento constitucional le delegó **al Tribunal Supremo** la facultad para reglamentar la administración de los Tribunales.

- Un estudio riguroso del historial de la Convención Constituyente, incluyendo el Informe de la Comisión de la Rama Judicial el cual entendió que el Tribunal Supremo tendría el poder de **"superentender en los tribunales"**.

- Un estudio de las ocasiones en las cuales el Pleno del Tribunal Supremo ha utilizado la

facultad de reglamentar la administración de la Rama Judicial en ocasiones anteriores **sin que nadie** la cuestionara, **contando incluso, con la conformidad de los Jueces que hoy disienten**. Véase, por ejemplo, *In re Reglas Adm. T.P.I.*, 148 D.P.R. 883 (1999); *In re Enmda. Regl. Adm. Pers. R.J.,* 167 D.P.R. 822 (2006); *In re Enmda. Regl. Adm. Pers. R.J. I*, 162 D.P.R. 425 (2004) e *In re Enmda. Art. 19.1 Regl. A.S.P.R.J.,* 158 D.P.R. 191 (2002).

- Un estudio sobre el proceder de este Tribunal en *Regl. Creac. Y Func. Unidad Esp. J. Apel.*, 134 D.P.R. 670 (1993), en el cual el entonces Juez Presidente señor Andreu García, quien era consciente **del límite de su facultad como Juez Presidente**, le solicitó al Pleno del Tribunal Supremo que aprobara unas reglas de administración para la creación y mantenimiento de la unidad especial de Jueces de Apelaciones. Valga señalar que en aquel entonces el hoy Juez Presidente señor Hernández Denton votó conforme con la decisión del Tribunal. Al parecer, tenía una visión distinta a la que tiene ahora de las facultades del Pleno del Tribunal Supremo.

- Y, tal como lo indica la Jueza Asociada señora FIOL MATTA en su voto, ni el Juez Presidente en su carácter individual ni la O.A.T. tienen facultad para ordenar investigaciones contra los demás miembros de este Foro. Así las cosas, la O.A.T. no tenía **autoridad jurídica** para contratar personal para investigar.

Por ende, toda vez que **conocemos** el poder que la Constitución de Puerto Rico delegó al Pleno de este Tribunal Supremo, estamos conformes con las Resoluciones de epígrafe. Sin embargo, ante los ataques esbozados en la disidencia y las advertencias huecas, irresponsables y falsas sobre un derrumbamiento constitucional, nos vemos en la obligación de emitir estas expresiones para vindicar el poder constitucional de esta Curia.

I

Los hechos que dieron génesis a la coyuntura en la cual se encuentra hoy este Tribunal son de conocimiento público. Curiosamente, tanto el Pueblo de Puerto Rico como los Jueces Asociados de este Tribunal, nos enteramos a través del mismo medio noticioso.

Durante el mes de diciembre de 2011, surgieron una serie de denuncias en cuanto a la mal utilización de fondos públicos y otros recursos de la Rama Judicial por parte del Juez Presidente Honorable Federico Hernández

Denton. Ante estas denuncias, tanto la Rama Ejecutiva como la Legislativa comenzaron investigaciones sobre el asunto.[5]

Posteriormente, y para sorpresa de todos los demás miembros que componemos esta Curia, el 26 de enero de 2012 un diario de circulación general, en exclusiva, publicó una noticia en la cual la Directora de la O.A.T. anunció la contratación del licenciado César López Cintrón. Según reportó el diario, la contratación del licenciado López Cintrón respondía a las serias denuncias que se habían hecho en contra del Juez Presidente, por lo cual la investigación encomendada incluiría a todos los jueces de la Rama Judicial y se enfocaría en el uso de recursos y fondos públicos, y alegadas intervenciones indebidas con procedimientos ante los tribunales de instancia. Trascendió a su vez que la investigación incluiría a todos los jueces y juezas de este Tribunal. El Juez Presidente confirmó que tenía conocimiento sobre la contratación del licenciado López Cintrón. Cabe señalar que dicho Contrato se suscribió el 13 de enero de 2012 y no fue hasta el 26 de enero que se anunció públicamente su existencia.

Por su parte, seis (6) jueces de esta Curia emitimos una comunicación pública en la cual denunciamos

---

[5] Véase R. del S. 2509 y R. del S. 2539.

el proceder del Juez Presidente y de la O.A.T. y mostramos preocupación ante la posibilidad que la investigación pudiese interferir con las investigaciones que se llevan a cabo por parte de las otras Ramas constitucionales del Estado.

A su vez, el proceder de la O.A.T. levantó serias interrogantes constitucionales. Ello ante el incuestionable hecho que la Constitución de Puerto Rico, en su Art. V, Sec. 11, le reserva **exclusivamente** a la Asamblea Legislativa la potestad para comenzar procesos de investigación que pudieran culminar en la residencia de miembros de este Foro.

Ante toda esta situación, se convocó a una reunión extraordinaria del Pleno de este Tribunal para el miércoles, 1 de febrero de 2012 a tenor con la Regla 6(b) del Reglamento del Tribunal Supremo de Puerto Rico, 2011 T.S.P.R. 174, a la cual asistieron siete (7) de los nueve (9) miembros de esta Curia.[6] En esta reunión, se discutieron las dos (2) Resoluciones de epígrafe. Mediante la primera, en virtud del **poder expreso** contenido en la Sec. 7 del Art. V de la Constitución de Puerto Rico, aprobamos las *Reglas para los Procedimientos*

---

[6] A la referida reunión extraordinaria del Pleno asistieron la Jueza Asociada señora Fiol Matta, el Juez Asociado señor Martínez Torres, la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Kolthoff Caraballo, el Juez Asociado señor Rivera García, el Juez Asociado señor Feliberti Cintrón y el Juez Asociado señor Estrella Martínez.

*de Investigaciones Especiales Independientes de la Rama Judicial.* A tenor con estas Reglas, promulgamos una segunda Resolución en la cual designamos una Comisión compuesta por ciudadanos para que investiguen todo el procedimiento mediante el cual se otorgó el contrato al licenciado López Cintrón, así como el uso de fondos y recursos públicos por parte de la OAT y su Directora.

En *Noriega v. Gobernador*, 122 D.P.R. 650, 654 (1988), esbozamos que "[n]o hay nada más preciado para un 'hombre de bien' que su dignidad y reputación en la comunidad". Eso se expresó en el contexto de las llamadas carpetas que por décadas la Policía de Puerto Rico recopiló sobre ciudadanos por el mero hecho de sus ideologías.

Creemos que esas palabras tienen gran peso en el Puerto Rico de hoy. Iniciar una investigación ilegal contra los Jueces del Tribunal Supremo por el hecho de que existan alegaciones públicas contra el Juez Presidente es un acto claro de intimidación institucional de parte de la O.A.T. que claramente lacera esta institución. Con la aprobación de las Resoluciones en controversia, este Foro protegió firmemente su integridad como organismo rector de la Rama Judicial, por mandato constitucional.

A la vez, creamos una Comisión verdaderamente independiente, para que investigue –no a los jueces de

este Tribunal- sino cualquier alegación de uso indebido de fondos y recursos de la Rama Judicial. Con eso, evitamos el carpeteo y la persecución, y protegimos la independencia de esta Rama, sin tratar de interferir con las investigaciones que ejercen las otras Ramas en el ejercicio de sus facultades constitucionales. Los fondos y los recursos de esta Rama son para el servicio del Pueblo y no para el carpeteo o la defensa personal de alguno de los integrantes de este Tribunal.

Gran parte de los votos disidentes que hoy se emiten se centran en argumentar que el proceder de una mayoría de miembros de este Tribunal fue *ultra vires*. Como mencionamos anteriormente, amparándose en ejercicios de retórica, aluviones de sofismas y lecturas acomodaticias de la Convención Constituyente, la disidencia intenta nublar la tinta de la primera oración de la Sec. 7 del Art. V de la Constitución de Puerto Rico, en un ejercicio inútil de negar su significado.

En aras de desenmascarar este intento de **hacer creer** que este Tribunal actuó más allá de sus contornos constitucionales, nos parece obligatorio realizar un análisis de la referida disposición constitucional.

II

A.

La disposición constitucional al amparo de la cual se aprobaron las Resoluciones del 1 de febrero de 2012 dispone que:

> **El Tribunal Supremo adoptará reglas para la administración de los tribunales** las que estarán sujetas a las leyes relativas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno. **El Juez Presidente dirigirá la administración de los tribunales** y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado. Art. V, Sec. 7, Const. E.L.A. Tomo 1, ed. 2008, pág. 416. (Énfasis suplido).

Una lectura inicial de esta disposición revela claramente la delegación de poder a dos (2) entes. La primera oración le delega el poder **al Tribunal Supremo** para adoptar las reglas para la **administración** de los tribunales. Por su parte, la segunda oración le delega dos (2) poderes a la figura del Juez Presidente: *dirigir* la **administración** de los tribunales y *nombrar* a un director administrativo el cual *continuará* en el cargo a su discreción.

Resulta evidente que la Sec. 7 del Art. V de la Constitución de Puerto Rico facultó al Tribunal Supremo –como ente colegiado- a formular las reglas que entendiese necesarias para administrar eficientemente los tribunales de Puerto Rico. Es decir, constitucionalmente es el Pleno del Tribunal Supremo el que formula, de entenderlo

necesario, el cuerpo de reglas administrativas de toda la Rama Judicial.

Por su parte, se le delegó al Juez Presidente el poder de **ejecutar** las reglas adoptadas por el Pleno del Tribunal Supremo en cuanto a la administración de los tribunales. Para esa encomienda, el Juez Presidente cuenta con la herramienta de nombrar a un Director Administrativo que servirá a su discreción.

Para convalidar esta interpretación conviene estudiar el proceso mediante el cual se aprobó esta disposición constitucional. Ello en aras de disipar las nubes retóricas que desesperadamente conjura la disidencia sobre esta cláusula constitucional.

Toda vez que nuestro documento constitucional es de reciente adopción, la labor de investigar su historial para interpretar sus diversas disposiciones "es relativamente fácil, ya que conservamos las memorias y los debates de la Asamblea Constituyente". L. Muñiz Argüelles & M. Fraticelli Torres, 4ta ed., *La Investigación Jurídica*, Bogotá, Ed. Temis, 2006, pág. 322. Así, la obra que por excelencia se utiliza para esta encomienda es el *Diario de Sesiones de la Convención Constituyente*. "Esta obra. . .recoge los debates de los integrantes de la convención durante el proceso de

discusión y aprobación del texto final sometido al Pueblo de Puerto Rico y al Congreso de los Estados Unidos". *Íd.*

La utilidad de este método de interpretación ha sido reconocida por diversos miembros de este Tribunal, inclusive por los tres (3) jueces que hoy suscriben votos disidentes. Véase por ejemplo *Córdova y otros v. Cámara de Representantes*, 171 D.P.R. 789, 805-807 (2007) (Op. de HERNÁNDEZ DENTON, J.P.); *García v. Aljoma*, 162 D.P.R. 572, 588-591 (2004) (Op. de HERNÁNDEZ DENTON, J.); *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 484-485 (1989) (Op. de HERNÁNDEZ DENTON, J.); *In re Solicitud Aumentar Núm. Jueces TS*, 180 D.P.R. 54, 105 escs. 2 y 5 (2010)(Op. Disidente de FIOL MATTA, J.); *Herrero y otros v. E.L.A.,* 179 D.P.R. 277, 292-294 (2010) (Op. de RODRÍGUEZ RODRÍGUEZ, J.) y *Santana v. Gobernadora*, 165 D.P.R. 28, 46-51 (2005) (Op. de RODRÍGUEZ RODRÍGUEZ, J.).

B.

La Comisión de la Rama Judicial de la Convención Constituyente estuvo dirigida por el distinguido delegado Ernesto Ramos Antonini. En su Informe a la Convención, la Comisión hizo un análisis detallado del significado de la Sec. 7 del Art. V, específicamente en cuanto al término "administrar" ahí contenido. Informó la Comisión que:

> **Se recomienda que se traspase *al Tribunal Supremo* la facultad de administrar los tribunales de justicia de Puerto Rico,** facultad que se viene ejerciendo por el Procurador General. La Comisión

entiende que las disposiciones de esta sección contienen garantías básicas de la independencia del poder judicial. La Comisión hace constar que el término "administración", usado en esta sección, comprende, sin que se entiendan excluidas otras similares o análogas, las siguientes funciones:

(1) Compilar estadísticas y preparar informes.

(2) Alquilar locales, comprar y proveer equipo y servicios.

(3) Conceder licencias y vacaciones a funcionarios y empleados.

(4) **Investigar quejas y formular cargos, ante la autoridad correspondiente, contra funcionarios y empleados.**

(5) Autorizar desembolsos dispuestos por ley y revisar las cuentas de todos los tribunales.

(6) Asignar y trasladar jueces.

(7) Aprobar reglamentos para las distintas cortes.

**(8) Superentender en los tribunales.**

4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, pág. 2613 (1952). (Énfasis suplido).[7]

De particular importancia en el Informe es el inciso ocho (8) de las funciones que la Comisión de la Rama Judicial entendía serían encomendadas al Tribunal Supremo. **Según la Real Academia Española, la palabra _superentender_ significa "_inspeccionar_, _vigilar_, _gobernar_".**[8] No cabe duda de la magnitud del poder que la Convención Constituyente delegó **al Tribunal Supremo** en cuanto a la administración

---

[7] Contrario al análisis del voto disidente de la Jueza Asociada señora Fiol Matta, resulta evidente que la Comisión de la Rama Judicial **no hizo distinción alguna** en el significado de la palabra "administrar" en las dos (2) oraciones de la Sec. 7.

[8] Diccionario de la Real Academia Española, http://www.rae.es, última visita 13 de febrero de 2012.

de los tribunales en Puerto Rico. Curiosamente, en el voto disidente del Juez Presidente señor Hernández Denton, al citar este Informe se omite el párrafo introductorio en el cual queda clara la delegación del poder de administración de los tribunales al Tribunal Supremo. Véase Voto disidente HERNÁNDEZ DENTON, pág. 19.

Por otro lado, se puede apreciar del Informe que previo a la adopción de la Constitución en 1952 la administración de los Tribunales estaba encomendada al Procurador General, figura que estaba supeditada a la Rama Ejecutiva. Ello provocó críticas durante la Convención Constituyente y existía "virtual unanimidad de criterio" en que el sistema debía ser reformado. Véase J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Universidad de Puerto Rico, T. III, pág. 98.[9]

Así, tomando como modelo las constituciones de los estados de California, Connecticut, Kentucky, Maryland, Missouri, West Virginia y particularmente la de New Jersey, así como las recomendaciones de la *American Bar Association* y varios escritos de Roscoe Pound y Arthur Vanderbilt, la Comisión de la Rama Judicial recomendó el

---

[9] La Convención recibió diversas propuestas en cuanto a cómo enmendar el sistema de administración de los tribunales. A tales efectos, la Escuela de Administración Pública de la Universidad de Puerto Rico recomendó la creación de una Comisión Judicial que estuviese a cargo del proceder administrativo de los tribunales. Escuela de Administración Pública de la U.P.R., *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. Universidad de Puerto Rico, ed. facsimilar de la primera edición publicada en 1954, 2005, pág. 472.

texto de la Sec. 7 del Art. V, en la cual claramente se le transfiere el poder de administración de los tribunales al Tribunal Supremo. **La dirección de esa administración, es decir, la ejecución de las políticas administrativas, fue delegada a la figura del Juez Presidente.**

Es durante un debate sobre la propuesta sección constitucional en el cual podemos apreciar de manera clara la intención de la Convención Constituyente de delegarle el poder al Pleno del Tribunal Supremo de adoptar las reglas de administración de los tribunales. Durante una sesión de debate, el delegado Valentín Vizcarrondo propuso una enmienda al texto de la Sec. 7 para que, en vez de servir a discreción del Juez Presidente, el Director Administrativo de los Tribunales estuviese sujeto a un Reglamento que sería promulgado por el Juez Presidente. Conviene citar *in extenso* del debate en cuanto a la enmienda para sustraer la intención de los constituyentes:

> **SR. VALENTÍN VIZCARRONDO:** Para una enmienda. En la página 2, línea 23, tachar "a discreción" y en su lugar poner; "de acuerdo con el reglamento preparado por dicho magistrado". Leería así: "El Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo quien desempeñará su cargo de acuerdo con el reglamento preparado por dicho magistrado". Sencillamente yo creo que la persona que el Juez Presidente nombre tiene que ser una persona idónea, deber ser un abogado, y me parece que [el] un abogado actuar de acuerdo a la discreción de otra persona no le da personalidad, ni siquiera le permite usar su criterio. Y, por esa razón yo creo que no debe ser la palabra "discreción" sino sencillamente cambiar esa

palabra por "reglamentación" en alguna forma que esta persona que va a desempeñar ese cargo se sienta con dignidad en el cargo. No es un lacayo, es un abogado que va a interpretar leyes, que va a administrar tribunales de Puerto Rico. Me parece a mí que debe dársele dignidad a ese cargo y restarle eso de que va a estar siempre subeditado [sic] a lo que quiera el abogado presidente del Tribunal Supremo.

**Sr. FERNÁNDEZ MÉNDEZ:** Una pregunta al Delegado.

**Sr. VALENTÍN VIZCARRONDO:** Sí.

**Srta. PRESIDENTA:** El delegado señor Fernández Méndez.

**Sr. FERNÁNDEZ MÉNDEZ:** Una pregunta para aclarar. ¿Lo que ha querido decir es reglamento preparado por dicho magistrado, por el tribunal o por el magistrado?

**Sr. VALENTÍN VIZCARRONDO:** El Juez Presidente.

**Sr. FERNÁNDEZ MÉNDEZ:** ¿Por el magistrado o por el tribunal?

**Sr. VALENTÍN VIZCARRONDO:** No. Aquí el que nombra y el que va a dirigir es el Juez Presidente.

**Sr. FERNÁNDEZ MÉNDEZ:** ¿Que él haga su propio reglamento?

**Sr. VALENTÍN VIZCARRONDO:** Sí. Es distinto.

. . .

**Srta. PRESIDENTA:** El delegado Ramos.

**Sr. RAMOS ANTONINI:** Señorita Presidenta: Digo, lo que yo veo es que nuevamente se tiende a darle énfasis a la personalidad del administrador en posible detrimento de la personalidad del Juez Presidente, a quien se le dice "usted será el responsable de la administración de justicia en Puerto Rico", en cuanto se aprobara una disposición como ésa, si tuviere el alcance que señala el compañero.

*Me permito llamar la atención además sobre dos puntos: Primero, que la oración primera de ese propio artículo dice que es el Tribunal Supremo quien adoptará reglas para la administración de los tribunales. El tribunal, no el magistrado, Juez Presidente.*

. . .

**Sr. VALENTÍN VIZCARRONDO:** Compañero Ramos Antonini, yo no decía el tribunal, sino el Juez Presidente.

**Sr. RAMOS ANTONINI:** **Por eso, lo cual lleva[ría] a señalar una** *contradicción* **en el sentido de que por falla ese propio artículo le da la facultad de reglas al tribunal en pleno y entonces en**

**cuanto al administrador se la va a dar al Juez Presidente.** 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, págs. 1668-1670 (1952).

En este intercambio queda clara la interpretación que el delegado Ramos Antonini le da a la Sec. 7. Si se hubiera aprobado la enmienda del delegado Valentín Vizcarrondo, la sección hubiese contenido una contradicción insalvable, al reconocerle el poder de reglamentar en cuanto a la administración de los tribunales al Pleno del Tribunal Supremo, pero en cuanto al funcionario que sirve de herramienta en la administración, su reglamentación hubiese estado sujeta a la voluntad del Juez Presidente. Afortunadamente, esa enmienda contradictoria fue derrotada, conservando la lógica de la doble delegación contenida en la Sec. 7.

Sorprendentemente, al hacer referencia a este debate en su Voto disidente, el Juez Presidente señor Hernández Denton señala que la enmienda derrotada solo proveía que el Director Administrativo de los tribunales estuviera sujeto a un "reglamento". **No obstante, de manera acomodaticia, omite mencionar que la intención del delegado Valentín Vizcarrondo era que el Director Administrativo estuviese *sujeto a un reglamento promulgado por el Juez Presidente*.** La intención del delegado Ramos Antonini era dejar claro que el poder de reglamentar le pertenecería exclusivamente al Pleno del Tribunal Supremo

**y que el Juez Presidente no tendría facultadas absolutas sobre la administración de los tribunales**. Es ahí donde queda rechazada la interpretación de los tres votos disidentes en cuanto a la dictadura imperial que aparentemente entienden ellos queda constituida con la segunda oración de la Sec. 7.

Esta interpretación de la Sec. 7 se sustenta además con un estudio de las ponencias que se presentaron ante la Comisión de la Rama Judicial de la Convención Constituyente. El entonces Juez Presidente señor Todd, Jr. manifestó lo siguiente:

> **SR. PRESIDENTE:** Señor Presidente del Tribunal Supremo: ¿No quiere decir lo manifestado por usted que no pueda ser un miembro del Tribunal Supremo el encargado de la administración?
> **SR. TODD, JR.:**. . . Hay unas sugestiones en cuanto a que la administración de las cortes se ponga o en manos del Juez Presidente, o en manos del Tribunal Supremo o en manos de un consejo judicial. El Tribunal Supremo ya se pronunció con respecto a este particular, en el sentido de que fuera eso a la rama judicial, integrada por el Tribunal Supremo. Y decimos que no debe ser en el Tribunal Supremo conjuntamente con un consejo judicial, porque en la práctica creo que no funcionaría bien. Si se quiere dársele a un consejo judicial, que se le dé; pero hay un proyecto radicado que dice que el administrador de las cortes será el Juez Presidente y que éste nombrará un administrador ejecutivo, y entonces el consejo judicial hará las recomendaciones para la administración de las cortes, lo que a mi juicio pone al Juez Presidente en una situación muy difícil porque quien enese [sic] caso hace toda la reglamentación y dispone todo lo que se haya de hacer es ese consejo judicial. Y eso, desde luego, es lo que nosotros vemos como peligroso. Por eso creemos que si es el Tribunal Supremo, debe ser el Tribunal Supremo el que haga

toda la labor. *Ponencia del Juez Presidente Roberto H. Todd, Jr. ante la Comisión de la Rama Judicial de la Convención Constituyente*, 1951.

La única forma de entender la Sec. 7 es reconociendo la intención de esa doble delegación de poder. Como muy bien expuso la Sección de Administración Judicial de la *American Bar Association*:

> Experience in both business and government organizations has established conclusively that effective administration requires the fixing of authority and responsibility. There should be no room for doubt in anyone's mind -be he judge, lawyer, litigant, legislator or layman- who has the responsibility for making a court system work well, both at the state and local level. **This means that responsibility must be fixed both for establishing court administrative policies and for the execution of those policies. . .**
>
> While general policy may appropriately be *formulated* by a group, responsibility for *executing* that policy must be vested in an individual. A.B.A. Section on Judicial Administration en J. Trías Monge, *El Sistema Judicial de Puerto Rico*, Río Piedras, Ed. U.P.R., 1978, pág. 222.

Así, es evidente que la Sec. 7 enmarcó claramente las facultades que ostentaría el Tribunal Supremo para llevar a cabo su labor constitucional de administrar los tribunales: el Tribunal Supremo en Pleno **formularía** las guías a través de reglamentación, y el Juez Presidente las **ejecutaría**.

En el voto disidente de la Jueza Asociada señora Fiol Matta se dice que esta interpretación del texto de la Sec. 7, particularmente en cuanto a la palabra

"administración", es "en extremo textualista". Voto Disidente FIOL MATTA, J., pág. 5. Dejando a un lado lo confuso que es tildar despectivamente al textualismo como herramienta de interpretación constitucional, el significado que el voto disidente provee de la Sec. 7 choca con el historial de la Convención Constituyente que ya hemos analizado. Resulta verdaderamente sorprendente la interpretación de que en una misma sección con tan solo dos (2) oraciones, la intención de los constituyentes fue que la palabra "administración" tendría dos (2) significados, como aparenta hacer creer el voto disidente. No se nos provee respuesta en el disenso a cuál es la "administración" que puede reglamentar el Tribunal Supremo, y cuál es la "administración" que dirige el Juez Presidente, **aun cuando el propio informe de la Comisión de la Rama Judicial a la Convención Constituyente no hizo distinción entre ambas palabras**. La respuesta posiblemente se encuentra en la elusiva "verdadera Constitución" a la cual se hace referencia en ese voto.

Nótese que ese no es el entendido en cuanto al significado de "administración" al cual ha llegado el Tribunal Supremo de New Jersey, cuya Constitución "fue el modelo utilizado en la redacción de la primera oración de la sección [7]". J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., T. III, pág. 98.

Así, al analizar las referidas disposiciones de su Constitución estatal, que son análogas a la Sec. 7 nuestra, el Tribunal Supremo de New Jersey ha expresado vehementemente que "[t]hose two provisions give the Chief Justice ___and___ the Supreme Court sweeping **authority to govern** ___their___ **own house**". *In re P.L. 2001, Chapter 362*, 186 N.J. 368, 379, 895 A.2d 1128, 1135 (2006) (Énfasis suplido).

Vemos entonces cómo el más alto Tribunal de ese estado, a diferencia del análisis acomodaticio de la disidencia, no titubea al afirmar que **tanto el Juez Presidente como el Pleno de su Tribunal** comparten el poder de administrar los tribunales: un ente establece la política de la Rama Judicial y otro la ejecuta.

Fue precisamente eso lo que ocurrió con la aprobación de las dos (2) Resoluciones de epígrafe. Ante el acto *ultra vires* efectuado por el Juez Presidente y la Directora de la O.A.T. al contratar un ente externo para investigar la conducta de miembros de esta Curia, advertimos que el problema surgía de la falta de parámetros reglamentarios para que la Rama Judicial encausara una investigación de la administración en la propia Rama. Por eso, utilizamos el poder expresamente delegado en la primera oración de la Sec. 7 para formular un cuerpo reglamentario para administrar las investigaciones que lleve a cabo la Rama Judicial sobre

sus fondos, su personal y sus funcionarios. **No se trata de un acto de usurpación como pretende *hacer creer* la disidencia, sino de la utilización de un poder constitucional expreso.**

No era posible mantenernos silentes y con los brazos cruzados ante el proceder altamente cuestionable del Juez Presidente y la Directora de la O.A.T. El contrato otorgado al licenciado López Cintrón laceró la imagen de toda la Rama Judicial, **al promover un claro conflicto de intereses a nivel institucional**: no es éticamente correcto contratar a una persona, sujeta al pago de fondos públicos, para que "investigue" denuncias en contra de las mismas personas que lo contrataron y quienes, a su vez, controlan la investigación e instruyen al investigador que simultáneamente le responde a estos. Se trataba a todas luces de una "cacería de brujas" o "expedición de pesca" contra todos los jueces y demás funcionarios de la Rama Judicial sin justificación alguna para ello con el solo propósito ilegítimo de desviar la atención de las serias imputaciones que pesan contra el Juez Presidente y la administración de los tribunales, cuya Directora Administradora es funcionaria de confianza del Juez Presidente por mandato constitucional.

Además, preocupaba la posibilidad de que se interfiriera con las investigaciones legítimas que se

llevan a cabo por parte de las otras Ramas constitucionales y se prestara para intimidar a los testigos potenciales, quienes a su vez son empleados o funcionarios de la Rama Judicial. La secretividad impenetrable con la cual se llevó a cabo la contratación también la rodeó de un aura altamente sospechosa. Ante ello, estábamos en la obligación de actuar conforme al **poder expreso** contenido en la Sec. 7 del Art. V de la Constitución.

La utilización de este poder no es algo novel en nuestro ordenamiento como aparenta sostener la disidencia. Evidencia de ello son las innumerables ocasiones en que el Pleno de este Tribunal ejerce su poder de reglamentación para atender diversos tipos de asuntos administrativos. Véase, por ejemplo, *In re Reglas Adm. T.P.I.*, 148 D.P.R. 883 (1999); *In re Enmda. Regl. Adm. Pers. R.J.,* 167 D.P.R. 822 (2006); *In re Enmda. Regl. Adm. Pers. R.J. I*, 162 D.P.R. 425 (2004); *In re Enmda. Art. 19.1 Regl. A.S.P.R.J.,* 158 D.P.R. 191 (2002). De adoptarse la interpretación de la Sec. 7 formulada en los votos disidentes, estaríamos *de facto* anunciando que fueron ejercicios en futilidad todas las veces que este Tribunal reglamentó en cuanto a la administración de los tribunales, ya que el Juez Presidente ostentaría el poder absoluto de administrar la Rama en su carácter individual.

Nuestra interpretación de la Sec. 7 no significa, como intenta *hacer creer* la disidencia, que la administración de los tribunales en Puerto Rico debe llevarse a cabo de forma colegiada. Al contrario, se reconoce el esquema dinámico de la doble delegación de poder contenida en la Sec. 7. El Pleno del Tribunal Supremo tiene facultad constitucional para reglamentar la administración de los tribunales, y el Juez Presidente tiene la facultad de ejecutar las políticas contenidas en esos reglamentos. **De existir un reglamento administrativo aprobado por el Pleno del Tribunal Supremo**, el Juez Presidente no puede refugiarse en la segunda oración de la Sec. 7 para argumentar que no está sujeto a este porque ostenta "facultad ejecutiva plena"[10] en su rol de director de la administración de los tribunales. Ergo, es un absurdo decir que si el Pleno del Tribunal Supremo reglamenta un aspecto de la administración de los tribunales se usurpan los poderes del Juez Presidente, ya que la Sec. 7 expresamente **le delegó el poder al Pleno para reglamentar la misma administración que el Juez Presidente dirige.** Ese es el mecanismo de administración dinámico que nuestra Constitución creó. No estamos usurpando facultad alguna del Juez Presidente, sino

---

[10] Véase Voto disidente de HERNÁNDEZ DENTON, pág. 15.

protegiendo el poder expreso que la Sec. 7 le provee al Pleno de este Tribunal.

Por eso es verdaderamente asombrosa la manera en la cual los votos disidentes conciben el significado de la primera oración de la Sec. 7. Tal parece que la existencia de esta los tomó por sorpresa, lo cual podría explicar la razón por la cual aducen que, junto con el texto, debería utilizarse un inexplicado "ideario colectivo", "el comportamiento durante sesenta años de los actores constitucionales que han vivido su historia" o inclusive otra "verdadera Constitución" para fijar su significado. Se denota un intento desesperado por derramar suficiente tinta como para erradicar esa primera oración de la Sec. 7 del Art. V de la de la Constitución de Puerto Rico.

Presumiendo que parte de ese comportamiento de "actores constitucionales" se encuentra en los tomos de las *Decisiones de Puerto Rico*, rescatemos del olvido un evento en el cual el Pleno de este Tribunal, contando con la anuencia del hoy Juez Presidente, reglamentó la administración de los tribunales de manera novel y controversial.

### C.

Mediante la Ley 21-1992, 4 L.P.R.A. sec. 1 (derogada), se creó en Puerto Rico por primera vez un tribunal de apelaciones intermedio. Un (1) año después,

una nueva administración entendió que la manera en que fue aprobado ese estatuto no era la más apropiada, y abolió mediante legislación el Tribunal de Apelaciones que había sido creado un tiempo antes.

Los jueces y juezas que habían sido nombrados a ese tribunal quedaron entonces fuera de sus puestos. El Juez Presidente en aquel entonces, José Andréu García, recomendó al Pleno del Tribunal Supremo que se aprobara un cuerpo reglamentario para crear una unidad especial, adscrita a la oficina del Juez Presidente, para que los jueces del abolido Tribunal de Apelaciones ejercieran las funciones judiciales que les encomendara el Juez Presidente. El Pleno del Tribunal Supremo de aquel entonces accedió a la solicitud del Juez Presidente y promulgó las Reglas para la Creación y Mantenimiento de la Unidad Especial de Jueces de Apelaciones. *Regl. Creac. Y Func. Unidad Esp. J. Apel.*, 134 D.P.R. 670 (1993).

Para fundamentar ese proceder administrativo, los jueces que suscribieron la creación de las reglas argumentaron que su aprobación era "un ejercicio válido de nuestras facultades constitucionales, tanto expresas como inherentes. . .Adoptamos estas reglas como parte de nuestra facultad constitucional de regir nuestro proceso decisorio, estructuración y procedimiento interno, y en **virtud de las facultades que nos confiere todo el Art. V**

**de nuestra Constitución**". *Íd.* págs. 676-677 (Voto de conformidad de Alonso Alonso, J., al cual se unió en su totalidad HERNÁNDEZ DENTON, J.) (Énfasis suplido).

Sustentaron además los miembros de esta Curia que:

> Sería un contrasentido jurídico que interpretáramos restrictivamente nuestras facultades constitucionales cuando precisamente se trata de proveerle *más eficiencia* al Poder Judicial, según fue la intención expresa de la Convención Constituyente. **Este Tribunal no se puede autolimitar cuando de mejorar la calidad de la administración de la justicia se trata.** *Íd.* pág. 679. (Énfasis suplido).

Ante la aprobación de las Reglas, tres (3) jueces suscribieron votos disidentes. El Juez Asociado señor Rebollo López no cuestionó la autoridad de la mayoría para aprobar reglas, pero argumentó que la creación de la Unidad Especial de Jueces de Apelaciones era *ultra vires* ya que "*se trata[ba], a todos los fines prácticos, de la creación de un tribunal o foro judicial de facto por parte de este Tribunal*". *Íd.* pág. 688. El Juez Asociado señor Negrón García, aunque reconoció la facultad constitucional del Tribunal Supremo para adoptar reglas administrativas, disintió vehemente del proceder de la mayoría por considerarlo inconstitucional al crear un tribunal, poder que solo ostenta constitucionalmente la Rama Legislativa. *Íd.* págs. 702-716. Ausente de su disenso, sin embargo, estuvo la amenaza de un derrocamiento constitucional y el

llamado a "la lucha" como el contenido en uno de los votos disidentes que hoy se emiten.

Este recuento histórico es altamente revelador. Sin entrar a dilucidar los méritos constitucionales del reglamento adoptado en 1993, podemos colegir dos (2) hechos interesantes. Primero, el Juez Presidente señor Andréu García solicitó al Pleno del Tribunal que adoptara las Reglas para la Unidad de Jueces Apelativos, la cual estaría adscrita a su oficina. No obstante, si la disidencia tuviese razón en su interpretación de la Sec. 7 del Art. V de la Constitución, ¿no tenía el Juez Presidente facultad absoluta para crear esa Unidad Especial y reglamentar su operación? ¿Por qué solicitar entonces a los demás miembros del Tribunal Supremo que adoptaran las reglas? Es obvio que el Juez Presidente señor Andréu García reconocía la doble delegación de poder de la Sec. 7, y que la facultad de administrar la Rama Judicial en Puerto Rico es del Juez Presidente *y* el Pleno del Tribunal Supremo, y no exclusivamente de quien ocupe la silla presidencial.

Segundo, no podemos más que presumir que este evento es una de esas instancias que forma parte del "ideario colectivo" al que se hace referencia en la disidencia. Presumimos también que es parte del "comportamiento durante sesenta años de los actores constitucionales que

han vivido" la historia constitucional de Puerto Rico. Lo contrario sería adoptar una versión selectiva de la historia.

III

Los votos disidentes también dirigen infructuosamente sus ataques a la orden que emitimos en la segunda Resolución de epígrafe, *In re Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas,* 2012 T.S.P.R. 22*.* En específico, la disidencia alega que la orden dirigida a la Directora de los Tribunales para que dejara sin efecto el contrato otorgado al licenciado César López Cintrón fue *ultra vires* ya que este Tribunal carece de poder para emitir un desacato a través de su función reglamentaria. La disidencia está confundida en cuanto a la naturaleza de las resoluciones de epígrafe.

Es harto sabido que "los tribunales tienen poder inherente para condenar por desacato con el fin de hacer cumplir sus sentencias, órdenes y autos y conservar el orden en los procedimientos judiciales". *Pueblo v. Pérez Díaz*, 99 D.P.R. 788, 801 (1971). Véase además *E.L.A. v. Asoc. de Auditores*, 147 D.P.R. 669 (1999) (*Per Curiam*).

En *In re Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas,* se estableció que:

**A tenor con los poderes que nos confiere las Reglas 7 y 8 de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial,** y en protección de la jurisdicción de la Comisión y la integridad de su encomienda, se le ordena a la Directora Administrativa de los Tribunales, so pena de desacato, que rescinda de manera inmediata el Contrato otorgado por la OAT al Lcdo. César López Cintrón y cualquier otra contratación relacionada a la investigación. 2012 T.S.P.R. 22, pág. 2.

La disidencia sostiene que este Tribunal carecía de poder para ordenar la rescisión del contrato del licenciado López Cintrón, so pena de desacato, porque ese poder inherente no está disponible en ámbito de reglamentación administrativa de este Foro.

Lo que obvia la disidencia es que la Resolución *In re Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas, supra,* no fue aprobada en virtud de nuestro poder para reglamentar la administración de los tribunales que provee la Sec. 7 del Art. V de la Constitución. **Las medidas contenidas en esa Resolución se hicieron al amparo del Reglamento que establecimos en *In re Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial,* 2012 T.S.P.R. 21.**

En específico, la Regla 7 de ese cuerpo reglamentario establece, en lo pertinente, que "el Tribunal podrá emitir, por iniciativa propia o a petición de la Comisión,

**todas las órdenes que sean necesarias para proteger la jurisdicción de la Comisión y la integridad de su encomienda"**. *In re Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial,* supra, pág. 6. (Énfasis suplido). Por ende, la orden de rescindir so pena de desacato no se dio en nuestra función reglamentaria, sino en nuestra función judicial ya que buscaba proteger la jurisdicción de la Comisión Especial para que pudiese llevar a cabo su encomienda. **Ello al amparo del poder expreso otorgado en la Regla 7 de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial**. Así las cosas, este Tribunal podía en derecho hacer uso de su poder inherente para emitir una orden so pena de desacato, ya que la orden a la Directora Administrativa de los Tribunales se dio dentro del ámbito de su función judicial.

Por otro lado, en su voto disidente el Juez Presidente aduce que la orden de rescindir el contrato so pena de desacato también es *ultra vires* por declarar una "pena" en contra de la Directora Administrativa de los Tribunales de manera "retroactiva".[11] Nuevamente, la disidencia confunde el ámbito de las Resoluciones de epígrafe.

---

[11] Voto disidente de HERNÁNDEZ DENTON, pág. 33.

En ninguna parte de *In re Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas, supra*, se condena retroactivamente a la Directora Administrativa de los Tribunales, ni se rescinde el contrato de manera retroactiva. Al contrario, se le apercibió a la Directora que debía rescindir el contrato otorgado al licenciado López Cintrón; no se le condenó por desacato por haber otorgado ese contrato. Tampoco se declaró nulo el contrato de manera retroactiva, sino que se ordenó su rescisión ya que no cumplía con la Regla 8 de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, la cual establece que "[l]a vigencia de estas reglas será inmediata y aplicará a todo proceso vigente, comenzado o por comenzar al momento de la aprobación de las mismas". Resulta evidente que nunca ordenamos la rescisión del contrato **de manera retroactiva.**

IV

Curiosamente ausente de gran parte de los votos disidentes emitidos hoy es el recuento de la escena dantesca para la cual lamentablemente este Tribunal sirvió de escenario. Y es que la situación que obligó a una mayoría de miembros de este Tribunal a utilizar el poder constitucional de la Sec. 7 se desarrolló en la oscuridad

de la noche y a espaldas de todos los jueces y juezas que componen este Foro.

Es por ello que consideramos nuestro deber plasmar para el récord público las actuaciones *ultra vires* del Juez Presidente Federico Hernández Denton y de la Directora de la O.A.T., Sonia I. Vélez Colón, las cuales causaron las Resoluciones de epígrafe. **Resulta realmente sorprendente que las Juezas Asociadas y los Jueces Asociados de este Tribunal se enteren de una investigación en la cual se gastarían miles de dólares de fondos públicos[12] al leer en la mañana un diario de circulación general, particularmente en momentos en los cuales algunos empleados de la Rama Judicial reclaman un alza salarial y se aduce la falta de fondos como razón para no concederlo.**

Pero más que sorprendentes, las actuaciones del Juez Presidente y la Directora de la O.A.T. transgredieron las delicadas fronteras constitucionales de nuestro ordenamiento. Nos conforta que la Jueza Asociada señora Fiol Matta, a diferencia de la otra juez disidente, reconozca que la actuación por parte de la O.A.T. es claramente *ultra vires* ya que esa Oficina no tiene poder para llevar a cabo investigaciones disciplinarias contra los jueces y juezas de este Tribunal. Véase Voto

---

[12] El contrato del licenciado López Cintrón establecía que se le pagarían doscientos dólares ($200) la hora, hasta un máximo de cien mil dólares ($100,000).

Particular Disidente de FIOL MATTA, J. esc. 26, págs. 18-19. A su vez, es refrescante saber que la Jueza Asociada señora Fiol Matta también reconoce que el poder para velar por el buen uso de los recursos de la Rama Judicial recae tanto en el Pleno de este Tribunal como en la figura del Juez Presidente. *Íd.* pág. 9.

Bajo ninguna teoría de interpretación constitucional ingeniosa puede sostenerse que el Juez Presidente, en su rol de dirigir la administración de los tribunales en Puerto Rico, puede delegar un poder que no ostenta. **El Juez Presidente, en su carácter individual, no está facultado para ordenar investigaciones contra los demás miembros de este Tribunal.** Por ende, la artimaña a la cual se sometió a este Tribunal por espacio de dos (2) semanas es constitucionalmente inconcebible y seguramente causaría el asombro, malestar e indignación de los mismos constituyentes ilustres que cita la disidencia en sus primeras páginas. Ante semejante actuación, era verdaderamente un imperativo institucional utilizar los poderes expresos e inherentes de la Sec. 7 para corregir un grave vicio constitucional engendrado a oscuras en los pasillos de la O.A.T.

Por último, nuestra conciencia no puede estar tranquila sin antes hacer constar nuestro asombro ante el lenguaje utilizado en uno de los votos particulares

disidentes que hoy se publica. Jamás concebimos llegar a ver una jurista suscribir un voto que raya en una incitación a la violencia desde la trinchera política.

Desde que aceptamos la encomienda de ostentar la toga de la profesión jurídica, hemos sido conscientes de nuestra fragilidad como seres humanos. Jamás osamos pretender que nuestras interpretaciones del Derecho son infalibles; reconocemos que como humanos podemos errar. Por eso nunca suscribiríamos un voto en el cual se acuse a nuestros compañeros juristas de usurpar poderes constitucionales con la intención de causar un "derrocamiento constitucional". Que no quede la menor duda que en el voto disidente de la Juez Asociada señora Rodríguez Rodríguez se acusa maliciosa e irresponsablemente a los miembros de este Tribunal del más alto pecado que puede cometer un magistrado. **Esto es particularmente desafortunado toda vez que varios de nosotros somos jueces de carrera, y hemos laborado por años desde los estrados de tribunales inferiores.**

Como si tal afrenta fuese poco, esa disidencia hace un llamado irresponsable que raya en la incitación a la violencia en contra de este Tribunal. ¿Cómo es posible que se haga una convocatoria a "iniciar la lucha"? ¿Lucha contra qué? ¿Contra quiénes? ¿Desde qué lugar? ¿En la calle o en la trinchera partidista? ¿Por qué influenciar

en estos tiempos álgidos al Pueblo a defender la Constitución (o la interpretación que la disidencia hace de esta) "con las uñas y con los dientes"? ¿Por qué acusar a los jueces que suscribimos las Resoluciones de epígrafe de "asediar" la Constitución de Puerto Rico? ¿Cómo osar imputarle a sus compañeros jueces el crear un estado de excepción en Puerto Rico y "revocar" el Estado de Derecho vigente? La disidencia es necesaria en todo foro judicial, pero resulta verdaderamente aberrante el que en cada situación constitucional en la cual existen diferencias de criterio se acuse a la otra parte de causar un holocausto jurídico. La retórica y los sofismas conjurados en el voto disidente de la Juez Asociada señora Rodríguez Rodríguez retarían al mismo Protágoras,[13] y lesionan severamente los entendidos básicos de un tribunal colegiado.

Hace un tiempo, la Juez Asociada señora Rodríguez Rodríguez sentenció injustificadamente en otro virulento voto disidente que "[h]oy...comienza el medioevo puertorriqueño". *In re Solicitud Aumentar Núm. Jueces TS*, 180 D.P.R. 54, 142 (2010)(Op. Disidente RODRÍGUEZ RODRÍGUEZ, J.). ¡Qué épicamente irónico resulta que el "medioevo puertorriqueño" que presagió quedó

---

[13] Protágoras fue uno de los sofistas mas reconocidos de la Antigua Grecia.

verdaderamente inaugurado en el voto disidente que hoy ella suscribe!

Por todo lo anterior, estamos conformes con las Resoluciones de epígrafe y garantizamos que la amenaza de crisis constitucional que aspira a *hacer creer* la disidencia no es más que una fantasía hiperbólica. El texto de nuestra Constitución es claro, y si alguien cuestiona la *legitimidad* del proceder de una mayoría de miembros de este tribunal -en vez de nuestra *interpretación constitucional*- su cuestionamiento no debe ir dirigido a los miembros de este Tribunal en su carácter individual, sino al texto mismo de la Constitución. **La legitimidad de las decisiones de este Tribunal no es solo responsabilidad de los que en un momento dado ocupamos sillas en este estrado: esa responsabilidad la compartimos como Pueblo, sustentados en el entendimiento básico de la organización social que adoptamos.** "Violar el acto por el cual existe sería destruirse, y lo que no es nada no produce nada." J. Rousseau, *El contrato social*, Madrid, Ed. Aguilar, 1978, Cap. VII, pág. 19.[14]

---

[14] Las referencias a los votos disidentes que se hacen en este voto de conformidad responden a las versiones originales que fueron circuladas. Ello debido a que cinco (5) minutos antes de certificarse estos votos, se nos circularon versiones editadas de estos.

Rafael L. Martínez Torres          Mildred G. Pabón Charneco
     Juez Asociado                      Jueza Asociada

Erick V. Kolthoff Caraballo        Edgardo Rivera García
       Juez Asociado                   Juez Asociado




Roberto Feliberti Cintrón      Luis F. Estrella Martínez
       Juez Asociado                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Aprobación de las Reglas para
Los Procedimientos de
Investigaciones Especiales
Independientes de la Rama          ER-2012-01
Judicial

In re:                             EN-2012-01

Designación de Miembros de la
Comisión Especial Independiente y
Adopción de Medidas Relacionadas

Voto Disidente emitido por el Juez Presidente señor HERNÁNDEZ
DENTON

En San Juan, Puerto Rico, a 21 de febrero de 2012.

El 14 de junio de 1985, juré que, como miembro de esta Curia, protegería y defendería nuestra Constitución contra todo enemigo interior y exterior. Así lo he hecho durante los casi veintisiete años de servicio que llevo en este Foro, siete de ellos como su Juez Presidente. Así lo seguiré haciendo hasta el 12 de abril de 2014, día en que, con el favor de Dios, alcanzaré los setenta años de vida, edad a la que, por mandato de la Constitución, estaré obligado a retirarme.

El Tribunal Supremo de Puerto Rico es, por diseño constitucional, el máximo intérprete de nuestra

Constitución. En el cumplimiento de tan delicada función, los Jueces y Juezas que conformamos

esta Curia tenemos el deber legal, asumido mediante juramento, de ser fieles al texto de nuestra Carta Magna, así como a las ideas, valores y principios que informaron su adopción por la Convención Constituyente, su ratificación por el Pueblo en las urnas y su aprobación por el Congreso de los Estados Unidos hace ya seis décadas.

He dedicado gran parte de mi vida profesional al servicio público, mayormente a través de mis nombramientos como Juez Asociado y Juez Presidente de este Tribunal. Al día de hoy, me honra ser el juez de más largo servicio en este Alto Foro bajo la Constitución del Estado Libre Asociado y el segundo de más largo servicio en la historia de este Tribunal, superado solo por el Juez Wolf, quien sirvió del 1904 al 1940, cuando los jueces eran nombrados por el Presidente de los Estados Unidos. En todo momento, mi norte ha sido brindarle justicia a los puertorriqueños y garantizar sus derechos y libertades.

Hago referencia a mi extenso récord de servicio público en este Tribunal con el único propósito de poner en perspectiva la situación en que, como miembro y Presidente de esta Corte, hoy me encuentro. Recientemente, nuestro Estado de Derecho recibió un golpe -que ha afectado la legitimidad y confianza de la ciudadanía en el Tribunal Supremo- con la aprobación de las Resoluciones emitidas durante mi ausencia por seis compañeros jueces de este Tribunal, que contaron con la oposición de los demás miembros. Como Juez Presidente, es mi deber expresarme sobre el particular. Hoy más que nunca, tengo claro mi deber: ser fiel a nuestra Constitución

y, de esa manera, protegerla de cualquier interpretación contraria a su espíritu.

Mediante las Resoluciones en cuestión, una mayoría de este Tribunal se ha arrogado funciones que la Constitución delega expresamente a la figura del Juez Presidente. Por ello, debo defender la Constitución, no como quien sufre la usurpación de las facultades de un cargo público, sino como defensor del texto constitucional y garante de la seguridad jurídica del país.

Es importante poner esta actuación en perspectiva frente a la situación actual del país. Los retos que hoy enfrentan importantes instituciones, incluido este Foro, pueden socavar la confianza de la ciudadanía en el Estado de Derecho. Ese Estado de Derecho es una condición indispensable para la seguridad jurídica y el bienestar social, político, democrático y económico de cada puertorriqueño y puertorriqueña. La actuación de una mayoría de este Tribunal cobra mayor trascendencia cuando partimos de la premisa de que, para evitar que el Estado ejerza sus poderes desenfrenadamente, es necesario sujetar el poder al Derecho. Ello, a su vez, depende de que la judicatura se adhiera a los postulados claramente definidos por nuestros constituyentes para crear pesos y contrapesos frente a cada acción gubernamental. Si no colocamos el Derecho por encima del poder, los ciudadanos no podrán confiar en que están cobijados -siempre- por la Constitución y sus garantías y por las decisiones tomadas por este Tribunal.

Habiendo analizado las Resoluciones de epígrafe a la luz de esas circunstancias, vemos que el texto y el historial de nuestra Carta Magna no permiten llegar a otra conclusión que no sea que estas son contrarias a la Constitución y atentan contra importantes derechos individuales. Ningún puertorriqueño o puertorriqueña merece tener que vivir bajo la amenaza de que, en cualquier momento, sin tan siquiera tener un caso ante sí, este Tribunal pueda dejar sin efecto obligaciones contractuales válidas y arrebatarle su libertad mediante el desacato. Eso es lo que ha ocurrido con la aprobación de esas dos Resoluciones.

Ante ello, he decidido suscribir estas expresiones con respeto pero con firmeza ante una actuación ilegal y arbitraria tomada apresuradamente por una mayoría del Tribunal sin el beneficio de una profunda reflexión de sus consecuencias sobre la credibilidad y legitimidad de esta institución, en momentos de grandes retos para la seguridad y calidad de vida de nuestra ciudadanía.

No olvidemos que en esencia, la autoridad de este Tribunal depende de la confianza que tenga el Pueblo en nuestras actuaciones. En los últimos años, las acciones de la mayoría de aumentar el número de jueces, de aprobar estas dos Resoluciones y de emitir otras importantes decisiones, han transcurrido sin el consenso que históricamente había caracterizado este tipo de decisión y se han tomado de manera atropellada, invocando la Regla 5(b) del Reglamento de esta Corte. Esto, con el propósito de evitar el debate que debe prevalecer en un foro colegiado. El resultado de esta

modalidad de decidir asuntos de transcendencia histórica lacera la confianza del Pueblo en nuestras actuaciones. Sin esa confianza nuestra institución decaerá hasta convertirse en un recuerdo de la historia constitucional de Puerto Rico.

I.

El martes, 31 de enero de 2012, se circularon los proyectos de las Resoluciones de epígrafe, dirigidas a frenar una investigación administrativa en curso sobre el uso de los recursos de la Rama Judicial. Esas Resoluciones fueron aprobadas atropelladamente, en menos de veinticuatro horas, **mientras me encontraba fuera del país** en una reunión de la Conferencia de Jueces Presidentes de los Estados Unidos y de su Comisión de Acceso a la Justicia, la cual me honro en presidir. Con ese proceder durante mi ausencia, una mayoría impone su criterio -por segunda vez en estos pasados dos años- de forma contraria al uso y costumbre en este foro.[15] Ante asuntos como este siempre se había actuado mediante consenso.

Las Resoluciones en controversia fueron impuestas, de acuerdo a seis jueces, al amparo del poder del Tribunal para adoptar reglas para la administración de los tribunales bajo la Sec. 7 del Art. V de la Constitución de Puerto Rico, Const. E.L.A., L.P.R.A., Tomo 1, pág. 416.

La primera Resolución promulga -por primera vez en nuestra historia- las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama

---

[15] Véase In re Solicitud Aumentar Núm. Jueces TS, 180 D.P.R. 54 (2010).

Judicial. La segunda Resolución se aprobó en virtud de las referidas Reglas y ordena una serie de acciones intrínsecamente administrativas, a saber: 1) que se "deje sin efecto" un contrato público válido con el Lcdo. César López Cintrón, "so pena de desacato"; 2) que se investigue la contratación del licenciado López Cintrón por parte de la Directora Administrativa de la Oficina de Administración de Tribunales, "así como el uso de fondos y recursos públicos por parte de la OAT y su Directora", y 3) le "prohíbe a la Directora de Administración de los Tribunales el desembolso de fondos públicos asignados a la Rama Judicial para el pago de los servicios del Lcdo. López Cintrón".

Antes de exponer los fundamentos de mi disenso debo señalar el contexto histórico y las circunstancias en que se desarrolla la actuación del Tribunal. A finales del pasado año, un grupo de funcionarios de la Rama Judicial comenzaron una campaña mediática para impulsar una serie de reclamos sobre mejoras a sus condiciones de empleo. En específico, solicitaron aumentos de sueldo.

Durante ese proceso, siempre reconocí públicamente la validez del reclamo de los trabajadores de la Rama de Gobierno que me honro en dirigir. Más aun, siempre me he asegurado de garantizar que todos los padres y madres de familia que laboran para el Pueblo de Puerto Rico desde los tribunales conserven su trabajo y sus beneficios, a pesar de la difícil situación que han enfrentado los empleados públicos en tiempos recientes. De igual forma, siempre he sido consciente de la importancia de garantizar, desde mi

cargo de juez, los derechos de libre expresión de todos los ciudadanos.

Sin embargo, algunos funcionarios fueron más allá de la denuncia e intentaron infructuosamente paralizar los servicios que la Rama Judicial brinda a la comunidad. En reacción a ese comportamiento de obstaculizar la función de los tribunales, que puso en riesgo el aparato de seguridad pública del país, la Oficina de Administración de Tribunales envió una carta mediante la cual apercibió a los empleados que se ausentaron injustificadamente de sus labores, de que habían violado varias normas laborales. Por eso, se les informó que tenían derecho a solicitar una vista informal previa a cualquier posible presentación de cargos administrativos.

Así las cosas, con el ánimo de amedrentar a los administradores de la Rama Judicial, una de las personas involucradas comenzó una nueva campaña mediática en contra de este servidor. Esta vez, hizo una serie de imputaciones falsas relacionadas a un uso indebido de recursos públicos. En ese momento fui categórico al destacar la mendacidad y falsedad de sus imputaciones. Además, le informé mediante declaraciones públicas que no me dejaría amedrentar por reclamaciones que respondían a sus intereses personales, ni por ataques abusivos a mi honra y a mi familia, que está ajena a cualquier asunto de interés para dicha persona.

En consecuencia, este acudió ante el Departamento de Justicia y al Senado de Puerto Rico a presentar sus denuncias. Ante las alegaciones sobre el supuesto uso

indebido de recursos públicos, la Oficina de Administración de los Tribunales -oficina llamada a custodiar los recursos públicos que se le confían a la Rama Judicial- contrató al Lcdo. César López Cintrón, con el propósito de investigar el uso de esos recursos. De esa manera, este podría rendir un informe con sus hallazgos y someter recomendaciones.

Su investigación iba dirigida a las alegaciones de ese funcionario, a la luz de las expresiones públicas que había hecho. Así surge claramente de la carta enviada por el licenciado López Cintrón a la Directora Administrativa, el 2 de febrero de 2012, mediante la cual aclaró que su investigación estaba limitada a las alegaciones públicas sobre uso indebido de recursos públicos. No obstante, la mayoría de este Tribunal optó por imposibilitar el desarrollo de esa investigación por medio de las Resoluciones de epígrafe.

Una vez el Tribunal aprobó dichas Resoluciones, el licenciado López Cintrón renunció al contrato y devolvió todos los documentos en su poder, sin cobrar honorario alguno. A pesar de que ese hecho, de suyo, tornaría académicas las acciones ordenadas por la segunda Resolución del Tribunal a la Directora Administrativa, la inconstitucionalidad y el cambio dramático al Estado de Derecho me fuerzan a emitir las siguientes expresiones.

II.

La Sec. 4 del Art. V de la Constitución de Puerto Rico establece que "[e]l Tribunal Supremo funcionará, bajo reglas de su propia adopción […]". Art. V, Sec. 4, Const. E.L.A.,

L.P.R.A., Tomo 1, pág. 412. Esa disposición se refiere principalmente al manejo de los asuntos adjudicativos de este Foro judicial. Por su parte, la Sec. 7 del Art. V de la Constitución de Puerto Rico dispone que "[e]l Tribunal Supremo adoptará reglas para la administración de los tribunales las que estarán sujetas a las leyes relativas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno". Art. V, Sec. 7, Const. E.L.A., *supra*. En otras palabras, el poder del Tribunal Supremo de adoptar reglas administrativas se debe ejercer en armonía con las leyes de control de gastos y de personal que aplican al gobierno en general.[16]

No obstante, adviértase que esa misma disposición constitucional les asigna **expresamente** tanto al Juez Presidente como al Director Administrativo de los tribunales la tarea particular de **administrar** la Rama Judicial. En específico, la segunda oración de la Sec. 7 del Art. V de la

---

[16] La Ley de la Judicatura, Ley Núm. 201 de 22 de agosto de 2003, según enmendada, ofrece una aclaración sobre el alcance del poder reglamentario del Tribunal. A tales efectos, el Art. 2.002 dispone que:

El Tribunal Supremo adoptará para el Tribunal General de Justicia Reglas de Evidencia y de Procedimiento Civil y Criminal, así como Reglas para la Administración de los Tribunales, de conformidad con lo provisto por la Constitución del Estado Libre Asociado de Puerto Rico. En la adopción de dichas Reglas se tomarán en cuenta los principios y objetivos de esta Ley. Las Reglas de Administración estarán sujetas a las leyes relativas a suministros, personal, fiscalización y asignación de fondos y a otras leyes aplicables en general al gobierno del Estado Libre Asociado de Puerto Rico, todo ello enmarcado en el principio de la autonomía judicial. 4 L.P.R.A. sec. 24c.

Constitución del Estado Libre Asociado dispone que "[e]l Juez Presidente dirigirá la administración de los tribunales y nombrará un Director Administrativo, quien desempeñará su cargo a discreción de dicho magistrado". Art. V, Sec. 7, *supra*. Así, pues, **la administración de la Rama Judicial recae por mandato constitucional en la persona del Juez Presidente del Tribunal Supremo de Puerto Rico.**

Este Tribunal ha expresado que "los poderes constitucionales de naturaleza administrativa del Juez Presidente del Tribunal Supremo, de ordinario, deben ser interpretados ampliamente". Bldg. Fast Cl. Servs. v. Asoc. C.B. Tower, 147 D.P.R. 874, 880 (1999). Véase, además, J. Trías Monge, El Sistema Judicial de Puerto Rico, San Juan, Ed. Universitaria, 1978, pág. 221 ("las obligaciones y facultades del Juez Presidente se conciben hoy con gran amplitud".).

Visto lo anterior, es trascendental analizar el surgimiento histórico de esos amplios poderes. Al momento de aprobarse nuestra Constitución, la facultad de administrar los tribunales en Puerto Rico era ejercida por el Procurador General. Véanse 4 Diario de Sesiones de la Convención Constituyente 2613 (2003); González Vélez v. Tribunal Superior, 75 D.P.R. 585, 609 (1953). Esa facultad pasó a manos del Juez Presidente tras nuestro proceso constituyente, culminado en 1952, en aras de garantizar un balance de poderes entre las ramas de gobierno. De esa forma, ese balance de poderes incluyó un contrapeso fundamental

adicional al dividir funciones entre el Pleno del Tribunal y el Juez Presidente.

El historial de la Convención Constituyente y múltiples fuentes históricas demuestran, sin espacio a dudas, que la administración del sistema judicial que adoptó nuestra Constitución se fundamenta en un sistema ejecutivo fuerte y centralizado, **no colegiado**, de autoridad administrativa bajo la dirección única del Juez Presidente y el Director Administrativo que éste designa **a su discreción**. Véase Trías Monge, El Sistema Judicial de Puerto Rico, op. cit., pág. 221 (1978).[17]

Más aun, al adoptar una administración centralizada bajo la discreción única del Juez Presidente, la Convención Constituyente rechazó una recomendación de la Escuela de Administración Pública para que la administración de los tribunales se confiase a un cuerpo colegiado, denominado Consejo Judicial, que hubiese tenido, además de autoridad de aprobar reglas, la facultad para ejercer una supervisión administrativa general. Escuela de Administración Pública, La

---

[17]  El Director Administrativo de los tribunales tiene el poder, al amparo de la Ley de la Judicatura, Ley Núm. 201 de 22 de agosto de 2003, según enmendada, de tomar cualquier decisión que redunde en un mejoramiento de los servicios que presta la Rama Judicial.

> La Oficina de Administración de los Tribunales desempeñará los deberes que propicien el aceleramiento de los trámites judiciales; establecerá medidas para lograr la evaluación, eficiencia y excelencia en la prestación de servicios y cualesquiera otros deberes afines que disponga el Juez Presidente para el mejor funcionamiento del sistema judicial. 4 L.P.R.A. sec. 24n.

nueva Constitución de Puerto Rico, págs. 472-78; J. Trías

Monge, 3 Historia Constitucional de Puerto Rico, San Juan,

Ed. de la Universidad de Puerto Rico, 1982, Vol. 3, pág. 98.

Los propósitos de la Convención Constituyente en cuanto

a este aspecto de centralización administrativa son

incuestionables. Ante una enmienda propuesta para eliminar la

discreción del Juez Presidente para seleccionar al Director

Administrativo de los tribunales, el delegado Sr. Ernesto

Ramos Antonini, presidente de la Comisión de la Rama Judicial

en la Convención Constituyente, señaló lo siguiente:

> La mejor manera de pensar para resolver
> sobre esta enmienda es entender cuál es el
> propósito de este artículo. **El propósito de este
> artículo es el de que la responsabilidad de la
> administración de los tribunales de justicia
> recaiga en el presidente del Tribunal Supremo**, y
> la letra del artículo al disponer "el Juez
> Presidente dirigirá la administración de los
> tribunales y nombrará un director". De manera que
> a quien hay que proteger aquí es, en primer
> término, al poder judicial [frente al Ejecutivo]
> en el sentido de garantizarle eficiencia en su
> funcionamiento por su administración. En segundo
> término, **a quien hay que proteger aquí es al Juez
> Presidente del Tribunal Supremo [frente al Pleno
> del Tribunal] en su responsabilidad y descargue
> de su autoridad para que pueda cumplir con la
> encomienda de la constitución que le dice que él
> dirigirá la administración. El administrador no
> es nada más que una herramienta que la
> constitución pone en sus manos para él manejarla
> según sus manos, su experiencia, su criterio le
> manden en su conciencia como juez presidente para
> seguirla usando o no seguirla usando.[…]** 3 Diario
> de Sesiones de la Convención Constituyente,
> 1667-1668. (Énfasis nuestro).[18]

---

[18] El Informe de la Comisión de la Rama Judicial a la
Convención Constituyente, 1952, págs. 12-13 lee como sigue:

> Se recomienda que se traspase al Tribunal
> Supremo la facultad de administrar los tribunales
> de justicia de Puerto Rico, facultad que se viene
> ejerciendo por el Procurador General. La Comisión
> entiende que las disposiciones de esta sección

(continúa...)

La Convención Constituyente se nutrió de una extensa discusión que terminó en la delegación expresa de poder al Juez Presidente. Además, esa discusión incluyó un debate entre los delegados señor Ramos Antonini y el Sr. Augusto Valentín Vizcarrondo. Este último proponía que el Director Administrativo sirviera conforme a un "reglamento", mientras que el señor Ramos Antonini proponía que fuera a "discreción" del Juez Presidente. La postura favorecida fue la de Ramos Antonini. Véase Diario de Sesiones, *supra*, págs. 1668-1669.

De otra parte, tampoco cabe duda de que el marco de acción administrativa bajo el cual operan el Juez Presidente y el Director Administrativo es claramente independiente y no está subordinado a la función cuasi-legislativa que ostenta el Pleno del Tribunal Supremo para adoptar reglas sobre la administración.

---

contienen garantías básicas del Poder Judicial. La Rama Ejecutiva no debe intervenir en función que es tan claramente de índole judicial. Íd.

Para ello, el propio Informe expresa que ha examinado los precedentes de la Constitución federal, y las disposiciones vigentes en California, Connecticut, Kentucky, Maryland, Missouri, New Jersey y West Virginia, así como escritos del Decano de la Escuela de Derecho de Harvard, Roscoe Pound. Véase Íd.

Como puede apreciarse, cuando la Comisión de la Rama Judicial recomienda que se traspase al "Tribunal Supremo" la facultad de administrar los tribunales, lo hace para proteger, en primer término, a la judicatura frente al Poder Ejecutivo. Sin embargo, como se aclara más adelante, la facultad de administrar se le confiere específicamente al Juez Presidente, como medida para protegerlo frente al Pleno del Tribunal, tal y como nos ilustran las expresiones de Ramos Antonini.

Nuestra estructura de administración judicial sigue como modelo la recomendación del American Bar Association y el ejemplo del Poder Judicial del Estado de Nueva Jersey, en donde el Juez Presidente es la única figura ejecutiva y centralizada, encargada de la administración de la judicatura de manera independiente al Pleno del Tribunal. Véanse N.J. Const., Art. VI, Sec. II, VII; E.H. Stern, Frustrations of an Intermediate Appellate Judge, 60 Rutgers L. Rev. 971, 976 (2008).

La propuesta promulgada por el American Bar Association fue acogida en Nueva Jersey; jurisdicción que, al momento de conducirse los trabajos en la Convención Constituyente de Puerto Rico, representaba el mejor ejemplo de un sistema unificado centralizado bajo la amplia dirección administrativa de un Juez Presidente. Véase A. Vanderbilt, Minimum Standards, pág. 63 ("New Jersey" presents the best picture of a unified court system with rather complete powers of management entrusted to the chief justice[.]") Fue, precisamente, "[h]acia Nueva Jersey [donde] miramos al momento de ordenar nuestro presente sistema de administración de justicia". Ramírez de Arellano v. Noguera, 85 D.P.R. 823, 828 (1962). El Juez Presidente Trías Monge lo explicó, como parte de su análisis sobre la Sec. 7 del Art. V, Const. E.L.A., supra, de la siguiente forma:

> [p]ara esta época, tan sólo dos constituciones estaduales, la de Maryland y la de Nueva Jersey encargaban al Juez Presidente de la dirección de los tribunales. La de Nueva Jersey, la cual también proveía para el nombramiento por el Juez Presidente de un director administrativo, constituyó el precedente directo para la nuestra.

La Constitución de Nueva Jersey también fue el modelo utilizado en la redacción de la primera oración de la sección. **La segunda oración se insertó en parte para fines de clarificación y en parte por razones análogas a las que provocaron las limitaciones que se impusieron en la sección anterior al poder judicial de aprobar reglas de procedimiento; la indisposición de un número de delegados a dotar al Tribunal Supremo de demasiado poder irrestricto.**

Respecto al alcance de la frase "administración de tribunales", tal como se emplea en esta sección, el informe de la Comisión de la Rama Judicial sobre este particular es de especial interés, haciéndose en él una lista de las más importantes. El amplio significado que se le dio a esta frase complementó en modo esencial la unificación establecida en virtud de la sección 2. **Fue parte esencial de la intención legislativa evitar a todo trance huella alguna de administración colegiada.** Trías Monge, 3 Historia Constitucional de Puerto Rico, op. cit., pág. 98. (Énfasis suplido); Véase, además, J. Trías Monge, La estructura del poder judicial en la Constitución de Puerto Rico, 46 Rev. Jur. U.P.R. 611, 630-31 (1977).

Como vemos, ese modelo que adoptamos de Nueva Jersey centralizó la responsabilidad de la operación de la Rama Judicial en la figura del Juez Presidente. Véase, además, Chief Justice Robert N. Wilentz, Separation of Powers - Judicial Independence in the 1980s, 49 Rutgers L. Rev. 835, 841 (1997). Para ello, la Constitución de Nueva Jersey, al igual que la de Puerto Rico, le otorgó al Juez Presidente una facultad ejecutiva plena sobre la administración de los tribunales distinta e independiente de la función cuasi-legislativa que se fijaría en el Tribunal Supremo de adoptar reglas ("rulemaking") para la administración. Véanse N.J. Const., Art. VI, Sec. II, Para. 3; N.J. Const., Art. VI, Sec. VII, Para. 1; R. D. Lipscher, A Tribute to Chief Justice Wilentz, 49 Rutgers L. Rev. 683, 683 (1997) ("With the

Constitution of 1947, New Jersey […] enabl[ed] rulemaking authority in the Supreme Court and centraliz[ed] executive powers in the Chief Justice as administrative head of the courts[.]").

A la luz de lo anterior, se ha establecido que por disposición constitucional, y de forma independiente al Pleno del Tribunal, el Juez Presidente de Nueva Jersey es el encargado de la administración de la Judicatura. Véase Stern, *supra*, pág. 976. Véanse, además, Kugler v. Helfant, 421 U.S. 117, 128 (1975) ("it is not the New Jersey Supreme Court, or its members, but the Chief Justice, who is the "administrative head" of the New Jersey court system."); State v. Linares, 470 A.2d 39, 42 (N.J Super. Law Div. 1983) ("The Supreme Court has the power to promulgate rules of administration […] and independently, the Chief Justice, as administrative head of the court system, can promulgate binding directives[.]").

El marco de autoridad administrativa independiente bajo el cual se concibe la figura del Juez Presidente llevó a la Convención Constituyente de Nueva Jersey a rechazar una propuesta que pretendía sujetar su poder a la facultad del Tribunal Supremo de adoptar reglas. Véanse 2 N.J. Constitutional Convention 1169; 4 N.J. Constitutional Convention 730; Voorhees Dunn, Arthur T. Vanderbilt's Impact on Judicial Reform at the New Jersey Constitutional Convention of 1947, 29 Rutgers L. J. 731, 754 (1998).

El esquema finalmente adoptado en Nueva Jersey incorpora los elementos de lo que se ha denominado un sistema ejecutivo

fuerte, no colegiado, de autoridad administrativa judicial. A tales efectos, se ha dicho:

> Three basic models of administrative leadership have emerged: (1) the strong-executive model; (2) the traditional-collegial model; and (3) the modified-executive model. The model adopted depends largely on the legal and political authority vested in the state's Supreme Court.
>
> The strong-executive model features a chief justice whose functions essentially as the chief executive officer of the courts. **Associate justices, aside from their essential voice in the rule-making process, act as mere advisors or consultants with regard to administrative matters.** The chief justice acts and speaks for the entire judiciary. Few courts have adopted this model. Hawaii and New Jersey come perhaps the closest. Waller & Goza, <u>The Office of Chief Justice of the Supreme Court of Mississippi</u>, 29 Miss. C. L. Rev. 469, 476 (2010). (Énfasis nuestro).

Bajo este modelo, se ha observado que la facultad de fijar el criterio ejecutivo de la Rama Judicial recae en la figura del Juez Presidente. Véase Robert W. Tobin, <u>Creating the Judicial Branch: The Unfinished Reform 105</u> (National Center for State Courts, 1999) ("**Supreme Court colleagues have little to do with administration, other than rulemaking.** Normally, they fill only consultative roles, or the chief justice advises them of major changes before they become effective."). (Énfasis nuestro).

Además, cabe destacar que, al igual que en Puerto Rico, en treinta y cinco estados de los Estados Unidos el Juez Presidente del tribunal de última instancia es el encargado de administrar la Rama Judicial. Véase Bureau of Justice Statistics, <u>State Courts Organization: Governance of the Judicial Branch</u>, pág. 63 (2004). De esos treinta y cinco

estados, veintinueve de ellos le reconocen esa facultad al Juez Presidente por mandato constitucional. Íd.

Al respecto, Trías Monge, cita el criterio del American Bar Association:

> While general policy may appropriately be formulated by a group, responsibility for executing policy must be vested in an individual. Logically, the chief justice of the State's highest court should have that responsibility and authority, and in states having an integrated judicial system this is the common pattern. Trías Monge, El Sistema Judicial de Puerto Rico, op. cit., pág. 222, citando a A.B.A. Section on Judicial Administration, The Improvement of the Administration of Justice, 5ta ed. 1971, pág. 14.

En cuanto a este extremo, el Comité para el Estudio y la Evaluación del Sistema Judicial (Comité de 1965) sostuvo -en su informe al Tribunal Supremo- que: "la dirección ejecutiva, de la Rama Judicial puede ser objeto de asesoramiento por parte de los jueces asociados o del Tribunal en pleno pero no compartirse en forma colegiada". Informe al Tribunal Supremo de Puerto Rico sobre la Oficina de Administración de los Tribunales, Comité para el Estudio y la Evaluación del Sistema Judicial, 1965, pág. 6. La Constitución y las propias condiciones inherentes de la dirección administrativa, resaltaba el informe del Comité de 1965 bajo la dirección de Trías Monge, "requieren que la responsabilidad resida en el Juez Presidente como último centro de autoridad". Íd.

En este sentido, el señor Ramos Antonini advertía de la necesidad de reconocerle al Juez Presidente la autoridad que corresponde a la responsabilidad que se le fijó. Véase Diario de Sesiones de la Convención Constituyente, supra, T. 1, págs. 615-618. Lo mismo hemos sostenido en este Foro al

expresar que el "Juez Presidente [se concibe así] como [la] figura principal constitucional en el área de lo administrativo del Poder Judicial". Pueblo v. Tursi, 104 D.P.R. 12, 14 (1975).

"La amplia facultad otorgada al Juez Presidente" en materia de administración de la Rama Judicial, Negrón Soto v. E.L.A., 110 D.P.R. 664, 667 (1981), se ilustra en el amplio significado que en la Convención Constituyente se le dio al término "administración" al designar a dicho funcionario "como la persona encargada de la administración de los tribunales". Diario de Sesiones, *supra*, T. 4, pág. 2613. Véase, además, Trías Monge, El Sistema Judicial de Puerto Rico, op. cit., pág. 125. En torno a este asunto, el Informe de la Comisión de la Rama Judicial buscaba transferir a la Rama Judicial una serie de tareas que antes estaban asignadas al Ejecutivo. Para ello, el Informe de la Comisión de la Rama Judicial a la Convención Constituyente, 1952, págs. 12-13, hizo constar que el término "administración", usado en esta sección, comprende, **sin que se entiendan excluidas otras similares y análogas**, las siguientes funciones:

1. Compilar estadísticas y preparar informes.

2. Alquilar locales, comprar y proveer equipo y servicios.

3. Conceder licencias y vacaciones a funcionarios y empleados.

4. Investigar quejas y formular cargos, ante la autoridad correspondiente, contra funcionarios y empleados.

5. Autorizar desembolsos dispuestos por ley y revisar [supervisar] las cuentas de todos los tribunales.

6. Asignar y trasladar jueces.

7. Aprobar reglamentos para las distintas cortes.

8. Superentender [supervisar] en los tribunales. Íd. Véase, en igual sentido, Notes and Comments on the Constitution of the Commonwealth of Puerto Rico, págs. 92-93 (1952).

A la luz lo anterior, y en atención al texto y al historial de la Sec. 7 del Art. V de la Constitución, es evidente que la aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, en la medida que en sus Reglas 7 y 8 autorizan al Pleno del Tribunal Supremo a rescindir o resolver contratos válidamente otorgados por la Administración de los Tribunales en el descargo de sus funciones administrativas, constituyen una actuación contraria a la Constitución. Veamos.

III.

En primer lugar, dichas prerrogativas -utilizadas en la segunda Resolución para rescindir el contrato del licenciado López Cintrón- **claramente exceden las facultades constitucionales del Pleno del Tribunal Supremo al invadir zonas que han sido constitucionalmente reservadas al Juez Presidente como máximo dirigente de la Rama Judicial.**

Después de todo, **el acto de otorgar y rescindir contratos es una función inherentemente administrativa en el ámbito gubernamental.** De hecho, al definir el término "administración" en la referida disposición constitucional, el Informe de la Comisión de la Rama Judicial de la Convención Constituyente incluyó la autorización de

desembolsos dispuestos por ley. Diario de Sesiones, *supra*, T. 4, pág. 2613. Si bien es cierto que tal facultad está sujeta a las reglas de administración que adopte tanto el Tribunal Supremo como la Asamblea Legislativa, ello no debe ni puede tener el alcance de facultar a esos cuerpos a ejecutar o a atribuirse directamente dichas funciones administrativas en directa contravención al mandato constitucional y a la independencia judicial en su vertiente administrativa. De lo contrario, la aprobación de reglamentos generales con disposiciones específicas de aplicación retroactiva, contrarias a una actuación administrativa válida ya realizada, abriría la puerta al control *ex post facto* de todas las determinaciones ejecutivas del Juez Presidente. Ello, a su vez, eliminaría por completo de nuestra Constitución las prerrogativas y facultades expresamente delegadas al Juez Presidente.

Las Resoluciones del Tribunal se tratan, pues, de una arrogación ilegítima de un poder que el Pueblo le concedió expresamente al Juez Presidente y al Director Administrativo de los tribunales al ratificar la Constitución del Estado Libre Asociado de Puerto Rico. Dicho proceder, en esencia, constituye una enmienda a la Constitución sin el consentimiento del Pueblo mediante el mecanismo dispuesto en la Sec. 1 del Art. VII de la Constitución del Estado Libre Asociado de Puerto Rico, Const. E.L.A., *supra*.

Para enmendar la delegación expresa de poderes a la figura del Juez Presidente, así como el voluminoso historial que demuestra la intención específica de nuestros

constituyentes, no basta con la interpretación errónea del texto constitucional que se recoge en las Resoluciones de epígrafe. Para ello se requiere una resolución concurrente de la Asamblea Legislativa, aprobada por más de dos terceras partes de los miembros de cada cámara y obtener el favor de la mayoría de los electores en un referéndum, a celebrarse con no menos de tres meses de antelación. Íd. Dicha resolución, según ha expresado este Tribunal, tiene que surgir a iniciativa de la propia Asamblea Legislativa. Córdova y otros v. Cámara de Representantes, 171 D.P.R. 789, 803 (2007); Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84 (1980) (Op. Concurrente del Juez Asociado señor Negrón García).

Obviar ese riguroso trámite constitucional abona aún más al clima de incertidumbre en que se dan las Resoluciones en controversia y quebranta la seguridad jurídica del país. Con ese proceder, no solo se pone en entredicho el poder de este Tribunal para ejercer su jurisdicción, sino que se transgrede el clima democrático en que debe canalizarse la separación constitucional de poderes gubernamentales. En fin, con el presente trámite se atenta contra los poderes del electorado y de la Asamblea Legislativa mientras se pasa por alto que los puertorriqueños se reservaron para sí el poder de avalar y rechazar cambios en su Constitución. Berrios Martínez v. Gobernador II, 137 D.P.R. 195 (1994).

De otra parte, se ha expresado que en situaciones como la nuestra, en que existe un proceso riguroso para enmendar el texto constitucional, contrario a constituciones donde se

facilita el trámite de enmiendas, las mayorías tienen menos oportunidad de menoscabar los derechos de las minorías mediante fluctuaciones continuas del texto, sujetas al criterio popular. Véase Álvarez González, Otra mirada a la "Constitución discrecional", en R. Saba (ed.), Estado de derecho y democracia: Un debate acerca del "rule of law" 183, 198-200 (2001), publicado en inglés bajo el título Another Look at the "Discretionary Constitution", 71 Rev. Jur. U.P.R. 1, 21-25 (2002). Ese principio de protección a las minorías depende precisamente de que este Foro actúe de conformidad a los requisitos constitucionales para encausar esas enmiendas. Si bien es cierto que un proceso riguroso de enmienda constitucional puede interpretarse como una mayor amplitud al ámbito de la revisión judicial, ello no debe interpretarse como una carta blanca para enmendar la Constitución desde el estrado.

Así pues, de cara al futuro, le corresponde al Pueblo de Puerto Rico retomar democráticamente los poderes que quiso delimitar expresamente en su Constitución y reorientarlos de forma que respondan al esquema constitucional que avaló hace sesenta años. Como ha expuesto el profesor Álvarez González, refiriéndose a situaciones en que el Pueblo soberano revoca determinaciones judiciales mediante enmiendas constitucionales,

> [l]a utilización del proceso constitucional de enmienda en esas circunstancias no sólo tiene el efecto de arrasar una decisión judicial en particular. **Tiene el más importante efecto de recordar a los intérpretes finales de la constitución que sus interpretaciones en efecto son revisables, lo que puede conducirles a**

**ejercer     mayor     cautela     en     futuras interpretaciones**. Íd. (Énfasis nuestro).
IV.

Por otro lado, la acción de ordenar que se deje sin efecto un contrato válido retroactivamente por virtud de un Reglamento aprobado para tales propósitos específicos presenta una controversia muy seria que, de acatarse, violentaría doctrinas firmemente arraigadas sobre el menoscabo de obligaciones contractuales bajo la Constitución de Estados Unidos y la Constitución del Estado Libre Asociado de Puerto Rico. Véase United States Trust Co. v. New Jersey, 431 U.S. 1 (1977).

Mediante su actuación, seis jueces se atribuyen una facultad administrativa que no les corresponde, que no está cobijada por la inmunidad judicial sobre adjudicaciones[19] y que tampoco satisface el escrutinio aplicable al menoscabo de obligaciones contractuales públicas. Véase In re Justices of Supreme Court of Puerto Rico, 695 F.2d 17 (1er Cir. 1982).

La orden para que se dejara sin efecto el contrato entre la Oficina de Administración de Tribunales y el licenciado López Cintrón, viola la doctrina contra el menoscabo de las obligaciones contractuales al amparo del Art. I, Sec. 10, Cl. 1 de la Constitución de los Estados Unidos y Art. II, Sec. 7 de la Constitución de Puerto Rico. Un mero análisis superficial del estándar aplicable al menoscabo de las obligaciones contractuales públicas demuestra que la actuación de esos seis jueces es inconstitucional.

---

[19]  Véanse Reglas de Procedimiento para Acciones Disciplinarias, 131 D.P.R. 630, 644 (1992); Feliciano Rosado v. Matos Jr., 110 D.P.R. 550, 568-569 (1981).

En específico, al analizar una obligación pública, como en esta ocasión, es necesario determinar si el menoscabo responde a un interés gubernamental importante. Bayrón Toro v. Serra, 119 D.P.R. 605, 620 (1987); Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 395 (1973). Si es así, corresponde establecer un balance razonable entre el interés social en proteger el bien común y el interés social en proteger las relaciones contractuales contra la aplicación arbitraria e irrazonable de las leyes. Íd. A esos efectos, se debe determinar si el menoscabo es necesario para alcanzar ese interés gubernamental. Bayrón Toro v. Serra, supra, pág. 620; United States Trust Co. v. New Jersey, supra. El estándar para evaluar el menoscabo por el Estado de sus propias obligaciones es más exigente que el aplicable a obligaciones privadas. Íd.

El propósito de esta doctrina es fomentar y proteger la certeza en las consecuencias legales de lo pactado válidamente y la estabilidad en las relaciones contractuales. Warner Lambert Co. v. Tribunal Superior, supra. No obstante, este Tribunal ha decidido, irrazonablemente, menoscabar una obligación contractual pública sin debido proceso alguno. Ello, sin demostrar algún interés que supere la protección de la certeza de las obligaciones contractuales y la transparencia de la Rama Judicial promovida por la contratación válida[20] -desde el punto de vista de poder administrativo- del licenciado López Cintrón.

---

[20]    La Ley Núm. 80 de 2 de julio de 1987 autoriza a la Oficina de Administración de Tribunales a realizar
(continúa...)

V.

En vista de que el acto cuasi-legislativo de reglamentar las investigaciones de la Rama Judicial, según aplicado retroactivamente, infringe importantes disposiciones constitucionales sobre delegación de poderes al Juez Presidente y las protecciones económicas contra el menoscabo de obligaciones contractuales, debemos cuestionar ¿bajo qué fuente de derecho podía decretarse que se deje sin efecto el contrato de la Oficina de Administración de los Tribunales? Examinemos, pues, las doctrinas jurídicas para la extinción de los contratos por la vía judicial.

En ese sentido, lo primero que debe quedar claro es que se ha ordenado dejar sin efecto un contrato válido. Nuestro ordenamiento provee unos parámetros claros y específicos sobre la contratación gubernamental. Para que un contrato gubernamental sea válido, se tiene que cumplir con una serie

---

investigaciones sobre sus funciones y recursos. Véase Exposición de Motivos de la Ley núm. 80, 1987 Leyes de Puerto Rico págs. 307-308.

> Se faculta al Director Administrativo o al funcionario designado por éste, a los abogados y auditores de la Oficina de Administración de los Tribunales a tomar juramentos, requerir la comparecencia de testigos y requerir la presentación de libros, registros, documentos u objetos pertinentes a las investigaciones que realicen en el desempeño de sus funciones oficiales.

> Las declaraciones juradas obtenidas bajo las disposiciones de las secs. 335 a 340 de este título serán usadas únicamente para fines administrativos de la Oficina de Administración de los Tribunales y no podrán ser usadas en procedimientos criminales contra quienes las prestaron. 4 L.P.R.A. sec. 335.

de requisitos formales adicionales a los dispuestos para los contratos privados.[21]

Una vez se cumplen los requisitos formales de contratación, los contratos son válidos y exigibles. Johnson & Johnson v. Mun. de San Juan, 172 D.P.R. 840, 853 (2008); Fernández & Gutiérrez v. Mun. San Juan, *supra*, p. 833. Asimismo, hemos expresado que "[c]uando el Estado contrata, la interpretación del contrato debe hacerse como si se tratara de una contratación entre dos personas particulares". De Jesús González v. A.C., 148 D.P.R. 255, 267 (1999). Ello significa que cuando el Estado otorga un contrato con una persona privada, ambos están obligados por las normas generales relativas a los contratos. Íd.

Ante este Tribunal no se ha cuestionado el incumplimiento con alguno de esos requisitos. Por ello, no cabe la posibilidad de dejar sin efecto el contrato en controversia por razón de las disposiciones adicionales que regulan la contratación gubernamental.

Más aun, esta actuación surge *motu proprio*, sin estar presentes ante el Tribunal los requisitos de justiciabilidad para ejercer su jurisdicción. Véase, E.L.A. v. Aguayo, 80

---

[21] Dichos requisitos adicionales son: (1) que el acuerdo se haya hecho constar por escrito, (2) que se mantenga un registro fiel con miras a establecer la existencia del contrato, (3) que se envíe copia de éste a la Oficina del Contralor y (4) que se acredite la certeza de tiempo, esto es, que el contrato se otorgó no más de quince días antes. Mun. de Quebradillas v. Corp. Salud de Lares, 180 D.P.R. 1003, 1013 (2011); Fernández & Gutiérrez v. Mun. San Juan, 147 D.P.R. 824, 830 (1999); Hatton v. Mun. de Ponce, 134 D.P.R. 1001, 1006 (1994). Todo acuerdo en contravención a estas normas es ineficaz. Fernández & Gutiérrez v. Mun. San Juan, *supra*, pág. 833.

D.P.R. 552 (1958). Ello es un requisito esencial para dejar sin efecto un contrato por la vía judicial.

En la presente situación, una mayoría de este Tribunal ordenó dejar sin efecto un contrato pactado válidamente. La orden de este Tribunal mediante las Resoluciones en cuestión no puede aquilatarse ni como una rescisión, resolución, anulación o extinción de la obligación pactada, ni como una garantía de los requisitos establecidos para la contratación gubernamental. Tampoco aplican las formas de extinguir una obligación, ni se dan los requisitos de justiciabilidad, por lo que no puede decirse que el Tribunal ha actuado en el descargue de su jurisdicción. La determinación de este Tribunal se trata, pues, de una actuación evidentemente inválida.

## VI.

En su segunda Resolución, los jueces de la mayoría anunciaron la manera en que asegurarían el cumplimiento de una directriz inconstitucional: el desacato. Sin embargo, un análisis exhaustivo de las disposiciones que conceden el poder de imponer el desacato en nuestro ordenamiento revela que no existe una fuente jurídica para ese remedio judicial en las presentes circunstancias.

El desacato es un procedimiento *sui generis* y las fuentes del poder para imponerlo son varias. Véanse Pueblo v. Vega, Jiménez, 121 D.P.R. 282, 290 (1988); Pueblo v. Lamberty González, 112 D.P.R. 79, 81 (1982). Entre estas, figuran la Regla 40.10 de Procedimiento Civil, 32 L.P.R.A. Ap. V; el Art. 284 del Código Penal de Puerto Rico, 33 L.P.R.A. sec.

4912, y la Ley de Desacato, Ley de 1 de marzo de 1902, según enmendada, 33 L.P.R.A. secs. 517-518, que tipifican el desacato criminal; y la Regla 242 de Procedimiento Criminal, 33 L.P.R.A. sec. 4912, que establece los distintos procedimientos a seguir ante el desacato criminal directo y el indirecto. Además, los tribunales tienen el poder inherente para castigar por desacato. Pérez Pascual v. Vega Rodríguez, 124 D.P.R. 529, 535 (1989); Pueblo v. García Rivera, 103 D.P.R. 547, 551 (1975).

La diferencia entre el desacato civil y el desacato criminal recae en la naturaleza y propósito de cada uno. Pueblo v. Vega, Jiménez, supra. El desacato civil tiene un propósito reparador: inducir a alguien a cumplir con una obligación. Íd., citando a Shillitani v. United States, 384 U.S. 364 (1966). Por otro lado, el desacato criminal tiene como objetivo vindicar la autoridad del tribunal. Íd., citando a States v. Mine Workers, 330 U.S. 258 (1947); In re Cruz Aponte, supra, pág. 182.

De otra parte, este Tribunal ha señalado que, para que una conducta sea constitutiva de desacato criminal, esta debe menoscabar el respeto debido al tribunal e interrumpir los procedimientos llevados a cabo en el foro judicial. In re Velázquez Hernández, supra, pág. 327. Al respecto, establecimos que quien desobedezca cualquier decreto, mandamiento, citación u otra orden legal expedida por el tribunal será sancionado con pena de reclusión o multa, a

discreción del tribunal.[22] <u>Pérez Pascual v. Vega Rodríguez</u>, *supra,* pág. 534; <u>Pueblo v. Escalera</u>, 95 D.P.R. 148 (1967). De esta forma, hemos reiterado la existencia del poder inherente de los tribunales para hacer efectiva su jurisdicción y sus pronunciamientos y vindicar sus directrices. <u>In re Velázquez Hernández</u>, *supra*; <u>Pérez Pascual v. Vega Rodríguez</u>, *supra,* pág. 535; <u>Sterzinger v. Ramírez</u>, 116 D.P.R. 762 (1985).

Este poder inherente no se extiende a las agencias administrativas, las cuales carecen del poder coercitivo que ostentan los tribunales para exigir el cumplimiento de sus órdenes y resoluciones. Véanse*,* <u>D.A.Co. v. Alturas Fl. Dev. Corp. y otro</u>, 132 D.P.R. 905, 923 (1993); <u>Díaz Aponte v. Comunidad San José, Inc.</u>, 130 D.P.R. 782, 795 (1992).

Por otra parte, la Regla 242 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, establece el procedimiento a seguir en casos donde ha habido una conducta que pudiese dar lugar a la imposición de un desacato criminal. Dicha regla dispone:

---

[22] En cuanto a la penalidad por desacato, la sección 518 de la Ley de Desacato, *supra,* dispone lo siguiente:
El Tribunal Supremo y el Tribunal de Primera Instancia de Puerto Rico tendrán facultad para castigar el desacato a su autoridad con prisión por un período máximo de treinta (30) días, en la cárcel local más inmediata al tribunal, o con multa máxima de doscientos dólares ($200) o ambas penas, a discreción del tribunal. El Tribunal de Distrito y cualquier otro tribunal análogo o semejante y la Comisión Industrial de Puerto Rico, tendrán facultad para castigar el desacato, según expuesto anteriormente, dirigido a dicho tribunal, mediante una multa máxima de veinticinco dólares ($25), y en defecto del pago de dicha multa la persona declarada culpable podrá ser recluida en la cárcel local más inmediata a dicho tribunal por un período máximo de veinte (20) días.

(a) Procedimiento sumario. El desacato criminal podrá castigarse en forma sumaria siempre que el juez certifique que vio u oyó la conducta constitutiva de desacato, y que se cometió en presencia del tribunal. La orden condenando por desacato expondrá los hechos y será firmada por el juez, dejándose constancia de ella en las minutas del tribunal.

(b) Procedimiento ordinario. Salvo lo provisto en el inciso (a) de esta regla, en todo caso de desacato criminal se le dará al acusado previo aviso la oportunidad de ser oído. El aviso expondrá el sitio, hora y fecha de la vista, concederá al acusado un tiempo razonable para preparar su defensa, hará saber al acusado que se le imputa un desacato criminal y expondrá los hechos esenciales constitutivos del mismo. El acusado tendrá derecho a su libertad provisional bajo fianza de acuerdo con las disposiciones de estas reglas. Si el desacato se fundara en actos o conducta irrespetuosa hacia un juez, éste no podrá conocer de la causa excepto con el consentimiento del acusado.

Los múltiples requisitos procesales que requiere el procedimiento sumario se deben a que constituye una excepción a las garantías constitucionales, ya que en este se antepone el interés de mantener el orden y la integridad durante el proceso judicial. In re Velázquez Hernández, *supra,* pág. 331; Pueblo v. Susoni, 81 D.P.R. 124, 156 (1959). En particular, la garantía constitucional a no ser privado de la libertad o propiedad sin un debido proceso de ley, hace mandatoria la observancia de todas las salvaguardas constitucionales aplicables a toda clase de imputación tipificada y castigada como un delito criminal. E.L.A. v. Asoc. de Auditores, *supra,* pág. 687. La consecuencia de incumplir con estos requisitos en el procedimiento de desacato sumario es que la sentencia quedará enteramente nula y sin efecto. Íd.; Pueblo v. Tribunal Superior, 92 D.P.R. 471, 476-477 (1965).

Asimismo, ante los hechos específicos de las Resoluciones en controversia, cabe destacar que, **si un tribunal no tiene jurisdicción para dictar una orden, ésta es nula y no tiene efecto alguno y la parte que se niegue a obedecerla no incurre en desacato, ni puede ser castigada por ello**. Coll v. Leake, Juez de Distrito, 17 D.P.R. 857 (1911); Núñez v. Soto Nussa, 14 D.P.R. 199 (1908). Para que exista el desacato no solamente debe tener la corte jurisdicción sobre la persona del peticionario, sino también sobre el asunto en cuestión, así como para dictar la sentencia determinada cuyo incumplimiento produciría el desacato. Íd.

Por otra parte, el Art. 34-A del Código Político de 1902, según enmendado, 2 L.P.R.A. sec. 154a, confiere al poder legislativo la facultad de solicitar la ayuda del foro judicial para obtener el cumplimiento de sus órdenes relacionadas con la comparecencia y examen de testigos durante una investigación. **La facultad de castigar mediante desacato reside únicamente en el foro judicial en el ejercicio de sus funciones judiciales adjudicativas; no legislativas.**

Tampoco debemos perder de vista que los jueces deben utilizar correctamente su autoridad para imponer como castigo el desacato. In re Cruz Aponte, *supra,* pág. 181. Hemos fundamentado lo anterior en el Canon XVII de Ética Judicial, 4 L.P.R.A. Ap. IV-A, el cual establece, entre otras cosas, que los jueces dirigirán los trabajos del tribunal con orden y decoro y estarán alertas "contra todo proceder que pueda afectar la dignidad y el respeto debidos al tribunal". Íd.

Así pues, expresamos que "los jueces deben utilizar el desacato como última alternativa para vindicar la dignidad del tribunal, debido a que el uso indiscriminado de este instrumento equivaldría a una falta de temperamento judicial". Íd.

Como se desprende de lo anterior, no cabe duda de que el desacato es una herramienta coercitiva del foro judicial para poner en vigor una orden dictada como parte de un proceso adjudicativo. Esto es, un proceso considerado por un tribunal en su carácter de juzgador de controversias, o para asegurar una comparecencia. Ninguna de esas disposiciones contempla una imposición unilateral como resultado de una regla legislativa de aplicación general.

Como vimos, ni tan siquiera las agencias que realizan funciones cuasi-legislativas al amparo de sus poderes delegados para establecer reglas, análogas a las que ha descargado en esta situación este Tribunal bajo la Sec. 7 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, están facultadas para imponer desacatos para hacer valer sus órdenes o sus reglamentos. Las agencias administrativas vienen obligadas a acudir al foro judicial a solicitar auxilio mediante un proceso adversativo ordinario, cosa que no está presente ante este Foro. Véase RDT Const. Corp. v. Contralor I, 141 D.P.R 424 (1996). No podemos permitir que una posible violación a una regla de esta Curia, actuando en su función cuasi-legislativa o administrativa y no adjudicativa, tenga como sanción el encarcelamiento automático. Véase Wong Wing v. United States, 163 U.S. 228

(1896) (Las agencias administrativas no pueden ordenar un encarcelamiento).

Dicha actuación socava sustancialmente el Estado de Derecho y la seguridad jurídica de Puerto Rico. Además, pone en precario la libertad física de ciudadanos que, ante el actual precedente, podrían verse afectados por una orden de encarcelación emitida por el Tribunal Supremo en ausencia de un caso o controversia.

VII.

Por último, debemos llamar la atención a otra prohibición constitucional -fundamentada en la protección de derechos individuales- que esta acción de una mayoría de este Tribunal podría violentar. La Sec. 12 de la Carta de Derechos de la Constitución de Puerto Rico, Const. E.L.A., *supra*, preceptúa que "no se aprobarán leyes *ex post facto* **ni proyectos para condenar sin celebración de un juicio**". (Énfasis suplido). Esta disposición es idéntica a la disposición en la Constitución federal. El profesor José Julián Álvarez González ha expresado que:

> [e]l Art. II, § 12, calcando al Art. I, § 9 de la Constitución federal, prohíbe los bills of attainder ("proyectos para condenar sin celebración de juicio"). Se trata de un derecho íntimamente relacionado con otras garantías constitucionales, tales como el debido proceso procesal, la prohibición de leyes *ex post facto* y la libertad de expresión. La única decisión que lo discute, muy brevemente, es <u>Pueblo v. Figueroa Pérez</u>, 96 D.P.R. 6 (1968). Allí se planteó que la disposición de la Ley de la Bolita que ordenaba que los juicios se celebraran por tribunal de derecho, independientemente de la severidad de la pena que pudiere imponerse, 33 L.P.R.A. sec. 1250, constituía un bill of attainder. Correctamente, pero con poca discusión, el Tribunal rechazó este planteamiento:

"El estatuto de proscripción es una forma que utilizaba el poder soberano para castigar a una persona designada por su nombre o a miembros determinables de un grupo de personas. United States v. Lovett, 328 US 303 (1946). Otra característica de tal estatuto es que niega el derecho a un juicio en que las personas afectadas puedan obtener una adjudicación de sus derechos.

[…]

[…][d]esignar una categoría de personas que poseen una característica general normalmente no se considera contrario a esta disposición constitucional. L. Tribe, American Constitutional Law 643 (2a ed. 1988).

J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá, 2009, pág. 683.

En la Convención Constituyente, el Informe de la Comisión de Carta de Derecho señaló que "los llamados Bill of Attainder **constituyen un atentado al debido proceso de ley**. La garantía que recomendamos tiene el propósito de evitar que la legislatura actúe judicialmente". Diario de Sesiones, *supra*, T. 4, pág. 2572. (Énfasis nuestro). De otra parte, se ha establecido que "un bill of attainder es un castigo declarado legislativamente (a menudo con una determinación de culpabilidad respecto a algún crimen o actividad) para ciertos individuos en específico". J Novak & R. Rotunda, Constitutional Law, 6th. Ed. 2000, Minnesota, sec. 11.9 (c), pág. 466 ("A bill of attainder is a legislatively declared punishment (often with a legislative finding of guilt regarding some crime or activity) for certain specific individuals".).

Lo más alarmante de las Resoluciones en controversia es que atentan contra la libertad física de una persona sin celebración de juicio. Eso fue precisamente lo que quiso evitar la cláusula constitucional estadounidense:

> Those who wrote the Constitution well knew the danger inherent in some special legislative acts which take away life, liberty, or property of particular named persons because the legislature thinks them guilty of conduct which deserves punishment. They intended to safeguard people of this country from punishment without trial by duly constituted courts. United States v. Lovett, 328 U.S. 303, 317 (1946).

De otra parte, es necesario que se garanticen una serie de derechos procesales antes de dictar una orden judicial que afecte los intereses libertarios de un ciudadano. Para privar a una persona de su libertad es requisito un proceso adjudicativo en el cual, como mínimo, se le garantice al ciudadano una notificación adecuada del proceso, un juzgador imparcial, la oportunidad de ser oído, el derecho a contrainterrogar y examinar la evidencia en su contra, la oportunidad de tener asistencia de un abogado y que la decisión se base en el récord. McConnell Jiménez v. Palau Grajales, 161 D.P.R. 734, 758 (2004); Rivera Rodríguez v. Lee Stowell, 133 D.P.R. 881, 889 (1993).

La orden de carácter cuasi-legislativo que emitió el Tribunal determina, de manera retroactiva y sin celebración de juicio, la pena que enfrenta una persona identificada específicamente por nombre y apellido, la Hon. Sonia I. Vélez Colón, por realizar los deberes de su cargo público. A la luz de los fundamentos de derecho antes esbozados, este tipo de actuación es precisamente la que se quiso evitar mediante la

prohibición constitucional que adoptamos íntegramente de los Estados Unidos. Por ello, la actuación de una mayoría de este Tribunal, al ordenarle a la Directora Administrativa a "dejar sin efecto", "so pena de desacato", viola importantes principios constitucionales que este Foro, en vez de malograrlos, debería garantizar.

## VIII.

Por todo lo anterior, me veo forzado a concluir que las Resoluciones que ha emitido este Tribunal son contrarias a la Constitución del Estado Libre Asociado de Puerto Rico y a las prohibiciones contra el menoscabo de obligaciones contractuales y las garantías de debido proceso de ley de la Constitución de los Estados Unidos. Los poderes de administración de la Rama Judicial fueron específicamente delimitados por nuestra Convención Constituyente. Permitir que en el futuro, mediante el poder de reglamentación, una mayoría de este Tribunal anule retroactivamente acciones y decisiones administrativas válidamente adoptadas por el Juez Presidente y puestas en vigor por el Director Administrativo de los tribunales, conllevaría usurpar el control de la administración de la Rama Judicial a través del poder de reglamentación. Ese esquema fue rechazado por nuestros constituyentes, quienes eligieron el sistema de control centralizado. **El historial es claro: lo que no se quiso fue precisamente un sistema de administración colegiado.**

Peor aun, ante la presente situación, la actuación de la mayoría atenta contra derechos constitucionales individuales de las personas involucradas, sin adelantar fin público o

interés gubernamental alguno. Simplemente se quería intervenir con el curso administrativo de una Rama de Gobierno para frenar una investigación sobre el uso de recursos públicos, ordenada válidamente por los funcionarios llamados a hacerlo, sin que se haya presentado un caso o controversia sobre el contrato afectado y sin celebrar un debido proceso adjudicativo.

IX.

Antes de concluir, me corresponde dejar plasmadas unas preocupaciones sobre la aplicación futura de las Resoluciones en controversia. En cuanto a la primera Resolución, hay que destacar que estas Reglas se adoptaron **en un solo acto** con la segunda Resolución. Ello debe ser motivo de análisis al momento de evaluar su aplicación. ¿Son estas Reglas de aplicación general? ¿Acaso el hecho de que, desde su propia introducción, se hace referencia específica a las circunstancias en que se aprobaron y que existía una investigación en curso permiten inferir lo contrario? ¿Por qué la Resolución dispone que "resulta inapropiado que una funcionario de confianza del Juez Presidente contrate servicios para realizar una investigación sobre el uso de fondos de la Rama Judicial relacionada con los serios señalamientos contra el Juez Presidente"? **¿No está el Tribunal prejuzgando la legalidad de un asunto que no se ha cuestionado ante foro judicial alguno?**

Además de prejuzgar la validez de la contratación antes mencionada, las premisas en que se basan ambas Resoluciones resultan altamente preocupantes pues dan la impresión de que

este Tribunal ha adjudicado la validez de las investigaciones iniciadas por las otras ramas de gobierno sin que ese asunto haya sido cuestionado ante foro judicial alguno. Ante ese cuestionable proceder, análogo a una opinión consultiva, es imperativo preguntarse si este Tribunal se ha autoexcluido de examinar controversias futuras sobre la legalidad de las investigaciones en curso. Véase, E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Máxime cuando esas investigaciones podrían lacerar importantes derechos constitucionales individuales que, por imperativo del debido proceso de ley, conllevan el derecho a una adjudicación ante un juzgador imparcial. Véase J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá, 2009, págs. 613-614.

De otro lado, la Regla 2 de la primera Resolución dispone que "estas reglas […] [t]ienen el fin de garantizar la pureza de los procedimientos investigativos realizados con fondos de la Rama Judicial, incluyendo… cualquier otro asunto de auditoría de recursos judiciales". Asimismo, la Regla 3 preceptúa que "[e]stas reglas regirán cualquier procedimiento investigativo realizado con fondos de la Rama Judicial… relacionado con el uso de su personal asignación, fiscalización de fondos y de recursos judiciales". Encima, la Regla 8 establece que "[c]ualquier contrato otorgado que no cumpla con el procedimiento y los parámetros dispuestos por estas reglas quedará resuelto o rescindido según sea el caso". **¿Significa eso que todos los contratos de auditoría de**

**la Rama Judicial válidamente otorgados también quedan menoscabados de forma inconstitucional?**

Por su parte, la Regla 6 (d) establece los requisitos para los miembros de las comisiones de investigación que designará el Tribunal al amparo de estas Reglas. Esos requisitos no incluyen ser abogado. No obstante, la Regla 6(f) le requiere a la Comisión que realice un informe que "deberá contener una exposición de los hechos que dieron lugar a la investigación y un análisis de los mismos a la luz del derecho aplicable". Cabe preguntarse, ¿este Tribunal descansará en un análisis de derecho realizado por personas que no tienen que ser profesionales del derecho?

Por otro lado, la Regla 6(f) también exige que los expedientes de las investigaciones sean "de naturaleza confidencial". ¿Sabemos durante cuanto tiempo serán confidenciales? ¿No es este un lenguaje precisamente inconstitucional a la luz de lo resuelto en Soto v. Srio. de Justicia, 112 D.P.R. 477, 503 (1982)? ("Ninguna ley de confidencialidad absoluta pued[e] invocarse frente al derecho constitucional de la ciudadanía de obtener información de su gobierno que pudiera revelar conducta cuestionable, susceptible de desagravio"). Véase, además, Ortiz Rivera v. Bauermeister, 152 D.P.R. 161, 183 (2000) ("No se justifica que extendamos la confidencialidad de los expedientes investigativos en procedimientos disciplinarios judiciales una vez la fase investigativa ha culminado con una determinación final y firme").

Finalmente, se hace poco menos que imposible delimitar el alcance de la investigación ordenada por la segunda Resolución. Por un lado, ambas Resoluciones enmarcan la aprobación de las Reglas y la designación de la Comisión en las circunstancias relacionadas a la contratación del licenciado López Cintrón. De hecho, la Regla 5 de la Primera Resolución establece que, tras presentarse "una solicitud para investigación el Tribunal en Pleno decidirá si ordena y remite el asunto a la Comisión". Es decir, que será necesario enmarcar un "asunto" objeto de investigación para así poderlo remitir a la Comisión. Sin embargo, al acudir al texto de la encomienda ordenada por la segunda Resolución, vemos que esta dispone que "[l]a Comisión deberá investigar el uso de fondos y recursos públicos de la Rama Judicial, así como los desembolsos por parte de la OAT y su Directora". Cómo interpretar el alcance tan vago y ambiguo de estos textos representará, sin duda, un enorme reto.

Ante estas preocupaciones sobre el texto de las referidas Resoluciones, resulta lógico pensar que este será el principio de una larga controversia sobre la distribución de poderes internos de la Rama Judicial y que podemos anticipar desestabilizará por muchos años la administración de una de las tres Ramas de nuestro ordenamiento constitucional. Lo peor es que el daño es auto infligido.

X.

A modo de epílogo, deseo expresar que nos corresponde a todos defender nuestras instituciones y sostener el Estado de Derecho que es fundamental para nuestra convivencia como

sociedad democrática. Todo país necesita poder confiar en una seguridad jurídica garantizada, principalmente, por su Tribunal Supremo. Cuando un máximo foro judicial dictamina, sin tan siquiera tener un caso ante sí, que puede arrebatar la libertad física de un ciudadano, se pone en entredicho el Estado de Derecho. Cuando un máximo Foro judicial deja sin efecto obligaciones contractuales válidas, que no han sido puestas en controversia y que no se le han sometido para adjudicación, se socava la legitimad y confianza de un pueblo en su sistema judicial y la seguridad jurídica de todas las personas, incluyendo a las empresas comerciales e industriales.

Yo continuaré defendiendo con firmeza la Constitución a la que me he adherido con convicción durante casi tres décadas en este Foro. Confío que lo ocurrido nos obligue a todos los miembros de este Tribunal, incluyendo a este servidor, a reflexionar sobre la sabiduría de este modo de resolver nuestras diferencias y que el tiempo nos permita restablecer el diálogo y la confianza que el país espera de todos los que tenemos el privilegio de servir al país en esta Curia. Invito a mis compañeros jueces y juezas a hacer lo mismo, conscientes de que la Constitución debe siempre prevalecer sobre nuestras preferencias personales. No olvidemos que debemos ser prudentes en el ejercicio de nuestros poderes por el bien de la justicia y de Puerto Rico.[23] En lo que a este servidor respecta, mi compromiso

---

[23] Así nos lo recuerda el profesor José Julián Álvarez González en su interpretación de la obra de 1962 del
(continúa...)

siempre ha sido y será con esta institución y con la
Constitución que juré defender con fidelidad en dos
ocasiones, una como Juez Asociado y otra como Juez
Presidente.


                              Federico Hernández Denton
                                      Juez Presidente

---

constitucionalista estadounidense Alexander Bickel, *The Least Dangerous Branch.*

> No conozco un mejor esfuerzo por contestar la pregunta sobre qué limita las interpretaciones constitucionales de los jueces que el de Alexander Bickel. Tomándome grandes libertades con su extremadamente complicado conjunto de respuestas, su contestación fue: nada, pero todo. Nada, en teoría, porque si los jueces supremos están decididos a alcanzar una solución que personalmente desean, tienen el poder para ello. No obstante, sostuvo Bickel, todo en la práctica los constriñe: el texto constitucional, la historia y la estructura, la naturaleza colegiada de la Corte, el requisito de caso o controversia, los precedentes, la obligación de los jueces de justificar sus decisiones, la opinión pública, su falta de una base política y la necesidad de lograr la cooperación de las otras ramas para poner en vigor sus decisiones, su deseo por mantener prestigio personal e institucional y su propio sentido de humildad y duda.

J.J. Álvarez González, *Otra Mirada a la 'Constitución Discrecional'*, en R. Saba, ed., Estado de Derecho y Democracia: Un Debate Acerca del Rule of Law, Buenos Aires: Ed. Universidad de Palermo, 2001, pág. 183. (Citas omitidas).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| *In re*: | |
| Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial | ER-2012-1 |
| *In re*: | |
| Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas | EN-2012-1 |

Voto particular disidente emitido por la Jueza Asociada señora FIOL MATTA al cual se une el Juez Presidente señor HERNÁNDEZ DENTON

En San Juan, Puerto Rico, a 21 de febrero de 2012.

Al aprobar las dos resoluciones que motivan mis expresiones, este Tribunal utiliza su función como intérprete final de la Constitución de Puerto Rico para traspasar los límites al ejercicio de ese poder que la propia Constitución le impone. El que esta decisión sea irreversible hasta tanto la mayoría decida otra cosa no los convierte en dueños de la Constitución, ni en sus autores. Nuestro llamado es a ser protectores de la voluntad del Pueblo constituido y esa voluntad, plasmada en nuestra Ley Suprema, dicta que nuestro poder para interpretar la Constitución no es ilimitado; no nos permite construirla

como nos plazca. Todo poder, incluyendo el del Tribunal Supremo, tiene límites. Sin embargo, la lógica de una mayoría del Tribunal parece codificar la infalibilidad judicial; en efecto, parece proclamar que, como somos los intérpretes de la Constitución, por definición, no podemos violarla.[24] La realidad es que la verdadera Constitución, voluntad viva del Pueblo, es mucho más que el razonamiento errado de un momento. El Pueblo retiene siempre la potestad de revocarlo.

I

Una mayoría de este Tribunal aprobó una Resolución mediante la cual pretende no sólo reglamentar sino ejercer el control total sobre las funciones administrativas de investigación y fiscalización respecto al uso de recursos en la Rama Judicial.[25] Al hacerlo, intenta fundamentar su acción en la sección 7 del Artículo V de la Constitución de Puerto Rico. Dicha sección lee:

---

[24] La mal llamada infalibilidad de los máximos foros constitucionales de un país ha sido objeto de análisis y crítica por la comunidad legal a través del tiempo. H.L.A. Hart, The Concept of Law, London, Oxford University Press, 1975, pág. 138. Como manifestó el Juez Robert Jackson, "no somos finales porque somos infalibles, somos infalibles únicamente porque somos finales". Brown v. Allen, 344 U.S. 443, 540 (1953) (Opinión concurrente del juez asociado Jackson). Pero el problema de la infalibilidad judicial es más peligroso cuando, en vez de simplemente equivocarse en una adjudicación constitucional, es el propio Tribunal Supremo el que ha violado, como actor, los límites de la Constitución. J.W. Nowlin, Constitutional Violations by the United States Supreme Court: Analytical Foundations, 2005 U. Ill. L. Rev. 1123 (2005).

[25] In re: Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, ER-2012-1.

>El Tribunal Supremo adoptará reglas para la administración de los tribunales las que estarán sujetas a las leyes relativas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno. El Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado.[26]

Entiende la mayoría que esta sección permite al Tribunal adoptar el Reglamento contenido en la Resolución y decretar la suspensión de una investigación sobre el uso de recursos en la Rama Judicial ordenada por la Oficina de Administración de Tribunales (OAT). El examen sosegado de la disposición constitucional, su historial y su función en nuestro esquema constitucional, contradice esa conclusión.

La exposición de motivos de la Resolución sostiene que la sección 7 faculta al Pleno del Tribunal para adoptar reglas de naturaleza administrativa respecto al momento y la manera en que se fiscalizarán los fondos de la Rama Judicial, a expensas de las facultades del Juez Presidente para hacer lo propio. Esto no lo dice el texto de la sección 7 al establecer, como condición al ejercicio del poder de reglamentación, que las reglas adoptadas cumplan, entre otras, con "las leyes relativas a… la fiscalización de fondos" públicos. No hay, pues, autorización expresa para adoptar reglas sobre la fiscalización de los fondos de la Rama Judicial. Debemos, entonces, interpretar el texto constitucional para determinar si dicha facultad surge

---

[26] Art. V sec. 7, Const. P.R.

implícitamente del mencionado texto o del esquema constitucional en general.

La propia sección 7 dispone que la <u>dirección</u> administrativa de la Rama Judicial corresponde al Juez Presidente. Su poder constitucional es de tal magnitud que la selección y remoción del director administrativo de los tribunales queda a su total discreción. Examinado el texto de la sección 7, es evidente que el Tribunal Supremo tiene un rol constitucional en la administración de los tribunales. Pero dicho poder no llega a los extremos a los que pretende llevarlo la mayoría en las resoluciones certificadas. Éstas, no importa sus títulos, no son meras reglas ni se limitan a designar miembros de una Comisión. Más bien, trastocan el esquema constitucional de administración, invadiendo, por un lado, el poder otorgado <u>exclusivamente</u> al Juez Presidente y, por el otro, violando las fronteras del poder regulatorio <u>compartido</u> por el Pleno, que, dicho sea de paso, incluye al propio Juez Presidente.

Al interpretar una disposición constitucional como la sección 7 del Artículo V, no podemos caer en la tentación de limitar nuestros esfuerzos a un análisis superficial. Los conceptos constitucionales no son palabras adoptadas casualmente; son parte de un diseño delicado, cuyo fin es evitar lo que hoy se ha materializado: la concentración del poder.[27] La mayoría parece invitarnos a que interpretemos la

---

[27] El Voto de Conformidad afirma que yo celebro "una **dictadura imperial** sin aparentes límites en su facultad administrativa". (Énfasis en el original.) Voto de

(continúa...)

sección 7 de la siguiente manera: esta sección atiende todo

lo relacionado con la administración de la Rama Judicial y,

como se usa la misma palabra, "administración", para

referirse tanto al Tribunal Supremo como al Juez Presidente,

debemos concluir que el Tribunal reglamenta toda la

administración, el Juez Presidente ejecuta y el director

administrativo facilita. Pero el asunto no es tan sencillo.[28]

Esta interpretación en extremo textualista es impropia para

el análisis de un texto constitucional.[29] Ni siquiera los

---

Conformidad, ER-2012-1 y EN-2012-1, a la pág. 3. Dicha aseveración representa un intento descontextualizado de parafrasear al Juez Antonin Scalia en su disidencia en Planned Parenthood v. Casey, 505 U.S. 833, 996 (1992), en la cual, curiosamente, éste critica a la mayoría del Tribunal Supremo federal por trascender los límites de su poder constitucional. Lo que expresa el Voto de Conformidad es totalmente desacertado. No soy yo quien celebra la concentración de poder; son las resoluciones aprobadas por la mayoría las que establecen un poder judicial irrestricto al asignarle al Pleno el poder que fue dividido constitucionalmente.

[28] En ese sentido, la mayoría parece recurrir a las herramientas de hermenéutica que se utilizan típicamente para la interpretación estatutaria. Tal proceder, además de incorrecto, es peligroso. Una Constitución no se interpreta como si fuera un estatuto. K. Stack, The Divergence of Constitutional and Statutory Interpretation, 75 U. Colo. L. Rev. 1 (2004); A. Kavanagh, Original Intention, Enacted Text and Constitutional Interpretation, 47 Am. J. Juris. 255, 290 (2002).

[29] El Voto de Conformidad, al comentar mi señalamiento sobre este asunto, comete el mismo error en que incurrió al analizar la Constitución: olvida el contexto y analiza mis expresiones superficialmente, para aferrarse a la norma de interpretación estatutaria que supone que los términos se usan siempre con el mismo significado en un mismo texto legislativo. Como explica Clark, la herramienta de la lectura "intratextualista", en la que se emplea una hermenéutica sistemática de los términos utilizados en diferentes partes de un estatuto, no debe usarse mecánicamente en la interpretación constitucional. B. Clark, Federal Lawmaking and the Role of Structure in

(continúa...)

originalistas y textualistas, como el Juez Antonin Scalia, proponen este enfoque. Por el contrario, reconocen que, cuando se trata de la Constitución, el textualismo y la interpretación sistemática resultan insuficientes.[30]

Curiosamente, los dos temas más discutidos al debatirse esta disposición durante la Convención Constituyente fueron aquellos relacionados a la fiscalización de los fondos públicos y el rol exclusivo del Juez Presidente en la administración cotidiana de la Rama Judicial. Veamos este intercambio entre los delegados Muñoz Rivera y Ramos Antonini sobre el alcance de lo que la sección 7 eventualmente dispondría al respecto:

> Delegado Muñoz Rivera:
> [S]i cuando se usa aquí la frase "fiscalización de fondos públicos" incluye la fiscalización previa al desembolso de los fondos además de la fiscalización posterior.
> Delegado Ramos Antonini:

---

Constitutional Interpretation, 96 Calif. L. Rev. 699, 723 (2008). Al referirme a la necesidad de ir más allá del texto, no planteo, como afirma el Voto de Conformidad, que existan dos "administraciones" en la Constitución, sino que, dentro del esquema amplio de separación de poderes de la Constitución, es improcedente una lectura minimalista y simplista que tajantemente otorga todo el poder sustantivo al Tribunal y limita al Juez Presidente meramente a una herramienta de trámite. *Véase* Voto de Conformidad, ER-2012-1 y EN-2012-1, a la pág. 14 esc. 7 y las págs. 20-21.

[30]  A. Scalia, "Common-Law Courts in a Civil-Law System: The Role of the United States Federal Courts in Interpreting the Constitution and Laws", en A Matter of Interpretation (Amy Gutmann ed., 1996). En particular, como explica el profesor Eskridge, no se puede perder de perspectiva que un "estatuto ordinario y la Constitución extraordinaria son instrumentos legales estructuralmente distintos". W. Eskridge, Jr., Textualism and Original Understanding: Should the Supreme Court Read the Federalist but not Statutory Legislative History, 66 Geo. Wash. L. Rev. 1301, 1316 (1998).

<u>Esta materia está gobernada por la voluntad legislativa</u> según dispongan las leyes … Por eso dice ahí: <u>sujeta a</u> la aplicación general de las leyes aplicables al gobierno en general.
Delegado Muñoz Rivera:
¿La Asamblea Legislativa tiene el poder para determinar que los fondos asignados al Tribunal Supremo sean fiscalizados previamente?
Delegado Ramos Antonini:
Claro.[31]

Ante una pregunta semejante del delegado Valentín Vizcarrondo, esta vez sobre el significado de la frase "otras leyes aplicables" como restricción al poder del Tribunal Supremo apara adoptar reglas, el delegado Ramos Antonini afirmó:

Compañero, cualquier ley que pueda ser aplicable en materia de administración a cualquier rama de gobierno será aplicable al Tribunal Supremo de Puerto Rico en materia de administración.[32]

Resulta, pues, meridianamente claro que la frase "sujetas a … la fiscalización de fondos" en la primera oración de la sección 7, que la mayoría enfatiza para afirmar su facultad no sólo para aprobar reglas sobre este asunto sino para revocar la decisión de iniciar una investigación autorizada por el Juez Presidente, no le concede al Tribunal facultad alguna. El único efecto de esta parte de la sección 7 es el que indica el texto: someter el poder de reglamentar la administración de los tribunales a las leyes aprobadas por la Asamblea Legislativa para el

---

[31] (Énfasis suplido.) 3 Diario de Sesiones de la Convención Constituyente, Ed. Conmemorativa 2003, pág. 1666.

[32] *Íd.*

Gobierno en general. El Pleno del Tribunal Supremo no puede derivar de esa oración la facultad de revocar las decisiones administrativas del Juez Presidente ni arrogarse la función exclusiva de reglamentar cómo se fiscalizarán los recursos de la Rama Judicial. Esa posibilidad fue descartada por la Convención Constituyente.

Pero hay más. Es cierto lo que afirma la Exposición de Motivos de la Resolución aprobando las llamadas "Reglas": la sección 7 del Artículo V debe interpretarse, no aislando sus disposiciones, sino en su totalidad. Precisamente, al contraponer la primera oración de esta sección con la segunda, se hace más patente el error de análisis de la mayoría y es obligada la conclusión de que ésta ha usurpado y concentrado un poder que la Constitución expresamente dividió.

La sección 7 otorgó algunas facultades de manera exclusiva al Juez Presidente y otras de manera compartida entre el Pleno y el Juez Presidente. La segunda parte de la sección 7 delega expresamente en el Juez Presidente el poder de dirigir la administración de los tribunales. Esa facultad es exclusiva. El Pleno del Tribunal Supremo no tiene autoridad constitucional para administrar la Rama Judicial, solamente tiene el poder para adoptar reglamentación en esa dirección. La mayoría comete dos errores, cada uno la causa del otro.

En primer lugar, la mayoría concluye que el poder del Juez Presidente para administrar la Rama no es exclusivo. Es decir, confunde el poder del Pleno para adoptar reglas sobre

la administración de los tribunales con la facultad de administrar la Rama. Reglamentar la administración no es administrar. Si ese fuese el caso, el poder de la Asamblea Legislativa para adoptar leyes conllevaría el poder para administrar la cosa pública en Puerto Rico. En segundo lugar, la mayoría concluye que el poder para reglamentar es exclusivo del Pleno, por lo cual puede utilizar ese poder para revocar una decisión administrativa del Juez Presidente. La lógica de este razonamiento, francamente, se me escapa. En esencia, consiste en concluir que, si se tiene poder para reglamentar, se puede reglamentar todo, y en cualquier momento: antes, durante y después. Lo que ocurre es que la Constitución no es una ecuación matemática.[33] El balance de poderes se da al separar unos y compartir otros. No cabe duda que el poder del Juez Presidente de dirigir la administración de la Rama Judicial incluye la facultad para autorizar investigaciones sobre el uso de recursos. Sin embargo, la mayoría confunde su potestad para adoptar reglas con la autoridad para privar al Juez Presidente de la

_____

[33] Según Charles Black, el Derecho Constitucional surge de las instituciones creadas o reconocidas por la Constitución, en vez de directamente de su texto. Clark, *supra*, pág. 727. Por su parte, el Juez Stephen Breyer enfatiza que, en la interpretación constitucional, se debe prestar mayor atención a los valores encarnados en el texto y al diseño del ordenamiento creado en su totalidad. S. Breyer, Active Liberty: Interpreting Our Democratic Constitution, New York, Vintage Books, 2005, pág. 8. En particular, el autor señala la "complejidad estructural" de la Constitución y las salvaguardas que ella misma crea dentro de dicha estructura. *Íd.*, págs. 28-31. Finalmente, como explica el profesor Tribe, en el plan constitucional, "*there's more there than meets the eye*". L. Tribe, The Invisible Constitution, London, Oxford University Press, 2008, pág. 8.

facultad para ejercer las suyas, en este caso, la de ordenar o autorizar investigaciones. En cuanto al poder de velar por el buen uso de los recursos de la Rama, la sección 7 de la Constitución lo otorga a ambos.

El debate en la Convención Constituyente exige y confirma esta conclusión. Al considerarse la sección 7, varios delegados propusieron enmiendas con el fin de limitar, aunque mínimamente, el rol del Juez Presidente como administrador de la Rama Judicial. En particular, se pretendía condicionar las facultades del Juez Presidente para escoger y remover al director administrativo y compartir ese poder con el Pleno del Tribunal Supremo. Todas esas enmiendas fueron derrotadas.

En primera instancia, refiriéndose al director administrativo, el delegado Lino Padrón Rivera propuso añadir a la sección 7 la frase "mientras observe buena conducta", después de "a discreción de dicho magistrado". El propósito de la enmienda se dirigía a evitar que un director administrativo competente fuera cesanteado por un nuevo Juez Presidente. Al oponerse a dicha medida, el delegado Ramos Antonini expresó lo siguiente:

> La mejor manera de pensar para resolver sobre esta enmienda es entender cuál es el propósito de este artículo. El propósito de este artículo es que la responsabilidad de la administración de los tribunales de justicia recaiga en el presidente del Tribunal Supremo, y la letra del artículo al disponer "el Juez Presidente dirigirá la administración de los tribunales y nombrará un director". De manera que a quien hay que proteger aquí es, en primer término, al poder judicial, en el sentido de garantizarle eficiencia en su

funcionamiento por su administración.[34] En segundo término, a quien hay que proteger aquí es al Juez Presidente del Tribunal Supremo en el desempeño de su responsabilidad y descargue de su autoridad para que pueda cumplir con la encomienda de la constitución que le dice que él dirigirá la administración.

......

[P]uesto que donde hay que fijar la atención para resolver esta enmienda es en la responsabilidad y autoridad del Juez Presidente, no debemos en forma alguna coartar su libertad para su eficiencia.[35]

Nada de lo expuesto anteriormente concede facultad al Pleno del Tribunal Supremo para usurpar los poderes delegados al Juez Presidente por la Constitución, ya sean los exclusivos o los compartidos.[36] Por el contrario, la

---

[34] Esto contrasta grandemente con la afirmación constante de las Reglas adoptadas de que ninguna investigación nuestra podrá llevarse a cabo si la Asamblea Legislativa ya ha iniciado otra. Como puede apreciarse, la Convención Constituyente quería evitar ese escenario, disponiendo que el poder protegido por la sección 7 sería la Rama Judicial, de manera que ésta no esté a la merced de los demás poderes en cuanto a la administración interna de sus recursos.

[35] (Énfasis suplido.) 3 Diario de Sesiones de la Convención Constituyente, Ed. Conmemorativa 2003, págs. 1667-1668.

[36] Para concluir que el Juez Presidente no tiene poder alguno para pautar normas sobre el funcionamiento de la Rama Judicial, el Voto de Conformidad cita parte del debate en la Convención Constituyente. Voto de Conformidad, ER-2012-1 y EN-2012-1, a las págs. 16-17. La realidad es que una lectura integral del debate sobre la sección 7 del Artículo V demuestra que los poderes del Pleno del Tribunal Supremo para reglamentar la administración de los tribunales no fueron otorgados a expensas de los del Juez Presidente. El debate citado por el Voto de Conformidad se refería específicamente a si se debía exigir que la facultad del Juez Presidente de nombrar y destituir al Director Administrativo estuviese sujeta a reglamentación. Por entender que ello limitaba los poderes del Juez Presidente, la Convención derrotó la enmienda. Resulta, pues, que el debate citado se centró en proteger los poderes del Juez Presidente. El Voto de Conformidad invierte dicho objetivo y utiliza el debate, fuera de contexto, para reforzar su conclusión equivocada.

Convención Constituyente prohibió tal proceder. Trías Monge lo confirma de manera categórica: "[f]ue parte esencial de la intención legislativa evitar a todo trance huella alguna de administración colegiada".[37] Lo que se pretendía con la sección 7 era llevar a cabo una separación doble del poder. En primera instancia, entre las Ramas: la primacía de la Rama Judicial sobre las demás en cuanto a su propia administración. En segundo lugar, al interior de la Rama: la primacía del Juez Presidente sobre el Pleno del Tribunal en la administración propia del sistema de tribunales.[38]

Nuestra jurisprudencia siempre ha reconocido la deferencia debida a las prerrogativas constitucionales del Juez Presidente. En *Negrón Soto v. Gobernador*, nos enfrentamos a la dicotomía que se produce cuando el Director Administrativo de los tribunales es, además, un juez.[39] En ese caso, atendimos dos asuntos importantes. En primer

---

[37]   J. Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Ed. U.P.R., 1982, Vol. III, pág. 98.

[38] El Voto de Conformidad insiste en que la única división que hizo la Constitución fue delegar al Tribunal Supremo el poder de establecer las reglas de administración y al Juez Presidente la facultad de ponerlas en vigor. Voto de Conformidad, ER-2012-1 y EN-2012-1, a la pág. 11. Procede entonces a caracterizar como "refrescante" mi reconocimiento de que tanto el Pleno del Tribunal Supremo como el Juez Presidente tienen "el poder para velar por el buen uso de los recursos de la Rama Judicial". Voto de Conformidad, ER-2012-1 y EN-2012-1, a la pág. 34. Sin embargo, hasta ahí llega la **aparente coincidencia** entre ambos Votos, pues la Conformidad ni siquiera reconoce el poder del Juez Presidente de llevar a cabo una investigación o auditoría para conocer cómo se están utilizando los fondos de la Rama.

[39] Negrón Soto v. Gobernador, 110 D.P.R. 664 (1981).

lugar, <u>separamos con meridiana claridad la función administrativa del quehacer adjudicativo judicial</u>, distinción que la mayoría no reconoce en esta ocasión, pues simultáneamente adopta un reglamento administrativo <u>y</u> adjudica una controversia que aún no se le ha presentado al amparo de las reglas recién adoptadas. En segundo lugar, en *Negrón Soto v. Gobernador* reconocimos "[l]a amplia facultad otorgada al Juez Presidente".[40] Hoy, esa "amplia facultad" ni siquiera incluye la potestad de autorizar una investigación sobre el uso de los recursos en la Rama Judicial.

Al interpretar un texto constitucional no podemos extraerlo o separarlo artificialmente de las fuerzas históricas que le dieron vida. Nadie pretendería abstraer la Constitución de los Estados Unidos de América de su contexto revolucionario y del marco filosófico de separación de poderes en el cual se confeccionó su esquema de gobierno. Tampoco puede negarse que el estudio de la Declaración de los Derechos del Hombre requiere conocer la obra de Rousseau y demás textos que inspiraron aquel grito de "¡Libertad, igualdad, fraternidad!" que resonó en el mundo occidental. Nuestra Constitución también tiene su historia, si bien más íntima, más nuestra.

Con relación a la sección 7, esa historia se remonta a la Ley Jones, que asignó la administración de la Rama Judicial al Procurador General, es decir, a un funcionario de la Rama Ejecutiva que también era el abogado del Estado

---

[40] *Íd.* a la pág. 667.

en los casos presentados ante el Tribunal.[41] Relata Trías Monge que "[s]obre la necesidad de relevar al Procurador General de la función de administrar la justicia había virtual unanimidad de criterio en la Convención Constituyente".[42] La asignación al Juez Presidente de la dirección de la administración de los tribunales fue, pues, un acto afirmativo de separación de poderes y un factor importantísimo en el esquema de independencia judicial.[43] No

---

[41] El Artículo 14 de la Carta Orgánica de 2 de marzo de 1917, mejor conocida como Ley Jones, dispone que "[e]l Procurador General tendrá a su cargo la administración de justicia en Puerto Rico; será el consejero legal del Gobernador y de los jefes de departamentos, y será responsable de la debida representación del Pueblo de Puerto Rico o de sus funcionarios debidamente constituidos, en todas las demandas y procesos, civiles o criminales, ante el Tribunal Supremo de Puerto Rico … También desempeñará aquellos otros deberes, no incompatibles con esta Ley, que se le asignen por ley".

[42] Trías Monge, *op. cit.*, a la pág. 98.

[43] El modelo inmediato para el esquema adoptado fue el de la Constitución de Nueva Jersey. J. Trías Monge, El Sistema Judicial de Puerto Rico, San Juan, Ed. U.P.R., 1978, pág. 124. Curiosamente, al referirse al modelo de Nueva Jersey, el Voto de Conformidad cita con autoridad unas expresiones del Tribunal Supremo de ese estado que no confirman la tesis de la mayoría, sino las conclusiones de los votos disidentes. El Voto de Conformidad interpreta el siguiente enunciado del Tribunal Supremo de Nueva Jersey: "Those two provisions give the Chief Justice ***and*** the Supreme Court sweeping authority **to govern *their* own house**". (Énfasis en el original.) Voto de Conformidad, ER-2012-1 y EN-2012-1, a la pág. 21. De esta cita surge con claridad que el Tribunal Supremo de Nueva Jersey reconoce que <u>tanto</u> el Juez Presidente como el Tribunal Supremo tienen autoridad para "gobernar" la judicatura. Nada en esta cita apoya la conclusión del Voto de Conformidad de que el Tribunal Supremo de Nueva Jersey "no titubea" al afirmar que el poder del Pleno es establecer la política de la Rama Judicial y el del Juez Presidente es ejecutarla. Más aún, en esa misma Opinión del Tribunal Supremo de Nueva Jersey encontramos que el poder de <u>reglamentar</u> la administración de los tribunales es <u>compartido</u> por el Pleno del Tribunal y el Juez Presidente: "Because <u>their rulemaking authority</u> cannot be

(continúa...)

pueden tratarse livianamente ni borrarse de un plumazo los deslindes de poderes tan cuidadosamente plasmados en la Constitución.[44]

II

Las Reglas adoptadas también encierran un conflicto de separación de poderes, pues expresamente ceden las potestades investigativas de la Rama Judicial ante las otras dos ramas gubernamentales.[45] Ambas resoluciones declaran que las investigaciones especiales de la Rama Judicial no podrán intervenir de forma alguna con las que lleven a cabo las otras dos ramas de Gobierno ni con los testigos que se utilicen en éstas.[46] Asimismo, crean una Comisión Especial

---

circumscribed by legislation, the Supreme Court and the Chief Justice exercise exclusive and plenary power over the governance of the judiciary". (Énfasis suplido.) In re P.L. 2001, Chapter 362, 186 NJ 368, 381-382 (2006). Desafortunadamente, el Voto de Conformidad no cita esta parte de la Opinión.

[44] Al analizar el Informe de la Comisión de la Rama Judicial sobre el traslado de la administración de los tribunales de la Rama Ejecutiva a la Judicial, el Voto de Conformidad concluye: "No cabe duda de la magnitud del poder que la Convención Constituyente delegó al Tribunal Supremo en cuanto a la administración de los tribunales en Puerto Rico". (Énfasis en el original.) Voto de Conformidad, ER-2012-1 y EN-2012-1, a la pág. 13. De esa forma, la mayoría trata de obviar todo el debate acerca de la segunda división del poder, esta vez al interior de la Rama Judicial; cuando advierte que existe, intenta minimizarlo.
[45] Art. I sec. 2, Const. P.R. Véase, además, Artículo 2.003 de la Ley de la Judicatura de 2003, que dispone que el poder de reglamentación del Tribunal estará "enmarcado en el principio de autonomía judicial". (Énfasis nuestro). 3 L.P.R.A. sec. 24c.

[46] Regla 3, Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, ER-2012-1, pág. 3; In re Designación de Miembros de la Comisión
(continúa...)

Independiente del Tribunal Supremo a la cual instruyen que coopere con cualquier investigación que realicen el Poder Ejecutivo o el Poder Legislativo.[47] De ese modo, convierten a la Comisión y, de paso, a la OAT como entidad obligada a darle apoyo a ésta,[48] en brazos investigativos de las ramas políticas del País. Incluso, limitan la facultad de la OAT de realizar investigaciones propias que complementen o corroboren los hallazgos de las demás ramas. Así, se lacera la independencia judicial y nos trae recuerdos preocupantes de aquellas épocas en que eran las otras ramas, a través del Procurador General y del poder de asignación de fondos, quienes administraban la Rama Judicial. Nada impide que más de una rama lleve a cabo cierta investigación a la misma vez. Pero, si se entiende que existe un choque irremediable, el ordenamiento constitucional da primacía a la Rama Judicial para investigar sus asuntos administrativos internos. Eso es parte de la independencia de la Rama Judicial.

La separación de poderes sirve para mantener el equilibrio entre las tres ramas de Gobierno con el fin de evitar que se ponga en peligro el sistema democrático,

---

Especial Independiente y Adopción de Medidas Relacionadas, EN-2012-1, pág. 2.

[47] Regla 6(h), Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, ER-2012-1, pág. 6.

[48] Regla 6(g), Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, ER-2012-1, pág. 6.

concentrando demasiadas facultades en una de éstas.[49] El propósito de esta organización es asegurar que ninguna de las ramas de gobierno pueda convertirse en opresor de los ciudadanos, distribuyendo las tareas y prerrogativas entre tres cuerpos interdependientes que se complementan y se vigilan, manteniendo un balance dinámico que asegura el funcionamiento eficiente de los tres.[50] De esa forma, se mantiene un sistema de "pesos y contrapesos" que evita que una rama amplíe su poder indebidamente, debilitando a las demás.[51] El desequilibrio se produce tanto cuando una rama le arrebata facultades a otra como cuando una de ellas cede sus poderes a otra. Cuando eso sucede, se rompe el balance y es difícil volver a estabilizarlo. El poder de la Rama Judicial de investigar lo que sucede a su interior no puede estar sujeto a la voluntad de las Ramas Legislativa o Ejecutiva.

III

Una mayoría de este Tribunal ejerce de forma simultánea, bajo premisas erróneas, el poder de adoptar reglas y el de adjudicar. Atiende el otorgamiento del contrato relacionado con la investigación iniciada por la OAT como si se tratase de una controversia judicial *bona fide* y concluye que es inválido, sin prueba de violación a

---

[49] *Véase* <u>Negrón Soto v. Gobernador</u>, *supra*, a las págs. 666-667.

[50] *Véase* J.J. Álvarez González, <u>Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos</u>, Bogotá, Ed. Temis, 2009, págs. 235-237, 265.

[51] *Véase* <u>Nogueras v. Hernández Colón</u>, 127 D.P.R. 405, 426-427 (1990).

un reglamento existente al momento de la contratación ni vista previa. Para ello, toma conocimiento de hechos de dudosa certeza o difícil corroboración inmediata.[52] Como consecuencia, ordena a la Directora de la OAT dejar sin efecto el contrato so pena de desacato. Este proceder ejemplifica, tristemente, la dicotomía juez y parte en su peor manifestación.

El propósito de reglamentar es pautar normas que dicten cómo se pondrá en ejecución una ley o una política pública, mientras que el de adjudicar es resolver una controversia jurídica sometida en sus méritos ante un tribunal con competencia y jurisdicción sobre las partes y la materia. Para castigar por desacato se requiere tener jurisdicción sobre la persona y que ésta haya incurrido en un agravio a la autoridad judicial. La existencia de un deber <u>previo</u> está implícita en la propia palabra, pues no puede desacatarse una norma u orden inexistente o desconocida por la parte. En cuanto al desacato por faltar a la dignidad del Tribunal, éste requiere, como mínimo, algún grado de intención y ambos requieren oportunidad de ser oído.

El desacato en Puerto Rico se divide en dos vertientes: la directa y la constructiva, las cuales pueden surgir en el contexto civil o el criminal, dependiendo de la

---

[52] De hecho, el Tribunal ni siquiera tuvo ante sí, ni cita de forma expresa, el contrato en cuestión, pues la descripción de éste que se incluye en las resoluciones se basa en la información que ha difundido la prensa del País.

naturaleza de la afrenta a la autoridad judicial.[53] Pero en ambas situaciones aplica a una persona natural o jurídica que es parte en un proceso judicial ante la consideración de un tribunal. Aquí <u>no existe un proceso judicial sino un ejercicio de reglamentación</u>. Por tratarse de un proceso de reglamentación, ninguna de las modalidades del desacato es aplicable a la situación que atienden las resoluciones refrendadas por una mayoría de este Tribunal.

El tratadista Santos Amadeo explica que el desacato constructivo por desobedecer las órdenes de un tribunal ocurre cuando una persona incumple con una directriz contemplada en una "orden legal relacionada con algún pleito o procedimiento que está o ha estado pendiente" ante el tribunal.[54] Es evidente que este Tribunal no tiene ante su consideración una controversia jurídica presentada mediante un recurso de revisión o apelación. Tampoco hay partes que hayan sido citadas y que hayan incumplido esa orden, que se

---

[53] El desacato directo consiste en "algo hecho o dejado de hacer, en presencia de la Corte, encaminado a impedir o interrumpir sus procedimientos o poner en duda su integridad". S. P. Amadeo, <u>El poder de los tribunales para castigar por desacato</u>, Madrid, Ed. Revista de Derecho Privado, 1961, pág. 7. A su vez, "[u]n desacato indirecto o constructivo es un acto realizado, no en la presencia de la Corte o de un juez mientras actúa judicialmente, bajo circunstancias que razonablemente tiendan a degradar la Corte o al juez como un funcionario judicial, o a obstruir, interrumpir o impedir la administración de justicia por la Corte o el juez". *Íd.*, a la pág. 8. *Véase* <u>In re</u> Héctor <u>Velázquez Hernández</u>, 162 D.P.R. 316 (2004); <u>DACO v. Alturas de Florida Dev. Corp.</u>, 132 D.P.R. 905 (1993), <u>Díaz Aponte v. Comunidad San José, Inc.</u>, 130 D.P.R. 782 (1992); <u>Pueblo v. Lamberty González</u>, 112 D.P.R. 79 (1982); <u>Pueblo v. Torres</u>, 50 D.P.R. 605, 611 (1940).
[54] Amadeo, *op. cit.*, a la pág. 71.

encuentren esgrimiendo argumentos de derecho ni reclamando remedios legales. Más bien, se ha creado un proceso híbrido reglamentario-adjudicativo para asegurar que la Directora de la OAT deje sin efecto un contrato que la mayoría del Pleno no acepta.[55]

El poder de este Foro para reglamentar la administración de los tribunales no es equivalente al de administrar la Rama Judicial. Por tanto, las medidas que adopte este Tribunal no pueden estar dirigidas a obstaculizar o limitar el poder delegado constitucionalmente al Juez Presidente como único responsable de la administración de los tribunales. La OAT, como organismo de apoyo en la administración del sistema judicial, tiene el deber de promover el uso eficiente de los fondos públicos en

---

[55] Las resoluciones se fundamentan en que la OAT no tiene facultad para investigar "la conducta de los Jueces y Juezas del Tribunal Supremo". *In re:* Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, ER-2012-1, pág. 2. Sin embargo, como refleja la información citada en otra parte de la misma Resolución, la investigación iniciada por la Directora de la OAT no está dirigida a disciplinar a un juez o una jueza del Tribunal Supremo. Por ello, la razón principal para desautorizar la investigación de la OAT se desploma. Por eso también, contrario a lo que señala el Voto de Conformidad de mis compañeros jueces y jueza que avalaron las resoluciones de epígrafe, no se puede decir que la OAT actuó sin autoridad. Lo que sí hay que advertir es que, si el Reglamento aprobado en la Resolución ER-2012-1 como fin encauzar procedimientos para disciplinar a los jueces y las juezas, ese Reglamento es *ultra vires*, pues al igual que la OAT el Tribunal Supremo no tiene autoridad constitucional para disciplinar a sus integrantes. Respecto a esto tengo que puntualizar que se equivocan los jueces asociados y la jueza asociada de mayoría cuando indican que en este Voto disidente se reconoce que la investigación iniciada por la OAT es *ultra vires*, pues **realmente concluyo todo lo contrario**. Véase Voto de Conformidad, ER-2012-1 y EN-2012-1, págs. 5 y 34.

beneficio del Pueblo para lograr una administración pública de excelencia.[56] Nuestra Constitución, la ley y el Juez Presidente le encomiendan expresamente a la OAT fiscalizar el estado de los tribunales de Puerto Rico.[57] Concluir lo

---

[56] *Véase* Memorando Núm. 1 del año fiscal 1998-1999 de la OAT, Restructuración de la Oficina de Administración de los Tribunales: Razones, Estructura y Funciones, 1 de julio de 1998. Este documento realza la estructura rediseñada y las nuevas funciones de la OAT. En sus criterios principales para la restructuración incluye "[r]econceptualizar la auditoría como un socio que colabora para que la organización utilice sus fondos con los controles adecuados, y con las mayores probabilidades de lograr efectividad en sus operaciones. Para esto se expanden las funciones de auditoría para incluir la auditoría operacional". (Énfasis nuestro). *Íd.*, a la pág. 1.2. Como misión accesoria a la de asesorar al Juez Presidente, la OAT tiene entre sus funciones principales "[p]reparar la documentación necesaria para rendir cuentas por el uso de los fondos públicos, incluso: planes de trabajo, peticiones presupuestarias e informes de progreso a la Rama Judicial". *Íd.*, a la pág. 2.4.

[57] La Orden Administrativa sobre las Funciones de la Oficina de Administración de los Tribunales, OE-JP-2009-108, establece, conforme al Artículo 2.016 de la Ley de la Judicatura de 2003, que "[e]n virtud de las disposiciones constitucionales y legales… disponemos, entre otros, los deberes y las obligaciones que corresponderán a la Oficina de Administración de los Tribunales bajo la dirección del (de la) Director(a) Administrativo(a) de los Tribunales:
1) Evaluar continuamente los métodos administrativos y la eficiencia del personal del Tribunal General de Justicia y hacer recomendaciones al (a la) Juez(a) Presidente(a) para mejorar el funcionamiento de los tribunales y las demás dependencias de la Rama Judicial.
…
7) Recopilar estadísticas y cualquier otra información sobre el funcionamiento de los tribunales.
…
11) Hacer recomendaciones al (a la) Juez(a) Presidente(a), según los criterios y las normas que a esos fines establezca, sobre… administrar las regiones judiciales o el Tribunal de Apelaciones y tomar las medidas que el(la) Juez(a) Presidente(a) ordene para lograr la mejor utilización de los recursos judiciales.
…

(continúa...)

contrario, como hace una mayoría de este Tribunal, equivale a razonar que la labor de administrar la Rama Judicial debe ser ejercida únicamente de forma colegiada.

En apoyo de esta visión, la mayoría hace una relación de la aprobación de varios reglamentos por el Pleno del Tribunal. Intima que si se adopta nuestra interpretación de la Sección 7 estaríamos anunciando *de facto* que las anteriores instancias de reglamentación fueron fútiles, "ya que el Juez Presidente ostentaría el poder absoluto de administrar la Rama en su carácter individual".[58] Este planteamiento revela, nuevamente, que la mayoría confunde la potestad del Pleno de adoptar reglas con una supuesta autoridad del Pleno de privar al Juez Presidente de la facultad de administrar la Rama Judicial.

La mayoría intenta equiparar las recién aprobadas "Reglas" a los actos de reglamentación anteriores. Sin embargo, estos reglamentos, relacionados a la administración del trabajo judicial y a diversas situaciones que afectaban al personal de la Rama Judicial, no son de la misma naturaleza que las recién aprobadas "Reglas". Además, todos se aprobaron luego de estudios profundos y los relativos al personal de la Rama, tras la recomendación de la Directora Administrativa de la OAT.[59] Las "Reglas" recientemente

---

15) Desempeñar cualquier otra encomienda que [el(la) Juez(a) Presidente(a)] le delegue para la consecución de una administración óptima de la justicia".

[58] *Véase* Voto de Conformidad, ER-2012-1 y EN-2012-1, pág. 24.

[59] En In re Reglas para la Administración del Tribunal de Primera Instancia, 148 D.P.R. 883 (1999), nuestro poder de
(continúa...)

aprobadas no son producto de un proceso de estudio y evaluación y su alcance no es claro; carecen de una estructura lo suficientemente racionalizada para evitar arbitrariedades, ambigüedades y lagunas sustantivas o procesales, y van dirigidas específica e inexorablemente a minar el poder constitucional del Juez Presidente de ejercer su función como administrador de la Rama Judicial. En fin, nada en nuestro voto disidente indica, como aduce la mayoría, que nuestro poder de reglamentar la administración de la Rama Judicial no se haya ejercido antes. Lo único novedoso en esta instancia es el proceder de la mayoría al ejercer un poder constitucional de forma contraria a nuestra Constitución.

---

reglamentación fue ejercido para derogar unas reglas aprobadas en 1975, con el fin de actualizar la administración del foro primario. Se aprobó un cuerpo de reglas abarcador que fue complementado por la labor de varios Comités de Revisión de Reglas del Tribunal de Primera Instancia y discutido ampliamente durante la Conferencia Judicial de 28 de abril de 1998. *Íd.*, a la pág. 883-884. Igualmente, en Regl. Creac. Y Func. Unidad Esp. J. Apel., 134 D.P.R. 670 (1993), se aprobó una reglamentación dirigida a estructurar el manejo interno del trabajo judicial. En In re Enmda. Art. 19.1 Regl. A.S.P.R.J., 158 D.P.R. 191 (2002), la Directora Administrativa de la OAT recomendó una enmienda a las Reglas sobre el personal de la Rama, con el fin de "atemperar el lenguaje a la neutralidad del género" y aclarar otras disposiciones sobre las licencias de vacaciones. *Íd.*, a la pág. 191. Aprobamos dicha recomendación. En In re Enmda. Regl. Adm. Pers. R.J. I, 162 D.P.R. 425 (2004), nuevamente enmendamos un reglamento con el fin de proveer un incentivo adicional que reconociera la labor sobresaliente de los empleados y empleadas eliminando una descalificación de beneficios a aquéllos que hubiesen recibido un aumento por mérito. *Íd.*, a la pág. 425. En In re Enmda. Regl. Adm. Pers. R.J., 167 D.P.R. 822 (2006), se enmendaron dos artículos de dicho reglamento, otra vez por recomendación de la Directora de la OAT, con el fin de aclarar el lenguaje en las disposiciones concernientes al proceso de cesantía y la jornada de trabajo.

Más allá de la inconstitucionalidad de las resoluciones certificadas, tenemos serias dudas en cuanto a la validez y la utilidad de las Reglas adoptadas para los procedimientos de investigaciones especiales independientes de la Rama Judicial. Éstas no tan sólo son vagas en cuanto a su alcance, sino que contravienen el principio de pureza en las investigaciones que supuestamente motiva la reglamentación.

El alcance de las Reglas es incongruente. Por un lado, las Reglas 4 y 6 sugieren que las normas adoptadas aplican a las investigaciones cuyo objeto sean los jueces y las juezas del Tribunal Supremo o su personal. No obstante, las Reglas 2 y 3 establecen que las Reglas aplicarán a todos los procedimientos investigativos dirigidos a cualquier funcionario de la Rama Judicial. Asimismo, la Regla 5 señala que se enviará a una Comisión Especial cualquier asunto cuya investigación se autorice, pero la Regla 6(a) indica que las comisiones se crearán cuando las investigaciones incluyan a los jueces que componen el Tribunal Supremo o su personal.

Notamos, además, que, debido a lo apurado que fue el proceso de adoptar y aprobar esta reglamentación, éstas son propensas a dejar un sinnúmero de asuntos al descubierto, tanto a nivel procesal como sustantivo.[60] Realmente, más allá de su título, fundamento jurídico y alcance, las Reglas

---

[60] Por ejemplo, se obvió algo tan básico como informar a todos los Jueces Asociados y Juezas Asociadas quiénes son las personas designadas a la Comisión y sus cualificaciones para desempeñar las funciones asignadas.

atienden pocos asuntos. Solamente disponen sobre ciertos requisitos de forma para solicitar al Tribunal que apruebe una solicitud de investigación,[61] la investigación de asuntos relacionados con los jueces y las juezas del Tribunal Supremo y su personal, y los aspectos operacionales de la Comisión Especial Independiente. La Regla 7 deja a la discreción de este Tribunal determinar el trámite a seguir en cualquier situación no contemplada en la Resolución.[62] Evidentemente, serán muchos los aspectos no previstos.

Esta estructura reglamentaria es hueca. En lugar de llenar un vacío, estas reglas establecen un esquema de investigaciones improvisadas que pueden tornarse fácilmente arbitrarias,[63] pues se implanta un procedimiento de investigación centrado en decisiones *ad hoc*. Esto no

---

[61] Por ejemplo, que sea juramentada la solicitud, si no proviene del Juez Presidente o algún Juez Asociado o Jueza Asociada del Tribunal Supremo. Regla 4(c), Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial; *In re* Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas, EN-2012-1, pág. 4.

[62] "El Tribunal Supremo determinará el trámite a seguir en los asuntos no previstos por estas Reglas, en la forma que garantice el cumplimiento de los propósitos de transparencia y sana administración pública que inspiran estos procedimientos". Regla 7, Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial; *In re* Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas, EN-2012-1, pág. 6.

[63] Por ejemplo, a la Comisión nombrada en esta ocasión para investigar la investigación encomendada por la OAT no se le brindan más parámetros que "investigar el uso de fondos y recursos públicos de la Rama Judicial", no interferir con las investigaciones de las ramas Legislativa y Ejecutiva, y respetar los "principios" del debido proceso de ley, la imparcialidad y la objetividad.

propicia la indagación eficiente y justa en los procedimientos de investigación realizados con fondos de la Rama Judicial y es particularmente preocupante frente al derecho al debido proceso de ley que tiene cualquier persona objeto de una pesquisa bajo estas reglas.

## IV

Estas resoluciones surgen como reacción a una situación particular en lugar de responder a un análisis ponderado sobre la necesidad de reglamentar alguna fase de la administración de los tribunales, el alcance de ese ejercicio y la mejor manera de llevarlo a cabo. Las resoluciones que motivan estas páginas quebrantan nuestro esquema constitucional al restarle poderes tanto al Juez Presidente como a la Rama Judicial; violan el derecho a un debido proceso de ley de la directora de la OAT y establecen unas reglas ambiguas que no cumplen con lo que se proponen. La acción que ha tomado una mayoría del Tribunal representa un precedente peligroso para la administración de una de las tres ramas de Gobierno del País y afecta el balance de poderes fundamental en nuestro esquema de Gobierno. Por todo ello, disiento.

Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| *In re*:<br><br>Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial | ER-2012-1 |
| *In re*:<br><br>Designación de Miembros de la Comisión Especial Independiente y Adopción de Medidas Relacionadas | EN-2012-1 |

Voto particular disidente emitido por la Juez Asociada señora Rodríguez Rodríguez al que se une el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico, a 21 de febrero de 2012

A sesenta años de la firma de la Constitución del Estado Libre Asociado de Puerto Rico, el País es testigo de lo que, probablemente, pueda catalogarse como la más grave crisis constitucional de su Historia.[64] Las Resoluciones de epígrafe, aprobadas por una mayoría de los miembros de este Tribunal, no caben en el texto que se firmó el 6 de febrero de 1952 y que el pueblo ratificó con su voto, mayoritariamente, meses más tarde. Es lastimoso observar cómo aquellos entendidos colectivos procurados por hombres y mujeres de bien, se minusvaloran de tal manera, que

---

[64] El *Voto de conformidad* emitido por una mayoría de esta Curia "aspira a *hacer creer*" que la acuñada frase *crisis constitucional* es producto de una "fantasía hiperbólica" de la disidencia. Llegar a tal conclusión es abstraerse de la realidad pública e intelectual que nos rodea.

colocan a este Tribunal al margen del ordenamiento constitucional establecido.

En estos momentos, cuando conmemoramos un evento tan significativo como la firma de nuestra Constitución, hoy bajo asedio, recordemos a esos hombres y mujeres quienes, sin importar su proceder, su pensamiento o su ideología, supieron apreciar y aquilatar el excelso documento que suscribían prestándole su adhesión. Así, antes o después de firmar el texto constitucional aquel sexagésimo segundo día de sesión, esto fue lo que dijeron:

> SR. GUTIÉRREZ FRANQUI: ... Acabamos de firmar el documento que contiene la Constitución del Estado Libre Asociado de Puerto Rico, escrita por el pueblo de Puerto Rico a través de sus delegados designados a ese efecto. **No puedo pensar en otro momento de nuestra historia que pueda compararse con éste, en cuanto a su significación y trascendencia.**
>
> ....
>
> SR. GELPÍ: Sr. Presidente; compañeros delegados:
>
> Yo realmente no s[é] qué admirar más en este momento tan solemne para el pueblo de Puerto Rico – principalmente por la responsabilidad que envuelve para los hombres que hemos estado aquí laborando, uno y otro día, para hacer lo mejor que hemos creído que se puede hacer actualmente en beneficio del pueblo de Puerto Rico-y**o no sé si es la propia Constitución, que yo creo es el documento más importante que han podido escribir los puertorriqueños hasta la fecha, hasta el día de hoy, o esta armonía tan grande, esta confraternidad que se viene expresando en el semblante de todos los delegados, donde no ha habido diferencia de personas, de ideales ni de nada, sino todos unidos en un solo pensamiento, en el pensamiento de Puerto Rico, en hacer lo mejor que se pueda para este pueblo.**
>
> ....
>
> SR. FERRÉ: Señor Presidente; compañeros delegados y distinguidos visitantes:

Poco me queda por decir en este hemiciclo augusto que no haya ya dicho yo en defensa de los principios que he sustentado y defendido con toda humildad toda mi vida. Al cerrar sus trabajos esta Convención Constituyente, sólo me resta decir que regreso a mi hogar, tranquilo con mi conciencia ...

....

**También me voy satisfecho, como puertorriqueño, porque a pesar de la discrepancia que nos ha mantenido y aún nos mantiene separados en cuestiones fundamentales, hemos llevado a cabo nuestro trabajo en un plano de elevada actitud cordial y de nobles motivaciones.** Eso nada más sería suficiente, compañeros, para que yo me sintiera orgulloso de haber participado en las deliberaciones de un grupo de compatriotas tan distinguidos.

....

SR. GARCÍA MÉNDEZ: Sr. Presidente, distinguidos visitantes, queridos compañeros: Sólo dos palabras: ... Voy sólo a deciros que a pesar de que comenzamos con discrepancias fuertes y continuamos luego luchando con nuestras discrepancias nobles; y a pesar de que comenzamos, como diría Nervo, juntos y separados como los remos de una misma barca, a la postre, luego de haber terminado este trabajo – que no se sabe fuera de aquí lo mucho que cansa el cerebro y lo mucho que a veces estruja el corazón, hemos terminado en forma tal: ustedes han usado de un espíritu y [actuado] con el corazón levantado, aceptando las enmiendas que para nosotros eran *sine qua non*. **Y yo creo que tengo derecho a decir, saliendo sinceramente de los hornos secretos de mi corazón, que los delegados que estamos aquí reunidos en este momento trascendente para la historia de nuestro país, han realizado una labor y han terminado redactando un documento que es honra de Puerto Rico y de los puertorriqueños.**

....

**[E]levemos nuestro pensamiento a Dios; para que en el silencio de esta plegaria esta Constitución toque a rebato en nuestros corazones, la podamos defender con uñas y con dientes y en definitiva nos traiga la felicidad a todos los puertorriqueños bajo el amplio palio de una amada tierra puertorriqueña.**

....

SR. PADRÓN RIVERA: **Después de haberse firmado la Constitución la delegación socialista que tengo el alto honor de presidir desea expresar que siente una profunda satisfacción por haber cumplido un deber patriótico cooperando en el deseo mutuo de todos los partidos aquí representados por el éxito de tener una constitución que encarna la conciencia de nuestro pueblo.**

....

No tengo temor en declarar que he adquirido una gran experiencia durante todo el proceso constitucional. La experiencia que me ha dado el estudio de todas las constituciones de Estados Unidos de América, de América Latina y de Europa me puso en condiciones para hacer un estudio comparativo con nuestra Constitución **y me siento orgulloso de poder decir ahora que ninguna de estas constituciones sanciona y consagra los derechos del pueblo en forma tan democrática como nuestra Constitución.**

....

**Se dijo que la Constitución estaba hecha. Yo tuve mis dudas sobre lo contrario pero luego aclaré mi mente y confieso con honradez intelectual y como líder responsable de un partido que no hay un solo delegado en esta Constituyente que no haya puesto su contribución en la redacción de esta Constitución. Y la Constitución es buena porque ella encarna la conciencia de los tres partidos aquí representados; por eso todos la hemos firmado para glorificarla en la historia de nuestra patria.**

*Diario de Sesiones de la Convención Constituyente*, Tomo IV, págs. 2464, 2469, 2470, 2472, 2474, 2476 (1961) (en adelante, *Diario de Sesiones*) (énfasis nuestro).

**¡Celebremos el espíritu y la altura de miras que fue; iniciemos la lucha para recuperarlo!**

Todo lo cual se hace necesario porque las Resoluciones aprobadas usurpan facultades constitucionales del Juez Presidente y lesionan principios democráticos de primer orden. Nos colocan en una zona oscura donde se hace imposible distinguir entre la excepción y la regla. *Véase*

Giorgio Agamben, *Homo Sacer* (Pre-Textos, España, 2006).  No albergo duda que desde este momento esta Curia ha escogido transitar por un ensortijado camino que nos aparta del sendero democrático que, como pueblo, habíamos decidido recorrer juntos. La acción que toma una mayoría de este Tribunal representa un retroceso en nuestro sistema político-democrático. Vale la pena aclarar que para que una decisión sea democrática no es suficiente con que haya sido aprobada por una mayoría.  Además de la aprobación mayoritaria, la decisión deberá reflejar los entendidos básicos y valores democráticos establecidos en la Constitución.  *Véase* Aharon Barak, *The Judge in a Democracy*, págs. 23-27 (Princenton University Press, 2006).[65]

Acorde a lo anterior, es mi deber recordarles a los integrantes de la mayoría de este Tribunal que una condición principalísima de cualquier orden democrático es la institucionalización de los entendidos colectivos a los cuales los miembros del cuerpo social han llegado.  La falta de dicha institucionalización imposibilita garantizar la estabilidad social y apareja, con ello, la pérdida de legitimidad ante quienes han acordado ceder parte de sus prerrogativas individuales en pos de que el Estado provea,

---

[65] Aharon Barak fue Juez Presidente del Tribunal Supremo de Israel (1995-2006).  En la actualidad es profesor de Derecho en varias escuelas prestigiosas, entre ellas la Escuela de Derecho de la Universidad de Yale.  Además, es autor de *Judicial Discretion* (1989), *Purposive Interpretation in Law* (2005), varios libros en hebreo y numerosos artículos en revistas jurídicas de habla inglesa.

cuanto menos, igualdad ante la ley. No es casual que, en todas las democracias liberales, la forma por antonomasia de institucionalización de estos acuerdos sea la Constitución. Es la Constitución la que da continuidad y garantía a la democracia como forma de organización política. Los acuerdos plasmados en ésta no pueden -ni deben- estar sujetos a la cambiante voluntad de quienes tienen el rol de interpretarla.

El Juez Breyer señala que "[t]he Constitution sets boundaries within which the institutions of government must act. And the Court's constitutional job is primarily that of a boundary patrol". Stephen Bryer, *Making Our Democracy Work: The Yale Lectures*, The Yale Law Journal, pág. 20 (2011). Hoy una mayoría de este Tribunal ha traspasado esas fronteras en un afán goloso de apropiarse de aquello que no le corresponde: los poderes del Juez Presidente.

Es mi obligación reiterar nuevamente que la dúctil interpretación de la Ley Suprema pone en riesgo la estabilidad y la confianza que la ciudadanía ha depositado en este cuerpo como el más Alto Foro judicial y lacera nuestra democracia. El proceder mayoritario que hoy rechazamos socava la legitimidad de esta Institución y crea un estado de excepción que más que conservar el Estado de Derecho, lo revoca a su propia voluntad.

En este sentido, Giorgio Agamben[66] señala que "[e]l Estado de excepción no es un derecho especial (como el derecho de guerra) sino que, en cuanto suspensión del propio orden jurídico, define el umbral o el concepto límite". Giorgio Agamben, *Estado de Excepción*, pág. 28 (Buenos Aires, Adriana Hidalgo Editores, 2004). Todo indica que nos encontramos ante otro momento de excepción donde, tras el subterfugio de la interpretación de nuestro poder de reglamentar, se suspenden arbitrariamente las potestades constitucionales del Juez Presidente. Irrumpir indebidamente en dichas facultades en el marco de una investigación independiente no hace otra cosa que lacerar la legitimidad de este Tribunal como el último foro garantizador de justicia. Indubitadamente estamos ante un concepto límite que presagia el lento pero seguro derrocamiento de nuestro orden constitucional.

Es por ello que el lenguaje de la Resolución certificada por la mayoría de este Tribunal es revelador. En ésta se deja entrever el espacio creado entre la norma y su aplicación para que, mediante una interpretación forzada, se construya un espejismo de corrección jurídica.

---

[66] Giorgio Agamben es un filósofo y jurista italiano. Nació en Roma en 1942. En su juventud asistió a los célebres seminarios de Martin Heidegger en Le Thor. Ha dictado cursos en diversas universidades europeas. Desde 1986 es director de programa en el Collége International de Philosophie de Paris. Entre sus libros se destacan: *El hombre sin contenido* (1970); *Estancias: la palabra y el fantasma en la cultura occidental* (1977); *El lenguaje y la muerte* (1982); *Idea de la prosa* (1985); *La comunidad que viene* (1995); *Medios sin fin* (1996); *Lo que queda de Auschwitz* (1998) y *El tiempo que falta* (2000), entre otros.

Decir hoy que las actuaciones de esta Curia están dirigidas a "defender la independencia del Poder Judicial, los preceptos de nuestra función constitucional, y en respuesta a la necesidad de mantener mecanismos efectivos y transparentes para atender aquellas investigaciones realizadas por la Rama Judicial", *In re: Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial*, ER-2012-1, no es otra cosa que tergiversar el Estado de Derecho vigente para ocultar la inconstitucionalidad de una reglamentación que a todas luces lo es.

## I

Pasemos a ver entonces qué dice la Constitución sobre la controversia que hoy pende ante el País. Para ello debemos analizar el texto constitucional tomando en cuenta los siguientes factores: el propio texto; el marco teórico y disposiciones de otras jurisdicciones que le sirvieron de influencia; el entendido de los constituyentes; el contexto histórico en que se promulga; el comportamiento durante sesenta años de los actores constitucionales que han vivido su historia; y, como siempre, todo ello en armonía con el sentido común y sin ánimo prevenido.[67]Finalmente, en esta tarea debemos procurar que la interpretación que hagamos

---

[67] Contrario al *Voto de conformidad* que suscribe la mayoría, no limitaremos nuestra exégesis constitucional sólo al "texto mismo de la disposición constitucional y el historial de la Convención Constituyente", *Voto de conformidad*, ER-2012-1; EN-2012-1 (2012), sino que ampliaremos el marco de fuentes que puedan arrojarnos luz sobre esta empresa.

pueda armonizar las distintas oraciones del texto interpretado, de suerte que nuestra lectura no tenga el efecto real de negar el alcance de una cláusula a favor de otra.

**A**

La Sección 7 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico dispone que:

> El Tribunal Supremo adoptará reglas para la administración de los tribunales las que estarán sujetas a las leyes relativas a los suministros, personal, asignación y fiscalización de fondos, y otras leyes aplicables en general al gobierno. **El Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado.** (énfasis nuestro)

La mayoría se ampara en la primera oración de la sec. 7 del Art. V de la Constitución para justificar su actuación.

Resumamos el pensamiento textualista de la mayoría. Éste dice así: como la primera oración de la sec. 7 del Art. V faculta al Tribunal a adoptar reglas "para la administración de los tribunales" y la segunda oración indica que el Juez Presidente dirigirá "la administración de los tribunales", ambas oraciones hablan del mismo asunto, con lo cual, el Juez Presidente "administrará los tribunales" de acuerdo a como nosotros, la mayoría del Tribunal, dispongamos a través de la reglamentación que promulguemos. El problema con esta conclusión es que yerra en sus premisas. Nos confrontamos así con un silogismo defectuoso. Más que todo, este razonamiento retrata un argumento circular y aporético en la medida en que presume

la corrección de lo que se intenta probar en el intento de probarlo. *Véase* Ruggero J. Aldisert, *Logic for Lawyers, A Guide to Clear Legal Thinking* (Clark Boardman Co., 1989); Irving M. Copi & Carl Cohen, *Introduction to Logic* (Prentice Hall, 2007). El propósito evidente de este argumento circular es tergiversar el texto constitucional para crear un espectro de legitimidad.

**B**

La cláusula constitucional bajo análisis se deriva principalmente del sistema inglés. Su origen directo se encuentra en una disposición análoga de la Constitución del estado de Nueva Jersey, la cual dispone lo siguiente en la Sección 7 de su Artículo VI:

> The Chief Justice of the Supreme Court shall be the administrative head of all the courts in the State. He shall appoint an Administrative Director to serve at his pleasure.

La precitada cláusula se basó, a su vez, en los escritos de teóricos influyentes de la época, tales como Roscoe Pound, *véase*, *e.g.*, Roscoe Pound, *Organization of Courts* (1940), y Arthur T. Vanderbilt, cuya obra *Minimun Standards of Judicial Interpretation* (1949) se convertiría luego en la piedra angular de las sucesivas guías modelos creadas por la American Bar Association para la organización de los tribunales estatales. Ambos escritores compartían la visión de que la supervisión de la totalidad del sistema judicial debía recaer sobre la figura del Juez Presidente. Así, Vanderbilt señalaba que "every judicial system must have a single administrative head who has the

power and responsibility for making the judicial establishment function efficiently". Arthur T. Vanderbilt, *Cases and Other Materials on Modern Procedure and Judicial Administration*, pág. 1253 (Washington Square Publishing Corporation, New York, 1952).

Basándose en estos preceptos, el Comité sobre los Estándares de Administración Judicial de la American Bar Association expresó:

> The chief justice should provide the court system with intellectual and professional leadership. He should also excercise powers of general supervision, including:
> (i) assignment of judicial and non-judicial personnel;
> (ii) **Supervision of the court system's financial affairs**, its program of continuing education for judicial and non-judicial personnel, and its planning and operations research;
> (iii) Serving as chief representative of the court system in relating with other branches of government and with the public;
> (iv) **Being general superintendent of the work of administrative staff of the court system.**

American Bar Association, *Court Organization*, pág. 81 (1974) (énfasis nuestro).

Incluso el Tribunal Supremo de los Estados Unidos tuvo la oportunidad de interpretar esta disposición de la Constitución de Nueva Jersey. En *Kugler v. Helfant*, 421 U.S. 117 (1975), el máximo foro federal dejó sin efecto una determinación del Tribunal de Apelaciones que hubiera permitido la interferencia de la Corte de Distrito federal en un procedimiento criminal del estado de Nueva Jersey. En dicho caso, el Tribunal señaló, sin ambages, que "it is not the New Jersey Supreme Court, or its members, but the

Chief Justice, who is the 'administrative head' of the New Jersey court system". *Id.* en la pág. 128. Lógicamente, del mismo modo que en la jurisdicción de la cual adoptamos la cláusula constitucional que hoy analizamos, en nuestro ordenamiento tampoco le corresponde al Tribunal Supremo, ni a sus miembros, sino al Juez Presidente, administrar la Rama Judicial.

**C**

Los constituyentes fueron claros en su redacción de la sec. 7 del Art. V. Éstos dejaron establecido que la disposición constitucional interpretada constituía un mecanismo para garantizar la independencia judicial, habida cuenta que, hasta entonces, el Procurador General era quien gestionaba la administración de la Justicia. *Diario de Sesiones*, Tomo II, pág. 617, Tomo III, pág. 1667. Esta injerencia del Poder Ejecutivo sobre el Poder Judicial ofendía la separación de poderes que recogía el nuevo texto constitucional, lacerando la independencia judicial. Curiosamente, en los debates de la Convención Constituyente hubo quien propuso que se eliminase la función del Juez Presidente como su administrador y se mantuviese al entonces Procurador General llevando a cabo esa labor. Esta propuesta fue derrotada. *Véase Diario de Sesiones,* Tomo I, págs. 616-618.

De otra parte, la discusión en el seno de la Convención en torno al nombramiento del director administrativo de los tribunales es ilustrativa del sentir de los constituyentes sobre los poderes del Juez

Presidente. El delegado Sr. Ramos Antonini comentó que la Convención Constituyente, con su proceder, buscaba proteger al Juez Presidente "en el desempeño de su responsabilidad y descargue de su autoridad para que pueda cumplir con la encomienda de la constitución que le dice que él dirigirá la administración [de los tribunales]". *Ibid*, pág. 1667. Ramos Antonini conminó a los miembros de la Convención a que no actuasen para "coartar [la] libertad [del Juez Presidente]" y limitar su "eficiencia" en el descargo de la encomienda que la Constitución le había confiado poniendo trabas sobre el desempeño del director administrativo de los tribunales. *Ibid.*

Don José Trías Monge, nuestro más insigne constitucionalista, miembro de la Convención Constituyente y Juez Presidente de este Tribunal, al explicar el alcance y contenido de esta encomienda constitucional, nos señala lo siguiente: "**Fue parte esencial de la intención legislativa evitar a todo trance huella alguna de administración colegiada**". José Trías Monge, *Historia Constitucional de Puerto Rico*, pág. 98 (Editorial Universidad de Puerto Rico, Vol. III, Río Piedras, 1982) (énfasis nuestro). Dicho de otra manera, esta disposición constitucional pretende proteger la independencia del Juez Presidente en su función administrativa, del mecanismo colegiado que prima en la función de adjudicación de los miembros de este Tribunal.

Esto no quiere decir que el Juez Presidente no deba, por consideraciones prudenciales y de deferencia, informar

a los miembros de esta Curia de los asuntos más trascendentales que afectan a la Rama Judicial, "a la par que debe estar siempre dispuesto a solicitar o recibir en tales asuntos los valiosos consejos de sus compañeros del estrado". José Trías Monge, *El sistema judicial de Puerto Rico*, pág. 222 (1978). No obstante, aconsejar al Juez Presidente no es sinónimo de impartirle directrices a él o a la Directora Administrativa de los Tribunales en el descargo de las funciones que la Constitución les confirió. Los consejos se imparten cuando se solicitan y no hay obligación legal alguna de solicitarlos.

Por otra parte, el Informe de la Comisión de la Rama Judicial a la Convención Constituyente enumera, "sin que se entiendan excluidas otras similares y análogas", las funciones administrativas de los tribunales, para cuya ejecución e implantación la Constitución ha designado al Juez Presidente. De éstas, vale destacar las siguientes: "... (2) Alquilar locales, comprar y proveer equipo y **servicios**. ... (4) Investigar quejas y formular cargos, ante la autoridad correspondiente, contra **funcionarios y empleados**. (5) Autorizar desembolsos dispuestos por ley y **revisar**[68] **las cuentas de todos los tribunales**. ... (8) Superentender[69] en los tribunales".[70] *Diario de Sesiones*,

---

[68] El texto incluido como apéndice al *Diario de Sesiones* de este Informe, tiene una anotación a pie de página, en cuanto a la expresión "revisar" señalando que leía, en su versión original, "supervisar."

[69] En la versión original también leía "supervisar".

[70] Como bien señala el *Voto de conformidad* redactado en un solo acto por seis jueces de este Tribunal, la Comisión de

(continúa...)

Tomo IV, pág. 2613 (énfasis nuestro). Para poder cumplir con la primera de estas funciones se hace necesario, evidentemente, la aprobación de contratos, prerrogativa ínsita al poder de administrar cualquier entidad. La encomienda quinta antes transcrita es reveladora porque establece, con meridiana claridad, que los constituyentes consideraron como una prerrogativa administrativa del Juez Presidente, "revisar o supervisar" **las cuentas de todos los tribunales**. Es decir, ya la Convención pasó juicio sobre a quién le corresponde la facultad de "**revisar las cuentas de todos los tribunales**" y concluyó que ésta era una de las prerrogativas administrativas que se le delegaban al Juez Presidente. Parece lógico concluir entonces que el Juez Presidente, a través de la Directora Administrativa de los tribunales, ejerce una función de naturaleza administrativa de su exclusiva incumbencia cuando contrata para que se revisen las cuentas de todos los tribunales.

No obstante la claridad del texto, la mayoría de esta Curia se refugia en la primera oración de la sec. 7 del Art. V de la Constitución.

---

la Rama Judicial recomendó traspasar al Tribunal Supremo la administración de los tribunales. Pero tal recomendación se enmarca, no dentro de la pugna actual, sino dentro del contexto de afianzar la independencia judicial al restarle dicha facultad administrativa al Procurador General. Es por ello que tras las ocho facultades recomendadas por la Comisión, el informe indica más adelante: "**Se ha creído conveniente designar al Juez Presidente como la persona encargada de la administración de los tribunales**". *Diario de Sesiones*, Tomo IV, pág. 2613 (énfasis nuestro). Quizás por omisión, el *Voto de conformidad* de la mayoría ignora esta última oración cuando cita el informe de la Comisión.

Las Resoluciones aprobadas por este Tribunal el 1 de febrero de 2012 desvirtúan el propósito de nuestra Constitución de que, por un lado, el Tribunal en Pleno adopte reglas y que, por el otro, la administración de los tribunales recaiga sobre la figura del Juez Presidente. Ya vimos que los constituyentes dejaron claramente establecido que la facultad de reglamentar que se le atribuía al Tribunal Supremo estaba enmarcada en el deseo de desligar la administración del sistema judicial del Poder Ejecutivo de suerte que, cuando el Poder Legislativo y el Poder Ejecutivo aprueben "leyes relativas a los suministros, personal, asignación y fiscalización de fondos", no le dicten al Poder Judicial normas de conducta. Lo que plasmaron los constituyentes fue que sea el propio Tribunal quien atempere su reglamentación a lo dispuesto por las ramas políticas del gobierno. En este tenor, esta disposición lo que pretende hacer es garantizar la independencia judicial de los Poderes Ejecutivo y Legislativo.

Leer otra cosa en el texto constitucional es faltar al rigor que se exige de este Tribunal. **No debemos confundir ni mucho menos fusionar el poder de reglamentar con el de administrar.** La interpretación propuesta por la mayoría lo que hace es negar el alcance de la facultad de administración del Juez Presidente. Es decir, la primera oración lo que representa es una limitación a la segunda oración, mas no una erradicación. No le podemos atribuir a los constituyentes la creación de un andamiaje tan absurdo.

Lo cierto es que no hay **nada** en el texto constitucional que permita la lectura que una mayoría de este Tribunal pretende validar. Por lo tanto, no es allí donde encontramos su razón de ser.

**D**

En cuanto al entendido colectivo de los actores constitucionales, es meritorio señalar que en 1965 el Comité para el Estudio y Evaluación del Sistema Judicial analizó varios temas relacionados con la administración de la justicia, entre ellos, el rol y la función de la Oficina de la Administración de los Tribunales, y de la persona que la dirige. Sobre las facultades del Director Administrativo, el Informe rendido indica:

> El Director Administrativo, según su mismo título constitucional indica, no puede limitarse a las funciones de estado mayor —de asesoramiento y servicios auxiliares— pues también debe y tiene que ser ayudante ejecutivo en el segundo escalafón de la jerarquía.
>
> Ambos funcionarios deben ordenar su división de trabajo y cultivar su relación oficial para producir un liderato unificado y eficaz como se hace en tantas empresas públicas y privadas, pues todo organismo administrativo de gran complejidad inevitablemente requiere que la capacidad directiva del líder principal se amplíe mediante la colaboración de ayudantes ejecutivos y de estado mayor.
>
> **Cualquier limitación que se le imponga al Juez Presidente que no le permita cumplir con su responsabilidad de principal dirigente, tiene que ser muy perjudicial. Asimismo será destructiva toda tendencia que no conduzca a obtener el máximo rendimiento del puesto de Director Administrativo, como el segundo eslabón en la línea ejecutiva.**

*Ibid.* (énfasis nuestro.)

Sobre las facultades administrativas del Juez Presidente, las expresiones del Comité aludido recogen diáfanamente lo que ya era desde entonces, y seguía siendo hasta el día de hoy, una concepción generalizada:

> De todas las actividades del Juez Presidente, la más importante es la dirección administrativa de la Rama Judicial, por la cual es responsable constitucionalmente. En él deben encarnar los principios y las normas fundamentales de la labor judicial en conjunción con los procedimientos administrativos de mayor eficacia. **Es él el último y único centro de convergencia para todo el sistema de administrar la justicia. Esta responsabilidad no es delegable.**

*Informe sobre la Oficina de Administración de los Tribunales* (1965) (énfasis nuestro).

Por tal razón, la dirección de la Rama Judicial "puede ser objeto de asesoramiento por parte de los jueces asociados o del Tribunal en pleno, pero no compartirse de forma colegiada". *Id.* en la pág. 6. Esta postura ha sido respaldada históricamente en la mayoría de las jurisdicciones estatales que poseen sistemas unificados como el nuestro:

> Experience in both business and government organizations has established conclusively that effective administration requires the fixing of authority and responsibility. There should be no room for doubt in anyone's mind -be he judge, lawyer, litigant, legislator or layman- who has the responsibility for making a court system work well, both at the state and the local level. This means that responsibility must be fixed both for establishing court administrative policies and for the execution of those policies....
>
> While general policy may appropriately be formulated by a group, responsibility for executing policy must be vested in an individual. Logically, the chief justice of the State's highest court should have that responsibility and authority, and in states having an integrated judicial system this is the common pattern.

A.B.A Section on Judicial Administration, *The Improvement of the Administration of Justice*, pág. 14 (1971).

A su vez, la sociedad puertorriqueña ha expresado en los pasados sesenta años esa concepción colectiva sobre la figura del Juez Presidente como único administrador, según hemos reseñado, por medio de las leyes promulgadas. A modo de ejemplo, véase la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley Núm. 201 de 22 de agosto de 2003, en cuyo Artículo 2.012, 4 L.P.R.A. Sec. 24j, dispone que el "Juez Presidente del Tribunal Supremo dirigirá la administración del Tribunal General de Justicia, será responsable del funcionamiento eficiente de los tribunales, promoverá la responsabilidad de los jueces en la ejecución de sus obligaciones judiciales y velará por el cumplimiento de los principios y objetivos de esta Ley".

Es con este trasfondo jurídico que hay que evaluar y analizar el contenido de las Resoluciones que hoy se aprueban.

## II

Con las Resoluciones de epígrafe aprobadas por una mayoría de esta Curia, las concepciones generalizadas sobre las funciones administrativas del Juez Presidente resultan truncas. La Resolución para aprobar las *Reglas de los Procedimientos de Investigaciones Especiales Independientes* indica que la investigación "se hizo bajo el aval y conocimiento del Juez Presidente ... **sin consulta ni notificación previa** al Tribunal en Pleno" (énfasis nuestro). Las preguntas que debemos hacernos al respecto

son: ¿acaso nuestra Constitución no dispone que el Juez Presidente dirigirá la administración de los tribunales?, ¿acaso no dice la Constitución que el Juez Presidente nombrará un director administrativo, quien desempeñará su cargo a su discreción?, ¿acaso nuestra Ley Suprema exige que el Juez Presidente consulte o notifique al Pleno del Tribunal sobre sus actuaciones como administrador?, ¿acaso existía al momento de ordenarse la investigación un reglamento o disposición que prohibiera al Juez Presidente o a la Directora Administrativa de los Tribunales realizar dicha investigación?  Veamos una por una.

Como se mencionó, nuestra Constitución dispone claramente que el Juez Presidente será el único administrador de los tribunales.  Tan clara es dicha disposición, que el ideario colectivo y acervo jurídico de Puerto Rico lo ha reconocido por más de sesenta años.[71]  En cuanto a la segunda interrogante, respondemos de igual manera: la propia Constitución es completamente diáfana en cuanto a ello.[72]  Sobre la tercera pregunta, si el Juez Presidente tiene la obligación de consultar al Pleno su intención de comenzar una investigación interna, es

---

[71] *Véase*, *e.g.*, *Diario de Sesiones de la Convención Constituyente* (1961); *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico* (1952); *Informe sobre la Oficina de Administración de los Tribunales*, Comité para el Estudio y Evaluación del Sistema Judicial (1965); José Trías Monge, *El sistema judicial de Puerto Rico* (1978); Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley Núm. 201 de 22 de agosto de 2003, 4 L.P.R.A. Secs. 24-25r.

[72] Más adelante retomaremos el punto sobre a quién responde la persona nombrada Directora Administrativa de los tribunales.

evidente que la Constitución no dispone eso.[73] Hacer creer, bajo la apariencia de una supuesta legalidad, que ello corresponde así, es un acto inicuo que tergiversa el texto de la Constitución para que en ésta se refleje algo que no se dijo y que nunca fue la intención de la Convención Constituyente decir.

En cuanto a la cuarta interrogante esbozada, esto es, si al momento de ordenarse la investigación algún reglamento prohibía al Juez Presidente o a la Directora Administrativa de los Tribunales realizar dicha investigación, debemos advertir que nada lo prohibía. Todo lo contrario, la Orden Administrativa OA-JP-2009-108 de 18 de mayo de 2009, emitida por el Juez Presidente Hon. Federico Hernández Denton bajo la autorización expresa de la Sección 7 del Artículo V de nuestra Constitución, dispone que entre los deberes y obligaciones de la Oficina de Administración de los Tribunales se encuentran:

> 1) **Evaluar continuamente los métodos administrativos y la eficiencia del personal** del Tribunal General de Justicia y hacer recomendaciones al(a la) Juez(a) Presidente(a) para mejorar el funcionamiento de los tribunales y las demás dependencias de la Rama Judicial.
> ....
> 8) Preparar y llevar libros adecuados de contabilidad y disponer todo lo relacionado con los procedimientos y las normas fiscales aplicables al Tribunal General de Justicia.
> 9) Tomar todas aquellas medidas necesarias y aprobar las normas y la reglamentación

---

[73] Nuevamente, consideraciones de deferencia pueden aconsejar que así se haga, pero la determinación final recae, indudablemente, sobre el administrador de la Rama Judicial: el Juez Presidente.

pertinentes relacionadas con la contabilidad y el control de la propiedad de la Rama Judicial.

....

13) Por delegación del(de la) Juez(a) Presidente(a), adquirir en cualquier forma legal; poseer, conservar, usar, disponer de cualquier bien mueble o inmueble, valor, derecho o interés en el mismo; **comparecer en los contratos y formalizar todos los instrumentos necesarios convenientes** ....

....

15) **Desempeñar cualquier otra encomienda que el Juez Presidente le delegue para la consecución de una administración óptima de la justicia.** (énfasis nuestro)

En vista de lo anterior, la prudencia intelectual y la razonabilidad llevan a concluir que al contratar con el Lcdo. César López Cintrón, la Directora Administrativa actuó dentro de sus parámetros legales y al amparo de las facultades constitucionales provistas al Juez Presidente. Hacer ver lo contrario, además de no reflejar el rigor esperado, constituye una pretensión extrajurídica e inconstitucional.

Aparte de lo anterior, una mayoría de este Tribunal induce nuevamente a error al expresar:

La Constitución ... no le reconoce a la Administración de Tribunales autoridad para realizar investigaciones disciplinarias de la conducta de los Jueces y Juezas del Tribunal Supremo. Estos solo "podrán ser destituidos por las causas y mediante el procedimiento..." de residenciamiento que la Constitución coloca en manos de la Asamblea Legislativa. Por otro lado, la facultad de investigar la posible comisión de delitos y de "hacer cumplir las leyes" recae en el Poder Ejecutivo.

Tales expresiones pretenden equiparar una investigación interna sobre la salud de los recursos de la Rama Judicial con un proceso de residenciamiento. Ambas procesos son,

independientes y disímiles. Abona a la confusión tratar de igualarlos, como igual pretende hacer la mayoría en su *Voto de conformidad* en un intento que induce a error.

De otra parte, preocupa el lenguaje utilizado en las Resoluciones aprobadas, pues denota una adjudicación judicial *a priori* para referirse a investigaciones que realizan otras ramas de gobierno sobre la figura del Juez Presidente. No podemos ignorar que "una palabra es mucho más que una palabra: es una toma de poder, un arma que permite la modificación de la circunstancia, una licencia para instalarse en el mundo". Luis Rafael Sánchez, "La generación o sea", *en El placer de leer y escribir* 405, 407-408 (2002). Las palabras que se utilizan en la Resoluciones indican que una mayoría de esta Curia ha llegado a conjeturas y conclusiones especulativas sobre los señalamientos contra el Juez Presidente. Todo ello sin haber escuchado a las partes involucradas. Este juicio adelantado es de todo punto incompatible con nuestra función de impartir justicia imparcial.[74] Si desea esta mayoría "fomentar la transparencia de los procedimientos e impulsar la confianza del Pueblo en nuestro sistema", como sostienen las Resoluciones, con tales expresiones que

---

[74] Es preciso señalar que las Resoluciones emitidas ordenan menoscabar una obligación contractual entre la Oficina de Administración de los Tribunales y el Lcdo. César López Cintrón, a pesar de la prohibición constitucional estatal y federal a tales efectos. Si bien es cierto que al día de hoy no existe relación contractual vigente entre el Lcdo. López Cintrón y la Oficina de Administración de los Tribunales, no podemos pasar por alto que las Resoluciones ordenaban menoscabar una obligación contractual vigente.

cargan el significado de una adjudicación precipitada se lacera la imagen de imparcialidad y ecuanimidad que debemos tener todos los que nos investimos con la toga de la justicia.[75]

Según hemos señalado, la Constitución provee una directriz sobre las funciones de administración de la Rama Judicial. Con las Resoluciones aprobadas la mayoría de este Tribunal intenta utilizar el subterfugio del poder de reglamentar para abolir un acto administrativo validado constitucionalmente. Es preciso esclarecer que si bien nuestra Constitución faculta unos poderes para que el Tribunal reglamente, ello no implica que se utilicen éstos para controlar o administrar la Rama Judicial. Como muy bien señala la mayoría en su escrito colectivo de conformidad, el asunto aquí en controversia es el poder. Sin embargo, omiten que se trata principalmente de la aspiración a un poder no delegado. Las Resoluciones aprobadas por quienes suscriben el *Voto de conformidad* sencillamente intentan crear confusión y apariencia de legalidad de los actos de arrogación de poder de la mayoría.[76]

---

[75] No debo pasar por alto las descalificaciones personales que se vierten en el voto colectivo de conformidad. Éstas, a mi juicio, dicen más de sus emisarios que del referente a quien se dirigen.

[76] Incluso, dice la mayoría que su expresión de conformidad responde a su obligación de *vindicar* su poder constitucional. No obstante, resulta improcedente e ilógico *vindicar* aquello que nunca se tuvo: tanto un poder constitucional como la legitimidad.

Es imperativo recordar que el deber ministerial de los Jueces Asociados es adjudicar, y en todo caso, asesorar al Juez Presidente cuando así lo solicite. Trías Monge, *El sistema judicial de Puerto Rico, supra*, pág. 222. Mas no es nuestro deber administrar la Rama Judicial en calidad de jueces presidentes, como pretende la mayoría en las dos Resoluciones y el *Voto de conformidad*.[77] De quererlo, así hubiera dispuesto la Convención Constituyente, pero todos sabemos que tal no fue su intención. *Véase Diario de Sesiones*, Tomo I, págs. 616-618.

Aparte de los dislates jurídicos mencionados que acarrean las Resoluciones de epígrafe, es harto importante señalar que una mayoría de esta Curia incide sobre la subordinación laboral que prescribe la Constitución al definir que la figura del Director Administrativo desempeñará su cargo a discreción del Juez Presidente. Esta composición binaria no acepta, y en estricta lógica inversa la Constitución lo prohíbe, que el Pleno del Tribunal Supremo dé órdenes a un oficial que constitucionalmente responde al Juez Presidente. Es por ello que la orden emitida a la Directora Administrativa, so pena de desacato, a los fines de "dejar sin efecto de manera inmediata el Contrato otorgado por la OAT al Lcdo. César López Cintrón y cualquier otra contratación relacionada a la investigación", *In re*: Designación de

---

[77] ¿Acaso la mayoría de esta Curia pretende que de ahora en adelante sea el Pleno de este Tribunal quien suscriba hasta los contratos de suministros y demás servicios? Esto, más que irrisorio, redunda en lo absurdo.

Miembros de la Comisión, es *ultra vires* y no tiene efecto jurídico ni vinculante alguno.[78]

De más está decir que igual se pone en entredicho la validez de ese desacato. Lo primero que salta a la vista es: ¿qué tipo de desacato es éste? La mayoría está actuando, por propia admisión, en su capacidad de reglamentación de los procesos administrativos, según le ha sido delegado por la Constitución. Entonces la pregunta forzada es, ¿en el contexto de un acto de reglamentación, se tiene facultad para imponer la sanción del desacato? ¿Bajo qué supuesto? Después de todo, sabemos que el desacato se considera como una herramienta coercitiva de los tribunales contra actuaciones o ausencia de actuaciones que obstruyan el ejercicio de las funciones de un tribunal **dentro de los parámetros de un procedimiento adversativo.** Santos P. Amadeo, *El poder de los tribunales en Puerto Rico para castigar por desacato*, pág. 40 (1961) ("Bajo ciertas circunstancias constituye desacato al Tribunal desobedecer las órdenes del mismo **dictadas durante el curso de un pleito civil o criminal**" (énfasis nuestro)).

Anteriormente se ha reconocido como una facultad constitucional el hecho de que los tribunales tienen un

---

[78] A pesar del argumento de la mayoría de que en la disidencia hay un "intento de **hacer creer** que este Tribunal actuó más allá de sus contornos constitucionales", *Voto de conformidad*, ER-2012-1; EN-2012-1, debemos señalar que dicho argumento carece de lógica, puesto que no se puede *hacer creer* lo ya creído por la opinión pública. Nuestra función como jueces no es *hacer creer* lo ya creído, sino denunciar con argumentos jurídicos un acto que transgrede el Estado de Derecho y la Constitución.

poder inherente para castigar vía el desacato. *Véase Ex Parte Robinson*, 19 Wall. 505 (1873); *Pueblo v. Fourquet*, 17 D.P.R. 868 (1911); *Ex Parte Bird*, 4 D.P.R. 244 (1903). No -obstante, dicho poder debe ejercerse dentro de unos márgenes de legalidad. Esto, pues no constituye desacato desobedecer una orden de un tribunal cuando el tribunal no tiene poder, de acuerdo con la ley, para dictar la orden desobedecida. *Véase* Santos P. Amadeo, *supra*, pág. 46; *Porrata v. Figueroa*, 41 D.P.R. 150 (1930). De igual manera, **tampoco constituye desacato incumplir con una orden del tribunal cuando ésta contraviene alguna disposición constitucional**. *Véase* Santos P. Amadeo, *supra*, pág. 46; *Reyes Delgado v. Corte*, 41 D.P.R. 902 (1930).

Precisamente esto último ocurrió al aprobar la Resolución sobre la designación de los miembros de la comisión especial. En tal Resolución una mayoría de este Tribunal ordenó, so pena de desacato, dejar sin efecto el contrato entre la Oficina de Administración de Tribunales y el Lcdo. César López Cintrón. Como dicha orden es inconstitucional porque constituye un acto administrativo que sólo le compete al Juez Presidente, la misma es nula y el desacato *ipso iure* también. Más aún, por tratarse de un desacato producto de un proceso de reglamentación, mas no de carácter judicial, dicho acto coercitivo resulta improcedente en Derecho.

## III

Puerto Rico hoy transita senderos oscuros. La línea entre la norma y su excepción se ha vuelto borrosa. Es por

ello que podemos decir hoy que "[e]l estado de excepción es, en este sentido, la apertura de un espacio en el cual la aplicación y la norma exhiben su separación y una pura fuerza-de-~~ley~~ actúa (esto es, aplica des-aplicando) una norma cuya aplicación ha sido suspendida". Giorgo Agamben, *Estado de Excepción*, *supra*, pág. 83 ("ley" tachado en el original). En atención a lo dicho vale recordar las palabras del profesor Efrén Rivera Ramos[79] cuando sostuvo que:

> El Tribunal Supremo depende para su legitimidad de la fuerza de sus argumentos, del respeto que susciten sus decisiones, de la acogida que logre, en su conjunto, tanto en la comunidad jurídica como entre la población general. Si ese respeto se desvanece, sufre su legitimidad. Ese respeto, sin embargo, no puede simplemente exigirse, sin más. Se lo tienen que ganar los miembros del alto foro con su proceder.

Publicado en *El Nuevo Día* el 17 de noviembre de 2010 y reproducido en *Derecho al Derecho* en la misma fecha, http://derechoalderecho.org/2010/11/17/poder-sin-legitimidad-efren-rivera-ramos/ (último acceso el 1 de febrero de 2012).[80]

El respeto de un tribunal de la más alta jerarquía, como el nuestro, se obtiene actuando dentro del marco de la

---

[79]El profesor Efrén Rivera Ramos es jurista y poeta, catedrático de la Escuela de Derecho de la Universidad de Puerto Rico. Enseña cursos de Teoría del Derecho, Derecho Constitucional, Derecho y Cultura, entre otros. Fue decano de la misma institución y es autor, entre muchas otras publicaciones, de *The Legal Construction of Identity: The Judicial and Social Legacy of American Colonialism in Puerto Rico* (APA Books, 2001). Además es miembro del Seminario en Latinoamérica de Teoría Política y Derecho Constitucional y ha recibido numerosos premios y reconocimientos.

[80] Para unas interesantísimas reflexiones sobre el rol de los jueces y las juezas en una democracia y sobre la legitimidad de las decisiones de los tribunales supremos, véase Stephen Breyer, *Making Our Democracy Work: A Judge's View*, Alfred A. Knopf (2010).

legitimidad y la legalidad. Si bien la legalidad se desarrolla dentro de un canon positivista, la legitimidad responde a valores sociales sobre la percepción que se tenga del Foro.[81]  En otras palabras, responde a consideraciones éticas (*ethos*) que tiene una sociedad sobre esta Institución.  Es por ello que la legitimidad que tiene este Foro ante nuestra sociedad se debe obtener dentro del margen de nuestra ley o Constitución, mas no tergiversando nuestro Estado de Derecho ni escudándose tras el barniz de una aparente legalidad induciendo a error como ha hecho una mayoría de este Tribunal con las Resoluciones aprobadas. La confianza de la ciudadanía queda lacerada ante tal actuación.  Se trata, más que nada, de la pérdida de lo que los antiguos romanos llamaron *auctoritas* jurídica.[82]

Así, concluyo con ánimo pesado, pues la salud de nuestra Rama Judicial se encuentra en un estado crítico y sólo hay presagios de mayores tempestades.  Las actuaciones de una mayoría de los integrantes de esta Curia vulneran nuestros entendimientos colectivos, según recogidos en la Constitución.  El alcance del hecho consumado será objeto de lamentaciones por generaciones venideras.

Hoy, más que nunca, honremos a don Miguel García Méndez recordando su llamado y comprometiéndonos

---

[81]  *Véase* Jürgen Habermas, "La desobediencia civil. Piedra de toque del Estado democrático de Derecho", en *Ensayos políticos*, pág. 51 (Ramón García Cotarelo trad., 1988).
[82]  Armando Torrent, Manual de derecho público romano (Edisofer, S.L., Zaragoza, 2002).

colectivamente a defender nuestra Constitución "con [las] uñas y con [los] dientes".[83]


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada

---

[83] *Diario de Sesiones*, Tomo IV, pág. 2472.